UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| LPD NEW YORK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 15 Civ.      (     ) |
| | ) | |
| - v. - | ) | **COMPLAINT** |
| | ) | |
| ADIDAS AMERICA, INC. and ADIDAS AG, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, LPD New York, LLC ("LPD"), by and through its attorneys, Kennedy Lillis Schmidt & English and the Law Offices of J.R. Stevenson, alleges upon information and belief as follows:

## INTRODUCTION

1.      In this action, LPD seeks to hold adidas America, Inc. and adidas AG liable for breaching their contract with LPD for the development of a fashion collaboration and for negligently or intentionally making a false oral statement about LPD by maliciously denying the existence of said collaboration to the fashion press.  Further, LPD seeks a declaration that (1) LPD did not infringe on any adidas trademark; (2) LPD owns all intellectual property rights in the LPD/adidas Collaboration Capsule discussed herein; (3) vis-à-vis LPD and adidas, LPD owns all intellectual property rights in the LPD-designed portion of the LPD/adidas Classics Capsule discussed herein; (4) LPD is free to continue to manufacture, market, and sell merchandise from the Collaboration Capsule discussed herein; and (5) adidas America, Inc. and adidas AG, through their dealings with LPD, abandoned certain adidas trademarks such that the registration of those trademarks should be cancelled pursuant to 15 U.S.C §§ 1119 and 1064.

## THE PARTIES

2.      LPD is a New York limited liability company with a principal place of business at 49 Wycoff Avenue #407, Brooklyn, New York 11237.

3.      LPD is a fashion design company.

4.      adidas America, Inc. is a Delaware corporation with a principal place of business at 5055 N. Greeley Avenue, Portland, Oregon 97217.

5.      adidas AG is a German joint stock company with a principal place of business at Postach 11230, D-91072 Herzogenaurach, Federal Republic of Germany.

6.      adidas America, Inc. directs all U.S.-based operations on behalf of adidas AG, including, *inter alia*, sales, brand marketing, product marketing, product design, public relations, distribution, contract formation, licensing of and for adidas-branded merchandise, enforcement of adidas trademarks, and quality control of adidas-branded merchandise produced under licenses of adidas trademarks.

7.      adidas America, Inc. and adidas AG, as well as any predecessors or related entities, will hereafter collectively be referred to as "adidas."

8.      adidas conducts substantial business in New York, including advertising, promoting, marketing, distributing, and selling adidas-branded merchandise.

9.      adidas derives substantial revenue from interstate and international commerce, including in New York, from both wholesale and retail sales of adidas-branded merchandise online and in brick-and-mortar stores.

**JURISDICTION & VENUE**

10.     This Court has subject-matter jurisdiction over this action pursuant to the provisions of the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

11.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1121, and 28 U.S.C. § 1338(a) because LPD's declaratory-judgment cause of action arises under the trademark laws of the United States.

12.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and LPD's damages exceed $75,000 exclusive of interest and costs.

13.     This Court has personal jurisdiction over adidas because they (1) have marketed, distributed, offered for sale, and/or sold products to persons within New York; (2) regularly transact and conduct business within New York; and/or (3) otherwise have made or established contacts within New York to permit the exercise of personal jurisdiction.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to LPD's claims occurred in this District.

**BACKGROUND**

15.     Beginning in or around July 2012, LPD designed and manufactured, amongst other products, athletic jersey-inspired tee-shirts with fashion designers' names and birth years on the back ("Signature Tees").

16.     LPD's Signature Tees were wildly popular and, together with LPD's other designs, brought LPD well-deserved acclaim as a streetwear fashion brand.

17.     Because of LPD's popularity and success, in or around August 2013, F.U.B.U. Corporation, an apparel company, offered to purchase a 51% stake in LPD for $2,000,000.

18.     Similarly, because of LPD's popularity and success, on 2 October 2013, adidas contacted LPD to "open up a line of communication in hopes of a future collaboration" between adidas and LPD.[1]

19.     Specifically, on 2 October 2013, adidas advised that it was planning a "retro remix" for five NCAA Basketball Teams (UCLA, Louisville, Kansas, Michigan, and Notre Dame) and that it hoped that LPD could design "5 unique styles for some of the most storied college basketball teams" and a "street-to-court campaign" (potentially including tee shirts, mesh jerseys, and "any other piece that would provide an[] [LPD] point of view to ensure a true collaboration") to "add[] the 'streetwear' status that [LPD's] brand has" to adidas's brand.

20.     LPD responded the same day to express its interest in collaborating with adidas on an "athletic/street crossover" collaboration.

21.     After being contacted by adidas, LPD developed (1) a series of design proposals for adidas's nominated NCAA Basketball Teams, which included prints for tee shirts,

---

[1] Unless otherwise specified, all communications between adidas and LPD referenced in this Complaint were by email.

basketball jerseys, basketball shorts, and team jackets, that could be featured with adidas's own contributions to a collaborative NCAA-Basketball-related capsule ("Classics Capsule"), and (2) a series of design proposals for basketball jerseys, tee-shirts, outerwear, jackets, hats, shorts, sports bras, lanyards, and pants for the LPD/adidas "athletic/street crossover" collaboration ("Collaboration Capsule").

22.     On 17 October 2013, LPD provided adidas its preliminary designs for prints for the Classics Capsule.

23.     The same day, adidas responded to LPD's preliminary designs by stating as follows:  "Love the graphics for the tee.  Tie into both [LPD's] brand and the school.  Really excited for these."

24.     On 17 November 2013, LPD inquired about the "execution of the collaboration, specifically how these [pieces] should/will be branded (with both LPD and Adidas logos) and how/where they will be distributed (in Adidas stores/distributors or otherwise)?"

25.     On 21 November 2013, adidas responded and advised "[t]his is a first for adidas basketball and coordinating with a fashion brand so the rules are really what we want them to be."  adidas proposed, with respect to branding and retail, as follows:

> Branding
>
> - Due to NCAA rules the uniforms can only be branded adidas.  So our actual on court product we will be badged as adidas.
>
> - There is an opportunity for co-branding on your retail pieces and our Satin Jacket.  Our designers could collab for a cool jocktag or woven label that would be badged with both logos.

- If you want to just badge your product LPD only we understand the option but we would want to at least show a true collaboration to demonstrate "court to street."

Retail

- This part is also new.  But after having [internal] discussion[s] . . . we have a few options of where we would retail

   ° Adidas.com-  Our own retail would love to feature this [as] an exclusive collection.  Your retail pieces are at a price point where we could feature our retail shorts with your retail pieces and make it an exclusive release online

   ° Your retailers- because these pieces are at a higher price point than our sales reps deal with your access to boutique and footprint accounts

   ° NYC stop-in-shop.  We would do an in-store collab where we split the store in half with your retail and some of our higher price point retail and highlight this collection but gain momentum for both brands

- Or the option of all 3.  Let me know your thought as I think we will have to write our rules because this has not happened with an actual on-court kit before.

[adidas] want[s] to start assembling team visuals where our product and your product mix.  This will allow us to get an idea of where our product mixes, what we want to co-brand, and begin presenting to retailers.

26.     The same day, LPD responded as follows:

On the branding front [LPD] would love to co-brand the collaboration items, [and] think[s] this will really bring together the brands and the visions we're bringing to life.  [LPD would] love to work on a tag or label for the items, if you or your designers have any ideas that come to mind.  Would [LPD] be able to get those from [adidas's] production so we can attach them to the items on our end?  When the time comes of course.

For retail [LPD] would love to explore all three options.  [LPD] thinks some of [its] retailers would definitely jump at the chance to carry these items, both within and outside the USA, and retailing

6

them online is a no brainer.  The stop-in-shop is an amazing idea [LPD] would absolutely *love* to be involved with.  [LPD] think[s] visuals will be crucial, and as soon as we have samples of the first approved products [LPD] can start doing visuals on [its] end. [LPD has] a great stylist who's done work for Vogue, Purple, W Mag, and a host of others – [who] came straight to mind . . . because . . . he can make really striking images that will really nicely round out the vision.

Two other questions came to mind this week too.  First, [LPD] was wondering if it would be possible to get a letter of intent for the collaboration? . . .  Second, [LPD is] starting to ramp up planning for [its] [Autumn/Winter 2014] show happening this February in NYC . . . [is] there[] some opportunity for [LPD] to use Adidas shoes in the show?  [LPD] figured it might be a nice way to begin bringing the brand association together as well as attention for each brand.

27.     The same day, adidas responded as follows:

For the labels [adidas] would love if [LPD] could work on those. [adidas's] production team could turn trim samples in about 30-45 days.  So, yes [adidas] could definitely get them through [its] production and have the available to badge the product.  As of right now [adidas's nominated] teams are aligned to wear [the adidas-designed pieces from the Classics Capsule] around 1/1.  But the retail could launch earlier, potentially before holiday time to catch sales and drive momentum.  [adidas] looks forward to visuals, as [it has] seen things from the past that were really impressive and drew [adidas] toward [LPD's] brand.

[adidas] think[s] the letter of intent is perfect . . . [and] will work on putting some of this into a document with the purpose of this along with details . . . .

Also, [adidas] would love to provide [LPD] shoes.

28.     In January 2014, adidas reiterated that it would like to collaborate on LPD's fashion show and that it would supply LPD with adidas shoes for that show and for LPD's fashion "look book" for LPD's Autumn/Winter 2014 collection.

29.   On 23 January 2014, LPD advised adidas that it would begin to have samples made from its designs for the Classics Capsule.

30.   The same day, adidas advised that Notre Dame was no longer under contract with adidas and that adidas instead needed LPD to redesign the Classics Capsule to include Indiana University.

31.   LPD accordingly developed a design for Indiana University to complete the Classics Capsule designs.

32.   In February 2014, LPD provided adidas with its "look book" for LPD's Autumn/Winter 2014 collection, which featured models wearing adidas-supplied adidas shoes.

33.   On 25 February 2014, LPD sent adidas a concept proposal for the Collaboration Capsule.

34.   On 3 March 2014, LPD advised that it would be sending adidas some tee shirt samples from its Autumn/Winter 2014 collection that illustrated some of the techniques LPD was considering using for its tee shirts for the collaboration.  LPD also sought adidas's feedback on its concept proposal for the Collaboration Capsule and again asked about a letter of intent and press strategy for the collaboration.

35.   On 11 March 2014, adidas advised that it had received LPD's concept proposal, reviewed it internally, "really like[d] the direction of the topics on the [concept proposal]," and that adidas and LPD were "all aligned to move forward."  adidas also advised as follows:

> The letter of intent is currently a work in progress, [adidas] [is] currently working on clearing all development boundaries and ex-

pecting finalized samples [for its portion of the Classics Capsule] here in the next two weeks. Of which [adidas] will send [LPD] a full set along with some other blank samples that you can embellish and potentially elevate for additional pieces. In terms of next steps let's begin to put down milestones and checklists so that we can remain connected. Thus far here are some key next steps:

1.      Send final NCAA samples to LPD ([adidas])

2.      Send blanks to LPD (will send today- [adidas])

3.      Letter of intent finalization ([Work in Progress] [adidas])

4.      Begin thoughts on partnership jock tag/label (this will be the most time sensitive in terms of our development phase- LPD)

5.      Begin artwork and silhouette finalization (LPD)

6.      Marketing/Photo-shoot/Press strategy brainstorming

Feel free to add any additional points here, [adidas] will be sending out some blanks and silhouettes today for [LPD]. In terms of press strategy [adidas] typically do[es]n't receive much marketing and exposure from our uniforms, but mainly because [adidas] ha[s] never put together a mid-season collection like this. So in terms of marketing [adidas] would obviously like to co-brand this collaboration and market it as a full on collaboration; putting some of our mainstream market exposure along with the underground street-wear respect that LPD has earned.

As we get closer to our launch date [adidas's] PR team can begin teasing product/concepts/images but [adidas] would like to lead with some of the imagery and concepts that [LPD] can produce.

36.     LPD replied the same day as follows:

Happy [LPD and adidas are] . . . on the same page so we can get things rolling! Definitely looking forward to the samples and blanks too – [LPD] thinks there are some great things [it] can do with the basic shapes and garments. Are there any specific references [adidas] ha[s] in mind for the tags other than what's in our respective [design proposals]? Just in case [LPD] should work on it in a specific way or with a specific design style. [LPD] can definitely start working on imagery as soon as [it] start[s] getting samples for everything. [LPD] figure[s] it would be good to have a

few styles of still photos paired with some video, so [LPD] can mix and match things for social and other distribution. [LPD] asks about press strategy because [it is] sure there are some great ways [LPD] can get exposure for the collab and the new Adidas-specific products since [LPD] ha[s] a solid lead time and will be working through New York Fashion Week.

[LPD] also wanted to make sure [LPD and adidas were] on the same page with sales and profits/etc - what did [adidas] have in mind for the collab?  [LPD] remember[ed] it being OK that [it] s[ell] directly online and to the stores selling LPD, but what kind of breakdown on the sales dollar side w[as] [adidas] thinking?

37.    On 12 March 2014, adidas advised:

As far as the sales and profits, on [adidas's] side our finished products [from the Classics Capsule] will be issue[d] to the teams at no cost.  We would also purchase all of the collaboration product[s] for our teams to have.  [adidas] ha[s] a licensed apparel side that would sell the game shorts and jersey's and those royalties would go to the schools.  However the capsule collection profits would likely be primarily profits to LPD.  We are seeking [LPD's] status and many of [its] creative ideas here and because a lot of our product is on court school products, the primary retail profits would come from your end.  [adidas] will have . . . to confirm this, but once the mission statement is complete those details will be in that document.

38.    On 12 March 2014, LPD responded:

OK great – thanks for the clarification. . . .  All below sound[s] good to [LPD] – just let [LPD] know the specifics and that everything is confirmed once [adidas] know[s] for sure.  [LPD has] been . . . trying to figure out the calendar for sales - do[es] [adidas] have a preference if [LPD] start[s] selling according to the fashion calendar or not?  For [LPD] to capitalize best on buyers [LPD] think[s] it would be best to start selling during men's and women's market weeks, which is from July through August (roughly).  The buyers could sign non-disclosure agreements so [LPD could] make sure nothing about the collab leaked until [adidas] [was] ready to go ahead and publicize.

39.    On 31 March 2014, LPD advised adidas that it was making arrangements

for pattern making and sampling for the Classics and Collaboration Capsules' pieces and asked

if adidas would cover the costs associated with this process in the first instance or if LPD should cover them first and then get reimbursed from adidas.

40.     The same day, adidas advised that it would pay for pattern making and sampling the Classics and Collaboration Capsules' pieces and that adidas would provide a "budget code" to be charged for those costs.

41.     The same day, LPD asked adidas whether LPD would be manufacturing the Classics and Collaboration Capsules' pieces or whether adidas would arrange production via its usual manufacturers in China.

42.     The same day, adidas replied that the Classics and Collaboration Capsules' pieces could be manufactured in adidas facilities, with the production lots sold directly by LPD or by adidas (applying adidas's royalty coding so LPD "could receive the dollar sales").

43.     The same day, LPD replied that it would arrange sales to its particular customers (as opposed to adidas's wholesale customer base) and proposed showing the collaboration to fashion buyers around Men's New York Fashion Week (July 2014) and then announcing the collaboration during Women's New York Fashion Week (September 2014).

44.     On 16 April 2014, adidas advised that it "would have no issue with [LPD] selling in [sic] this product in July [2014], [adidas's] sales team will begin [its] uniform sales [from adidas's portion of the Classics Collaboration] around the same period of time. [adidas] think[s] the key important steps are nailing down the final products, and determin[ing] selling strategy which [adidas] feels is [LPD's] world considering [adidas's] sales people typically deal with large wholesale vendors . . . ."

45.      On 28 April 2014, adidas advised that it had received the samples LPD sent from its Autumn/Winter 2014 collection.

46.      On 29 April 2014, adidas supplied the budget code it promised to provide to cover the costs of pattern making and sampling for the Classics and Collaboration Capsules.

47.      On 21 May 2014, LPD advised adidas that LPD's pattern-and-sample maker did not accept adidas's budget code for billing purposes, that LPD had to accordingly pay pattern making and sampling costs, and that LPD was seeking reimbursement from adidas because adidas had agreed to cover those costs.

48.      In early June 2014, LPD advised adidas that LPD had begun discussing the Classics and Collaboration Capsules with fashion buyers and that it would need to start finalizing sales in the near future.

49.      On 11 June 2014, LPD advised adidas that rap mogul, Jay-Z, was interested in pieces from the Collaboration Capsule for use on his *On the Run* Tour.

50.      On 12 June 2014, adidas advised LPD that there has been a "large realignment within [its] group so many of [adidas's] projects ha[d] been put on hold." "However, [adidas] still want[s] to see [its] project [with LPD] come to life." To do so, adidas advised as follows:

> 1. Regarding art for capsule collection. Is it possible to have art sent over so [adidas] can [internally review] to make this a priority. But with only [LPD's current] proposal and some [LPD] samples [from LPD's Autumn/Winter collection] it is difficult to get this momentum going. Also it is imperative for the teams to see [the Classics Capsule designs] so they can agree and sign off. So if you could pro-

vide pricepoint information or any further info on the proposed collection this would be helpful.  From there [adidas] will be able to get the invoice for samples and get that taken care of i[f] our budget code did not work. . . .

2. Sales.  [LPD] [is] free to show whatever materials at [LPD's] sale show as long as the team identities are kept confidential.  We can begin to tease the [Classics] project once we have art/samples for teams to see and approve.  But [adidas] does not want to hold up any of [LPD's] business planning or strategy so by all means please begin sharing as long as we keep teams confidential.

3. Development and Timelines.  If we are going to potentially build a jocktag or lockup logo, we would just need to build and confirm that artwork asap, to avoid any delays.  As our development is typically on extended timelines and for Holiday 14 we would need to begin developing now.

4. [adidas] thinks the Jay-Z opportunity is great.  [I]t would be great to potentially include pieces from the [Collaboration] capsule collection.

5. Samples.  [adidas's] samples [of the pieces it designed for the Classics Capsule] are finalized and ready.  Should [adidas] send them out to [LPD] to help as sell in [sic] tools?  Also, did [LPD] still want to oversee advertising/photo shoot moments?

Over the next few weeks let's connect back and forth over email to confirm dates, details.  [adidas] is extremely excited about this [collaboration] but there has been some delay due to some changes.  But let's bring this to life.  [adidas and LPD] spoke for the first time with the mission of bringing together a "Court to street" collection and we still have that amazing opportunity to collaborate between [LPD's] successful streetwear brand, [adidas's] 5 best NCAA schools, and adidas.

    51.    On the same day, LPD responded that it remained excited about the possibilities presented by the LPD/adidas collaboration, that it would like some feedback with respect to a co-branded logo/jocktag, and that it would be putting together its design proposal for the Collaboration Capsule, which would "outlin[e] the capsule styles, fabrics, inspiration, and all other relevant info."  As for price point, LPD advised that it was "hard to pin down exactly

since it depends on production (specifically whether [LPD is] producing the pieces here or at [adidas's] facilities abroad and how many units of each style are ordered), but [LPD] is making sure that it hits a lower price point then [sic] the main collection as much as possible."  LPD also advised, "before [LPD] can do anything [it] needs some sort of confirmation that the collaboration between adidas and LPD will be happening and that any designs meant for this collaboration will be kept confidential for these purposes."

52.    On 16 June 2014, adidas advised that, for its prior collaborations, adidas had "simpl[y] lock[ed] up logo's [sic] with an 'x' representing the collaboration," so LPD could do the same for the Classics and Collaboration Capsules' jocktags/logo.  adidas also advised that none of LPD's designs would be shared and that the collaboration would only be confirmed once adidas was "100% on board" at which time it would dedicate more funding for the collaboration.

53.    On 18 June 2014, LPD sent to adidas its design proposal for the Collaboration Capsule, which incorporated various adidas trademarks, and advised that it was designing a collaboration logo/jocktag based on adidas's feedback.  LPD also sought to confirm whether – assuming the collaboration was green lighted – the Classics and Collaboration Capsule pieces would be produced by LPD or by adidas at factories (as that decision would impact pricing).

54.    On 26 June 2014, adidas advised that it "fe[lt] very strongly about the [design proposal] [LPD] sent over," that adidas's upper management approved the designs, and that adidas gave its "permission to move forward" with the collaboration.  adidas asked LPD to "[p]lease move forward with all [LPD] sales propositions as [adidas] do[es]n't want to hold up

any of [LPD's] timelines."  adidas also stated, "once [LPD's] product is lined up next to [adidas's] we have a solid collection."

55.     On 27 June 2014, LPD assured adidas that it would move forward in time for sales in July 2014 during men's market week and in preparation for the main season market in September 2014.

56.     On 30 June 2014, adidas sent LPD samples of adidas's portion of the Classics Capsule to be used by LPD as selling tools in the promotion of the LPD/adidas collaboration.

57.     Once LPD received samples of adidas's portion of the Classics Capsule, it began offering them for sale to LPD's buyers together with LPD's own contribution to the Classics Capsule and the full Collaboration Capsule.

58.     On 11 July 2014, LPD again asked adidas to reimburse it for the pattern making and sample production costs that LPD covered and that adidas agreed to pay.

59.     On 14 July 2014, LPD advised adidas that it had received a great response from buyers and the fashion press and that it was interested in discussing "promotion/release/distribution/etc soon so [LPD and adidas] could start directing people to the right outlets."

60.     The same day, adidas reiterated to LPD that it would pay the pattern making and sample production costs LPD incurred and that it would have an internal meeting to further discuss the LPD/adidas collaboration to establish a marketing budget and promotional

plan.  In doing so, adidas reiterated that it "had enough signoff . . . to continue to push through and continue on with the collab."

62. The same day, LPD advised that it had produced the adidas/LPD logo/jocktag ("adidas x LPD" (in the companies' respective trademarked script) as proposed by adidas), that it had received samples from the Collaboration Capsule designs, and that it would provide adidas with pictures of said samples.

62. On 17 July 2014, adidas confirmed that "we are a full go for this collaboration!" and asked to discuss, *inter alia*, "Marketing/Promotion- needs/wants/concepts."

63. On or about 18 July 2014, LPD discussed marketing and promoting the LPD/adidas collaboration with adidas by telephone.  During their call, LPD and adidas agreed (as they previously had), *inter alia*, that LPD would start producing marketing materials (including images and video) for the collaboration and distribute those materials to the fashion press to promote the collaboration.

64. On 22 July 2014, LPD advised adidas that it had begun photo shoots for the Collaboration Capsule.

65. On or about 29 July 2014, LPD provided adidas with photos from LPD's photo shoots for the Collaboration Capsule.

66. On 31 July 2014, adidas confirmed its receipt of LPD's photos of the Collaboration Capsule and advised that "the product looks awesome" and that adidas "was excited about [the collaboration] all coming together."

67.     On 15 August 2014, LPD advised adidas that New York Fashion Week was coming up and that it needed to market and promote the collaboration around that time to maximize sales.

68.     On 25 August 2014, LPD provided adidas with updates respecting its efforts to publicize the LPD/adidas collaboration and the Classics and Collaboration Capsules.

69.     On 8 September 2014, LPD advised adidas that LPD had begun women's sales and that men's sales would begin once adidas provided wholesale pricing information for adidas's pieces from the Classics Capsule.  LPD also advised that it had coordinated with the following publications and that it expected the LPD/adidas collaboration to be featured in each: Teen Vogue, Glamour, Allure, HighSnobiety (print), Paper Magazine, Interview Magazine, Huge Magazine, Brutus Magazine, GQ (U.S. and Japan), EyeScream, and Vogue (Japan).   LPD also advised that its marketing efforts continued and that it had been invited to various press events in the U.S. and in Japan to promote the LPD/adidas collaboration.

70.     In September 2014, LPD received an order for tee shirts from its portion of the Classics Capsule.  As will be discussed *infra*, LPD would later decide not to fill this order.

71.     On 16 September 2014, adidas responded with the pricing information LPD needed for adidas's pieces from the Classics Capsule and an update on adidas's roll out of those pieces.  adidas reiterated that it was "still very excited about working with [LPD] and pushing the [Collaboration] capsule side of the collection and still co-merchandising and advertising" and further advised that, "[w]ith basketball season right around the corner, [adidas] [is]

gearing up for some of these upcoming platforms and this collab is still at the top of [adidas's] list for NCAA basketball."

72.     Between 3 September 2014 and 23 September 2014, LPD promoted the LPD/adidas collaboration and sought to take sales orders for pieces from the Classic and Collaboration Capsules at, and in connection with, Women's New York Fashion Week.

73.     Between 25 September 2014 and 1 October 2014, LPD travelled to Paris, France to promote the LPD/adidas collaboration and to take sales orders for the Classics and Collaboration Capsules at, and in connection with, Women's Paris Fashion Week.

74.     At no point after green lighting the LPD/adidas collaboration did adidas limit in any way or otherwise provide instructions or restrictions to LPD on the extent of LPD's authority to market and promote the Classics and Collaboration Capsules.

75.     Between September and November 2014, LPD continued to publicize the LPD/adidas collaboration, take sales orders for pieces from the Classics and Collaboration Capsules, and make arrangements for the LPD-designed pieces from the Classics Capsule and all the pieces from the Collaboration Capsule to be manufactured to fill LPD's customers' orders.

76.     As part of its efforts to publicize the LPD/adidas collaboration, LPD produced a marketing video for the Collaboration Capsule that, while provocative, was in line with LPD's marketing efforts for its prior collections and industry practice in general.  The edited video (see Paragraph 88, *infra*) is available at https://vimeo.com/111841563.

77.     On 4 November 2014, V Magazine, a fashion publication that had previously publicized LPD's prior collections, proposed that LPD exclusively feature the full Collaboration Capsule in its magazine.

78.     On 5 November 2014, LPD agreed to provide V Magazine the exclusive story on the Collaboration Capsule.

79.     On or about 19 November 2014, V Magazine published its exclusive story on the Collaboration Capsule on the main page of its website.

80.     On 20 November 2014, a Senior Editor from V Magazine contacted LPD to advise that an adidas representative claimed during a telephone call that the LPD/adidas collaboration was "illegitimate" – essentially claiming that LPD was advertising, manufacturing, and selling fake adidas apparel.

81.     adidas's claim that the LPD/adidas collaboration was "illegitimate" was untrue, and adidas knew it was untrue.

82.     Because adidas falsely claimed that the LPD/adidas collaboration was "illegitimate," V Magazine pulled its story on the Collaboration Capsule.

83.     On 20 November 2014, LPD asked V Magazine's Senior Editor to connect it with the adidas representative that claimed the LPD/adidas collaboration was illegitimate, and said Editor did so.

84.     The same day, LPD contacted the adidas representative that claimed the LPD/adidas collaboration was illegitimate and advised who LPD was working with at adidas,

explained that LPD had been working on the Classics and Collaboration Capsules for a year at that point, and noted that adidas had "signed off on [the Classics and Collaboration Capsule] as a whole and the individual designs."  While the adidas representative responded and promised to contact LPD to discuss the situation, he did not.

85.    The same day, LPD also wrote the following to adidas: "[LPD] just got an email from V Magazine saying that someone from Adidas PR called them to alert them the collaboration is illegitimate.  Can [adidas] shed some light on this?  Last we spoke [adidas] said we were all good to go and continue with sales/press/etc from our standpoint."

86.    The same day, adidas replied as follows:

The press of the collaboration was brought to [adidas's] attention today.  The original pitch was to collaborate on bringing light to our NCAA Classics Concept.  [adidas] feel[s] as though this took another route and with no knowledge of the press being put out or no visibility to what was being shown . . . our PR group raised some flags.

[adidas and LPD] have not been able to connect in quite some time and with [the previous adidas executive] who approved this [project] leaving, we were left on an island without much material to present to the new [adidas] management.  [adidas] did provide initial green lights to proceed but all content needed to be approved by [adidas's] higher ups.

[I]f [LPD] provide[s] . . . some marketing tools & materials . . . [that would] help the case.  Please send those over . . . asap so [adidas] can discuss [internally].

Are there any of the NCAA properties being used on any of the products?

87.    The same day, LPD responded as follows:

[LPD] know[s] the initial pitch was based on the NCAA Classics Concept, but [] thought everything was agreed upon and green lit

for the [Collaboration] capsule as [LPD] designed it. When [adidas] alerted [LPD] of the change in management months ago, [LPD] made sure [it] sent [adidas] revised and updated proposals with all the designs, tech packs, and flats included for [adidas] to review. Last we spoke, [adidas] said everything looked great, [it] w[as] excited about [the collaboration], and were on board for the [press] events [LPD] had mentioned previously. [LPD] [is] just confused as to how this could be happening now, when everything had been given the green light and [LPD is] leaving for Tokyo next week to do press for the [Collaboration] capsule (invite attached below).

[LPD] [is] re-sending everything [it] ha[s] in regards to marketing materials [to adidas] . . . though they're all things [adidas] ha[s] received before. Please let [LPD] know ASAP how this can be resolved . . . .

88.     On 21 November 2014, adidas wrote the following to LPD:

Thank you for your response.

Our PR team is pretty unhappy now due to the lack of knowledge they had about the material being put out. Also the content was somewhat polarizing so this caused some further disruption.

From [adidas's] side the products are good to go, but they ask is that the video including the "nudity" must be taken down. We may also run into an issue with any products with our NCAA properties names used on it. We may be able to have a promotional opportunity with those to put on court but selling those without royalties could cause issues. We are walking a fine line but because [adidas] gave approval adidas is willing to allow this to go forward but we are just trying to avoid any legal issues.

[adidas] will need this content to stop being produced ASAP or our legal department will take action. Unfortunately the content has rubbed our higher ups the wrong way due to the content.

89.     After receiving the message discussed in Paragraph 88, *supra*, LPD replaced the original marketing video that adidas objected to with a slightly edited version and advised V Magazine that adidas had confirmed the legitimacy of the LPD/adidas collaboration. Despite this, V Magazine refused to republish the story on the Collaboration Capsule, refused to

provide any publicity on the LPD/adidas collaboration (or on LPD since), and – upon information and belief – disseminated adidas's false allegation to others in the fashion press and industry.

90.     From 28 November 2014 through 7 December 2014, LPD travelled to Tokyo, Japan to promote and takes sales orders for the Collaboration Capsule.

91.     In December 2014, LPD continued to attempt to publicize the LPD/adidas collaboration and market pieces from the Collaboration Capsule, continued to take sales orders for those pieces, and manufactured (via various independent non-adidas manufacturers) pieces from the Classics and Collaboration Capsules to fill the sales orders it had taken to date.

92.     To date, adidas has not inspected the quality of the samples or pieces from the Classics and Collaboration Capsules that LPD manufactured and sold to customers.

93.     To date, adidas has not publically acknowledged the legitimacy of the LPD/adidas collaboration and has not marketed and publicized the LPD/adidas collaboration or the Classics and Collaboration Capsules as it had agreed.

94.     To date, LPD continues to market and sell pieces from the Collaboration Capsule and intends to continue to manufacture, market, and sell those pieces.  LPD, however, decided not to fill orders for the pieces it manufactured from its portion of the Classics Capsule and retains those pieces, fully reserving its rights therein.

95.     In January 2015, one of LPD's Japanese customers, which had ordered pieces from the Collaboration Capsule, advised LPD that it doubted the legitimacy of the

LPD/adidas collaboration (because adidas never publicly acknowledged it and presumably because V Magazine disseminated adidas's false allegation that the collaboration was illegitimate) and, accordingly, refused to pay for the pieces that it had ordered.

96.     To address this issue, on 15 January 2015, LPD requested that adidas provide a letter confirming the legitimacy of the LPD/adidas collaboration.

97.     On 3 February 2015, adidas provided a brief letter that stated that LPD and adidas had collaborated.

98.     LPD provided adidas's 3 February 2015 letter to its Japanese customer, but that customer rejected it and requested further assurances from adidas that LPD was authorized to sell pieces from the Collaboration Capsule.

99.     In an attempt to satisfy its customer, LPD again contacted adidas in April 2015 to request a specific confirmation that adidas had authorized LPD to sell pieces from the Collaboration Capsule.

100.    In May 2015, adidas proposed that LPD sign a back-dated licensing agreement ("dated" 1 June 2014) that acknowledged LPD's right to "use the adidas name and the Three-Stripes trademark (collectively 'adidas trademarks')" but sought to limit that right to the Classics and Collaboration Capsule pieces LPD had already manufactured to date – provided LPD paid 10% royalties on its sales to adidas.  The proposed back-dated licensing agreement also sought to terminate LPD's right to manufacture and sell pieces from the Classics and Collaboration Capsules on 1 May 2015.

101.    Because adidas's proposed back-dated licensing agreement did not comport with LPD's and adidas's original agreement, LPD refused to sign it.

102.    While adidas has never demanded that LPD stop marketing, manufacturing, or selling the Classics or Collaboration Capsules' pieces, after LPD refused to sign the proposed back-dated licensing agreement and sought reimbursement for the pattern making and sampling costs adidas repeatedly agreed to pay, adidas threatened to sue LPD for trademark infringement.

103.    As such, there is a substantial and continuing controversy between LPD and adidas, and a declaration of the parties' respective rights is both necessary and appropriate.

**FIRST CAUSE OF ACTION:  BREACH OF CONTRACT**

104.    LPD repeats and realleges the matters set forth in Paragraphs 1 through 103 with like force and effect as if fully set forth at length herein.

105.    Through their oral and written exchanges, LPD and adidas formed a contract ("Contract") under which, *inter alia*, (1) LPD agreed (a) to design the Classics and Collaboration Capsules, which consisted (in whole or in part) of pieces containing certain adidas trademarks, (b) co-market and co-promote those Capsules, (c) co-produce pieces from those Capsules, (d) and co-sell the pieces from those Capsules; and (2) adidas agreed (a) to allow LPD to use certain adidas trademarks without restriction, (b) agreed to fund pattern making and sample production costs for the Classics and Collaboration Capsules, (c) agreed to co-manufacture the Classics and Collaboration Capsules' pieces in adidas manufacturing facilities, (d) agreed to co-market and co-promote the Classics and Collaboration Capsules, and (e) agreed to co-sell pieces from the Classics and Collaboration Capsules.

106.    LPD exchanged with adidas the following consideration for the formation of the Contract:  (1) designing the Classics and Collaboration Capsules, (2) lending the street-wear status LPD's brand had and has to adidas's brand, (3) co-marketing and co-promoting the Classics and Collaboration Capsules, (4) manufacturing pieces from the Classics and Collaboration Capsules, and (5) co-selling pieces from the Classics and Collaboration Capsules.

107.    adidas exchanged with LPD the following consideration for the formation of the Contract:  (1) authorizing LPD to use certain adidas trademarks without restriction, (2) agreeing that LPD would recoup all profits earned from sale of pieces from the Collaboration Capsule, (3) agreeing to co-market and co-promote the Classics and Collaboration Capsules, (4) agreeing to co-manufacture pieces from the Classics and Collaboration Capsules, and (5) agreeing to co-sell pieces from the Classics and Collaboration Capsules.

108.    LPD performed all of its obligations under the Contract by designing, marketing, promoting, manufacturing, and selling pieces from the Collaboration Capsule and by designing, marketing, promoting, and manufacturing pieces from the Classics Capsule.

109.    adidas breached the Contract by, *inter alia*, (1) authorizing LPD to use certain adidas trademarks without restriction and later claiming that the LPD/adidas collaboration was illegitimate and claiming that LPD infringed on adidas trademarks, (2) failing to fund pattern making and sample production costs for the Classics and Collaboration Capsules, (3) failing to manufacture the Classics and Collaboration Capsules' pieces in adidas manufacturing facilities, (4) failing to co-market and co-promote the Classics and Collaboration Capsules, and (5) failing to co-sell pieces from the Classics and Collaboration Capsules.

110.    adidas's breaches of the Contract directly and proximately caused LPD to suffer damages in an amount in excess of $50,000,000 to be determined at trial.

## SECOND CAUSE OF ACTION:  DEFAMATION

111.    LPD repeats and realleges the matters as set forth in paragraphs 1 through 110 with like force and effect as though fully set forth at length herein.

112.    adidas's oral statement that the LPD/adidas collaboration was "illegitimate" was false and without basis in fact.

113.    adidas published this false allegation to V Magazine and, perhaps, others.

114.    adidas's false statements negatively reflect on LPD's professional reputation and character.

115.    adidas's false statement was made with knowledge that it was false or with reckless disregard of whether it was false.  That is, adidas's false statement was made with actual malice.

116.    As a consequence of adidas's false statement, LPD suffered and continues to suffer injury, the extent of which will have to be determined at trial.

**THIRD CAUSE OF ACTION: DECLARATORY JUDGMENT CONFIRMING THAT: (1) LPD DID NOT INFRINGE ON ANY ADIDAS TRADEMARK; (2) LPD OWNS ALL INTELLECTUAL PROPERTY RIGHTS IN THE COLLABORATION CAPSULE; (3) VIS-À-VIS LPD AND ADIDAS, LPD OWNS ALL INTELLECTUAL PROPERTY RIGHTS IN THE LPD-DESIGNED PORTION OF THE CLASSICS CAPSULE; (4) LPD IS FREE TO**

**MANUFACTURE, MARKET, AND SELL MERCHANDISE FROM THE COLLABORATION CAPSULE; AND (5) ADIDAS ABANDONED ALL OF THE ADIDAS TRADEMARKS LPD USED IN THE COLLABORATION CAPSULE**

117.   LPD repeats and realleges the matters as set forth in paragraphs 1 through 116 with like force and effect as though fully set forth at length herein.

118.   Because adidas threatened to sue LPD for trademark infringement, there is a substantial and continuing controversy between LPD and adidas, and a declaration of the parties' rights is both necessary and appropriate.

119.   adidas expressly and/or implicitly authorized LPD to use certain adidas trademarks without restriction.

120.   Therefore, LPD did not infringe on said adidas trademarks when it designed, marketed, promoted, manufactured, and sold merchandise bearing adidas trademarks.

121.   adidas did not exercise any control or supervision of LPD's use of the adidas trademarks LPD used in the Classics and Collaboration Capsules.

122.   Specifically, adidas did not retain a contractual right to (1) control the quality of the Classics and Collaboration Capsules' samples or pieces, (2) dictate product specifications for the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks, (3) monitor LPD's manufacturing of the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks, (4) to inspect the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks, or (5) otherwise supervise or control any aspect of the quality of the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks.

123.    Additionally, adidas did not actually (1) control the quality of the Classics and Collaboration Capsules' samples or pieces, (2) dictate product specifications for the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks, (3) monitor LPD's manufacturing of the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks, (4) inspect the Classics and Collaboration Capsules' samples or pieces marked with adidas trademarks, or (5) otherwise supervise or control any aspect of the quality of the Classics and Collaboration Capsules' samples or pieces LPD manufactured that were marked with adidas trademarks.

124.    In sum, adidas failed to play a meaningful role in supervising or controlling LPD's use of the adidas trademarks used in the Classics and Collaboration Capsules.

125.    Therefore, adidas abandoned the trademarks it authorized LPD to use in the Classics and Collaboration Capsules, and those trademarks should be cancelled pursuant to 15 U.S.C §§ 1119 and 1064.

**FOURTH CAUSE OF ACTION:  UNJUST ENRICHMENT**

126.    LPD repeats and realleges the matters as set forth in paragraphs 1 through 125 with like force and effect as though fully set forth at length herein.

127.    By marketing and promoting adidas's contribution to the Classics Capsule, LPD conferred a substantial benefit on adidas.

128.    adidas has failed to compensate LPD for marketing and promoting adidas's contribution to the Classics Capsule.

129.    Therefore, adidas has been unjustly enriched by profiting from LPD's marketing and promoting efforts at LPD's expense.

130.    It would be against equity and good conscience to permit adidas to retain the benefits conferred on adidas by LPD without adidas paying just compensation therefor.

131.    By reason of the foregoing, this Court should direct that the disgorgement of all adidas profits, to be determined at trial, earned from adidas's sales of pieces from adidas's portion of the Classics Capsule.

## PRAYER FOR RELIEF

WHEREFORE, LPD respectfully requests the Court enter judgment as follows:

A.    In LPD's favor awarding it damages in the amount (to be determined at trial but in excess of $50,000,000) required to put LPD in the same position in which it would have enjoyed had adidas not breached the Contract;

B.    In LPD's favor awarding it damages in an amount to be determined at trial required to account for adidas's negligent, intentional, or malicious publication of a false statement about LPD;

C.    In LPD's favor declaring that LPD's past, present, and future manufacturing, marketing, uses, offers for sale, sales, importation, and/or exportations of all existing and future adidas/LPD co-branded merchandise have not infringed, do not infringe, and would not, if marketed and sold, infringe or induce or contribute to the infringement by others of any of the adidas's trademarks contained in said merchandise;

D.      In LPD's favor declaring that LPD owns all intellectual property rights in the Collaboration Capsule;

E.      In LPD's favor declaring that, vis-à-vis LPD and adidas, LPD owns all intellectual property rights in the LPD-designed portion of the Classics Capsule;

F.      In LPD's favor declaring that adidas abandoned the trademarks it authorized LPD to use in the Classics and Collaboration Capsules;

G.      In LPD's favor awarding LPD punitive damages for adidas's malicious conduct;

H.      In LPD's favor disgorging all profits adidas earned from sales of adidas's contribution to the Classics Capsule;

I.      In LPD's favoring awarding LPD interest on its damages, its costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 (or on any other authorized ground);

J.      In LPD's favor awarding LPD such other relief that the Court deems just and proper under the circumstances.


**DEMAND FOR JURY TRIAL**

LPD demands a trial by jury in this action of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  New York, New York
       November 5, 2015

KENNEDY LILLIS SCHMIDT & ENGLISH
Attorneys for Plaintiff
LPD NEW YORK, LLC


By:  s/ John T. Lillis
John T. Lillis Jr.
75 Maiden Lane – Suite 402
New York, New York  10038-4816
Telephone:  212-430-0800


LAW OFFICES OF J.R. STEVENSON
Attorneys for Plaintiff
LPD NEW YORK, LLC


By:  s/ J.R. Steveson
J.R. Stevenson
75 Maiden Lane – Suite 402
New York, New York  10038-4816
Telephone:  (212) 939-7588