UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| LPD NEW YORK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 15-cv-06360-MKB-RLM |
| | ) | |
| - v. - | ) | |
| | ) | |
| ADIDAS AMERICA, INC. and ADIDAS AG, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ADIDAS AMERICA, INC.'S MOTION TO DISMISS

JOHN T. LILLIS, ESQ.
NATHAN T. WILLIAMS, ESQ.
KENNEDY LILLIS SCHMIDT & ENGLISH
75 Maiden Lane, Suite 402
Tel: 212.430.0800

J.R. STEVENSON, ESQ.
LAW OFFICES OF J.R. STEVENSON
75 Maiden Lane, Suite 402
Tel: 212.939.7588

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES...........................................................................................iii

I. PRELIMINARY STATEMENT ..........................................................................1

II. CORRECTING ADIDAS'S MISREPRESENTATIONS
OF THE FACTS ASSERTED IN LPD'S COMPLAINT...........................................2

    A. *adidas and LPD Agreed to Material Terms and
Manifested their Intent to be Bound to an Agreement*......................................3

    B. *The Parties Agreed to Move Forward without Memorializing
their Agreement in a Final Document* ..............................................................4

    C. *adidas Authorized LPD to Develop Promotional Photos
and Videos for the Collaboration and to Proceed with
Sales of Collaboration Merchandise* ...............................................................5

    D. *adidas Never Instructed LPD to Stop Selling or Marketing
Collaboration Capsule Merchandise* ...............................................................8

III. ARGUMENT .....................................................................................................9

    A. *LPD Sufficiently Plead All of Its Causes of Action* .........................................9

    B. *The Material Terms of the Parties' Contract
Are Sufficiently Definite* ..............................................................................10

        1. *adidas May Not Disavow Its Contractual Obligations by
Claiming the LPD-adidas Contract Omits Purported
"Material Terms" that adidas Never Saw Fit to Address
during Negotiations* ..........................................................................11

        2. *The LPD-adidas Contract Addresses Nearly All the Terms
adidas Claims Are Material* ...............................................................12

            a. *Price, Profit Sharing, Royalties &
Merchandise Pricing* ..............................................................12

            b. *Branding, Trademarks & Logos*............................................14

            c. *Marketing and Advertising* ....................................................15

            d. *Cost Sharing* .........................................................................16

            e. *Distribution* ..........................................................................16

3.  *Although LPD and adidas Did Not Expressly Address Duration of Their Contract During Negotiations, New York Law Fills that Gap* ...........................................................17

C.  *Even If Certain Material Terms Were Not Sufficiently Definite, adidas Should Still Be Held to those That Were Because It Assented to the Parties' Contractual Objective and Manifested Its Intent to be Bound* ......................................................17

D.  *adidas Should be Estopped from Claiming that the Contract Fails for Indefiniteness Because It Manifested its Intent to Be Bound and allowed LPD to Perform* ...................................20

E.  *Alternatively, Even if the adidas-LPD Contract is Unenforceable for Indefiniteness, LPD Is Still Entitled to Recover Its Damages from adidas under Quasi-Contractual Theories of Liability* .......................21

F.  *LPD's Defamation Claim Is Not Dependent on Its Breach of Contract Claim* ........................................................23

G.  *adidas Authorized LPD to Use Its Trademarks; Therefore, LPD Did Not Infringe on Them and adidas Abandoned Them, So Such That They Should Be Cancelled Pursuant to 15 U.S.C §§ 1119 and 1064* .........................................24

CONCLUSION .........................................................................25

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                          <u>Pages</u>

*Amscan Inc. v. Shutter Shades, Inc.*,
No. 13-CV-1112, p. 8 (S.D.N.Y. Apr. 30, 2015) ..................................................25

*Apex Oil Co. v. Vanguard Oil & Serv. Co.*,
760 F.2d 417, 422 (2d Cir. 1985) ........................................................................20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 555 (2007) ....................................................................................10

*Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. (5 Otto) 269, 273, 24 L. Ed. 410 (1877) ............20

*Cent. Mfg., Inc. v. Brett*,
492 F.3d 876, 883 (7th Cir. 2007) .......................................................................25

*Chadirjian v. Kanian,* 123 A.D.2d 596, 598, 506 N.Y.S.2d 880, 882 (2d Dep't 1986) ........22

*Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*,
No. 87 Civ. 6294 (MJL), 1988 U.S. Dist. LEXIS 4422,
at *5-6 (S.D.N.Y. May 10, 1988) ........................................................................17

*Cobble Hill Nursing Home v. Henry & Warren Corp.*,
74 N.Y.2d 475, 483, 548 N.E.2d 203, 548 N.Y.S.2d 920 (1989) .....................................10-11

*Core-Vent Corp. v. Implant Innovations, Inc.*,
53 F.3d 1252 (Fed. Cir. 1995) .............................................................................12

*Dawn Donut Co. v. Hart's Food Stores, Inc.*,
267 F.2d 358, 367 (2d Cir. 1959) ....................................................................... 25

*Ditri v. Coldwell Banker Residential Affiliates, Inc.*,
954 F.2d 869, 873 (3d Cir. 1992) ........................................................................25

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*,
804 F.2d 787, 793 (2d Cir. 1986) .....................................................................21-22

*Inamed Corp. v. Kuzmak*,
275 F. Supp. 2d 1100 (C.D. Cal. 2002) ................................................................11

*LaPorto v. Village of Philmont*,
39 N.Y.2d  7 (1976) ..........................................................................................20

*Merrill Lynch Interfunding, Inc. v. Argenti*,
155 F.3d 113, 122 (2d Cir. 1998) ..........................................................................1

*R.G. Group, Inc. v. Horn & Hardart Co.,*
751 F.2d 69, 75-76 (2d Cir. 1984)..........................................................................19

*Rothschild v. Title Guar. & Trust Co.,*
204 N.Y. 458 (1912).............................................................................................21

*Seiden Associates, Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 39 (S.D.N.Y. 1991)..........22

*Simmons v. Westwood Apts. Co.,*
261 N.Y.S.2d 736 (1965), *qff'd.,* 271 N.Y.S.2d 731 (1966)..............................................21

*Teachers Ins. and Annuity Assoc. v. Tribune Co.,*
670 F. Supp. 491, 498 (S.D.N.Y. 1987) ..............................................................11

<u>Statutes</u>

15 U.S.C § 1064 ..............................................................................................24-25

15 U.S.C § 1119 ..............................................................................................24-25

<u>Other Authorities</u>

BLACK'S LAW DICTIONARY,
1608 (9th ed. 2009) .............................................................................................11

Plaintiff, LPD New York, LLC ("LPD"), through its undersigned attorneys, respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss of adidas America, Inc. ("adidas").

## I.   PRELIMINARY STATEMENT

In this action, LPD seeks to hold adidas liable for breaching its agreement with LPD for the development of a fashion collaboration (that was proposed by adidas) and for making false statements regarding LPD to the fashion press which caused LPD significant financial and reputational damages.  In its Memorandum of Law in Support of Defendant adidas America, Inc.'s Motion to Dismiss the Complaint (the "adidas Memorandum"), adidas primarily argues that its contract with LPD is unenforceable because the agreement lacked sufficiently definite terms, so LPD's entire Complaint must be dismissed.  For the reasons explained below, adidas' argument fails.

Through the Parties'[1] acts and their written and oral communications, LPD and adidas unquestionably manifested intent to be bound to an agreement.  While adidas argues that the agreement is unenforceable due to lack of sufficiently defined terms, all terms deemed material by the Parties were in fact agreed to.

Even if certain material terms were insufficiently definite (which is denied), adidas should still be held to those terms that were sufficiently defined because it assented to the Parties' contractual objective and manifested its intent to be bound.  Moreover, adidas should be estopped

---

[1] The Parties include LPD, adidas America, Inc., and adidas AG because "adidas America, Inc. directs all U.S.-based operations on behalf of adidas AG, including sales, brand marketing, product marketing, product design, public relations, distribution, enforcement, and licensing of and for ADIDAS-branded merchandise, including goods bearing the distinctive Three-Stripe Mark."  Paragraph 8 of adidas America, Inc. and adidas AG's Complaint in 15-cv-582 filed in the U.S. District Court for the District of Oregon, attached as Exhibit 1 to the Declaration of J.R. Stevenson, Esq.  Thus, although LPD negotiated with adidas America to form the contract at issue here (under which LPD was authorized to use adidas trademarks), adidas America bound adidas AG to that contract because it had actual authority to do so.  *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998).

from claiming that the LPD-adidas contract is unenforceable for indefiniteness because it stood by and allowed LPD to perform under that agreement. Alternatively, even if the LPD-adidas agreement was unenforceable for indefiniteness, LPD is still entitled to its damages under quasi-contractual theories of liability such as unjust enrichment, promissory estoppel, and/or detrimental reliance.

adidas's argument that LPD's defamation claim is wholly dependent on its breach-of-contract claim similarly fails. adidas defamed LPD when it made the false statement to fashion press that the LPD/adidas collaboration was illegitimate, despite having previously expressly authorized the collaboration LPD's promotion thereof. While LPD and adidas' contract is clearly enforceable, the collaboration is still legitimate even if LPD-adidas agreement was found to unenforceable for indefiniteness because adidas expressly authorized the collaboration and confirmed (in writing) that the collaboration was legitimate after it had claimed that it was not.

Similarly, LPD is unquestionably entitled to the declaratory relief it seeks because (1) adidas threatened to sue LPD for trademark infringement despite expressly authorizing LPD to use the trademarks and (2) adidas unquestionably abandoned its rights to certain trademarks when it granted LPD a naked license.

## II.   CORRECTING ADIDAS'S MISREPRESENTATIONS OF THE FACTS ASSERTED IN LPD'S COMPLAINT

While purporting to accept the facts asserted in LPD's Complaint as true, adidas attempts to distort the record by ignoring the timeline of the Parties' negotiations, disregarding its admissions, denying approvals it provided, and trying to recast its words and conduct in a light that does not correspond with reality. The Court should not credit these distortions. The allegations outlined in LPD's Complaint are fully developed and now supported by testimony from LPD's founder Benjamin Fainlight and by written communications between the Parties.

LPD respectfully refers the Court to its Fed.R.Civ.P. 56.1 Statement, the Fainlight Decl., and the Declarations of Katharine Zarrella ("Zarrella Decl.") and J.R. Stevenson, Esq. (together with the Attachments and Exhibits[2] to those Declarations) for a full recapitulation of the underlying facts. LPD will briefly correct certain material misrepresentations of fact asserted by adidas.

A.   *adidas and LPD Agreed to Material Terms and Manifested their Intent to be Bound to an Agreement*

adidas suggests that it merely engaged LPD in a "prolonged series of conversations" about a possible future collaboration but never agreed on anything. This is untrue. The documentary record clearly evidences that adidas approached LPD to develop a fashion collaboration to "add[] the 'streetwear' status that [LPD's] brand has" to adidas's brand. *See* Complaint ¶ 19; Fainlight Decl. at ¶ 10, Ex. 2. Over the next several months, the Parties discussed and agreed to material terms of this first-of-its-kind arrangement, including terms addressing branding, trademarks, and logos; payment of pattern- and sample-making costs; marketing and advertising; sales and retailing; merchandise pricing; and allocation of profits – the exact terms adidas now conveniently claims were never addressed by the Parties.

On 18 June 2014, after having previously provided designs for the Classics Capsule, LPD provided adidas with its design proposals for the Collaboration Capsule (which was co-branded at the direct request of adidas), and on 26 June 2014, adidas expressly approved them and gave LPD "permission to move forward" with the collaboration and with LPD's proposals for selling merchandise from the Classics and Collaboration Capsules. *See* Complaint ¶¶ 53, 59; Fainlight Decl. ¶ 36, Ex. 24. adidas later unambiguously confirmed that the Parties were "a full go for th[eir] collaboration!" *See* Fainlight Decl. at ¶ 41, Ex. 27. These exchanges, together with LPD's performance of its contractual obligations, adidas's acceptance thereof, and adidas's

---

[2] Unless otherwise noted, all references to Exhibits ("Ex.") are to the Fainlight Decl. Exhibits.

subsequent recognition of its agreement with LPD,[3] unmistakably show that the Parties mutually manifested an intent to be bound in contract.

      B.    *The Parties Agreed to Move Forward without Memorializing their Agreement in a Final Document*

adidas tries to make much of the fact that the Parties initially discussed a letter of intent on two occasions (in November 2013 and March 2014) but that no such letter was ever exchanged.   While this is true, adidas later proposed (on 12 June 2014) that, to see the collaboration "come to life," "[LPD and adidas] connect back and forth over email to confirm dates, details" "[o]ver the next few weeks."   *See* Complaint ¶50; Fainlight Decl., ¶¶ 16, 22-23; Exs. 11-12, 37; ¶ 34, Ex. 22 (quotation). LPD agreed to proceed on this basis provided that LPD received "confirmation that the collaboration between adidas and LPD [would] be happening . . . ."   *See* Complaint ¶ 51 Fainlight Decl. ¶ 35, Ex. 23. On 16 June 2014, adidas advised that the collaboration would only be confirmed once adidas was "100% on board."   *Id.*  On 26 June 2014, after receiving LPD's design proposal for the Collaboration Capsule, adidas advised that its upper management approved the designs and that adidas gave its "permission to move forward" with the collaboration and with "all [LPD] sales propositions . . . ." *See* Complaint ¶ 54; Fainlight Decl. ¶ 36, Ex. 24. On 14 July 2014, adidas reconfirmed this and advised that it "had enough signoff . . . to continue to push through and continue on with the collab[oration]," and on 17 July 2014, it

---

[3] Even after it maliciously misrepresented to V Magazine that the LPD/adidas collaboration was "illegitimate," adidas recognized that it had authorized LPD to sell collaboration merchandise such that LPD was entitled to proceed with those sales:

    From [adidas's] side the [collaboration] products are good to go . . . . ***because [adidas] gave approval adidas is willing to allow this to go forward*** . . . .

*See* Fainlight Decl. ¶68, Ex. 36. In this way, adidas recognized the existence of its contract with LPD. It also did so subsequently.  On 23 December 2014, adidas wrote LPD "to check in and see how the collection [was] doing in terms of sales" and "to apologize for the confusion at the launch" of the collaboration (referring to the V Magazine incident). *See* Fainlight Decl. ¶72, Ex.37. Moreover, on 3 February 2015, adidas provided LPD a letter for a LPD customer confirming that LPD and adidas agreed to collaborate on the Collaboration Capsule. *See* Fainlight, ¶74, Ex. 38.

declared, "we are a full go for this collaboration!" *See* Complaint ¶¶ 60, 62; Fainlight Decl. ¶¶ 40-41, Exs. 26-27.  Neither party ever insisted that their agreement be codified into a final writing or expressly reserved the right not to be contractually bound absent such a writing.

C.  *adidas Authorized LPD to Develop Promotional Photos and Videos for the Collaboration and to Proceed with Sales of Collaboration Merchandise*

Mysteriously, adidas claims that LPD promoted and sold merchandise from the Classics and Collaboration Capsules "without express authorization from adidas."  This is untrue. On 11 March 2014, after having received LPD's concept proposal for the Collaboration Capsule, adidas advised that it had reviewed it internally, "really like[d] the direction of the topics on the [concept proposal]," and that adidas and LPD were "all aligned to move forward." adidas also advised that, with respect to marketing and advertising the collaboration merchandise, it "***would like to lead with some of the imagery and concepts that [LPD] can produce***." *See* Complaint ¶35; Fainlight Decl., ¶¶ 23,24, Ex. 13.  LPD replied the same day and advised that it could "definitely start working on imagery as soon as [it] start[s] getting samples for everything," including producing "a few styles of still photos paired with some video, so [LPD] can mix and match things for social and other distribution." *See* Complaint ¶ 36; Fanlight Decl., ¶ 24, Ex. B.

On 12 March 2014, LPD proposed showing collaboration merchandise to buyers around New York Men's Fashion Week in July 2014. *See* Fainlight Decl., ¶ 25 Ex. 14.  On 16 April 2014, adidas advised that it "would have no issue with [LPD] selling in [sic] this product in July [2014] [because] [adidas's] sales team will begin [its] uniform sales [from adidas's portion of the Classics Collaboration] around the same period of time."  *See* Complaint ¶ 44; Fainlight Decl., ¶ 28 Ex. 17. adidas also noted that it felt the "selling strategy [for collaboration merchandise] . . . is [LPD's] world considering [adidas's] sales people typically deal with large wholesale vendors . . . ." *Id.*

In early June 2014, LPD advised adidas that it had begun discussing the Classics and Collaboration Capsules with fashion buyers and that it would need to start finalizing sales in the near future, and adidas responded by advising:

> [LPD] [is] free to show whatever materials at [LPD's] sale show as long as the [NCAA] team identities are kept confidential.  We can begin to tease the [Classics] project once we have art/samples for teams to see and approve.  But [adidas] does not want to hold up any of [LPD's] business planning or strategy so by all means please begin sharing as long as we keep teams confidential.

*See* Complaint ¶¶ 48-50; Fainlight Decl., ¶¶ 32-34; Exs. 21, 22.

On 25 June 2014, LPD demanded to know if the collaboration was going forward because its sales manager had to send out market invites to stores by the end of the week.  *See* Complaint ¶ 53; Fainlight Decl., ¶ 36, Ex. 24.  The following day, adidas advised that it "fe[lt] very strongly about the [design proposal] [LPD] sent over," that adidas's upper management approved the designs, and that adidas gave its "permission to move forward" with the collaboration.  *Id.*  adidas also asked LPD to "[p]lease move forward with all [LPD] sales propositions as [adidas] do[es]n't want to hold up any of [LPD's] timelines." *See* Complaint ¶ 54; Fanlight Decl. ¶ 36, Ex. 24. On 27 June 2014, LPD assured adidas that it would move forward in time for sales in July 2014 during men's market week and in preparation for the main season market in September 2014.  *See* Complaint ¶ 55; Fainlight Decl., ¶ 38, Ex. 25.

On 30 June 2014, adidas sent LPD samples of adidas's portion of the Classics Capsule to be used by LPD as selling tools in the promotion of the LPD/adidas collaboration.  See Complaint ¶ 56; Fainlight Decl. ¶ 38, Ex. 25.  Once LPD received samples of adidas's portion of the Classics Capsule, it began offering them to LPD's buyers together with LPD's own contribution to the Classics Capsule and the full Collaboration Capsule.  *See* Complaint ¶56; Fainlight Decl., ¶ 38, Ex. 25.

On 14 July 2014, LPD advised adidas that it had received a great response from buyers and the fashion press and that it was interested in discussing "promotion/release/distribution/etc soon so [LPD and adidas] could start directing people to the right outlets." *See* Complaint ¶ 57; Fainlight Decl., ¶ 40, Ex. 26.  The same day, adidas advised it would have an internal meeting to further discuss the LPD/adidas collaboration to establish a marketing budget and promotional plan.  *Id*.  LPD responded the same day to advise that it had received samples from the Collaboration Capsule designs and that it would provide adidas with pictures of said samples, which it later did.  *See* Complaint ¶ 61; Fainlight Decl., ¶ 41; Ex. 27.  On 17 July 2014, adidas confirmed that "we are a full go for this collaboration!" and asked to discuss, *inter alia*, "Marketing/Promotion- needs/wants/concepts."  *Id*.

On 22 July 2014, LPD advised adidas that it had begun photo shoots for the Collaboration Capsule and provided adidas with photos from those shoots days later.  *See* Complaint ¶ 64; Fainlight Decl., ¶ 42-43, Exs. 28-19.  On 31 July 2014, adidas confirmed its receipt of those photos, advised that "the product looks awesome," and that adidas "was excited about [the collaboration] all coming together."  *See* Complaint ¶ 16; Fainlight Decl., ¶ 46; Ex. 30.

In or around August, LPD discussed marketing and promoting the LPD/adidas collaboration with adidas by telephone.  *See* Fainlight Decl., ¶ 48. During their call, LPD and adidas agreed (as they previously had) that LPD would start producing marketing materials (including images and video) for the collaboration and distribute those materials to the fashion press to promote the collaboration.  *Id.*  On 25 August 2014, LPD provided adidas with updates regarding its promotion of the LPD/adidas Collaboration Capsules. *See* Complaint ¶ 68; Fainlight Decl., ¶ 49; Ex. 31. On 8 September 2014, LPD advised adidas that it had begun women's sales and that men's sales would begin once adidas provided wholesale pricing information for adidas's pieces from the Classics Capsule.  *Id.*  LPD also advised that it had coordinated with a number of

fashion publications and that it expected the LPD/adidas collaboration to be featured in each. *Id.* LPD also advised that its marketing efforts continued and that it had been invited to various press events in the U.S. and in Japan to promote the LPD/adidas collaboration. *See* Complaint ¶ 69; Fainlight Decl., ¶ 49; Ex. 31. On 16 September 2014, adidas responded with the pricing information LPD needed for adidas's pieces from the Classics Capsule and an update on adidas's roll out of those pieces. *Id.* Despite being advised that LPD was selling and promoting Collaboration Capsule products, adidas did not assert that the LPD-adidas agreement lacked definitiveness or that the collaboration merchandise was illegitimate. Rather, adidas reiterated that it was "still very excited about working with [LPD] and pushing the [Collaboration] capsule side of the collection and still co-merchandising and advertising." *See* Complaint ¶ 16; Fainlight Decl., ¶ 49; Ex. 31. Accordingly, any claim by adidas that LPD promoted and sold merchandise from the Classics and Collaboration Capsules without authorization is patently false.

### D.   *adidas Never Instructed LPD to Stop Selling or Marketing Collaboration Capsule Merchandise*

In a blatant attempt to mislead the Court, adidas selectively quotes, conveniently omits, and purposefully misrepresents correspondence between the Parties exchanged in November 2014 to claim that it "specifically requested LPD's Collaboration Capsule 'content stop being produced.'" adidas Memorandum, p. 5. On the contrary, those exchanges make clear that the "content" adidas asked to stop being produced was a provocative promotional video – not the actual products of the Collaboration Capsule. In fact, in the referenced exchanges, adidas expressly recognized that "the [collaboration] products are good to go" "because [adidas] gave approval." *See* Complaint ¶ 88; Fainlight Decl., ¶ 68, Ex. 36. The communications make it abundantly clear that adidas authorized LPD to market and sell the co-branded Collaboration Capsule products. *See* Fainlight Decl. ¶¶ 66-68, Exs. 35-36. This is confirmed by the fact that

adidas later emailed LPD on 23 December 2014 to see how sales of the Collaboration Capsule were doing and to apologize for the "confusion" at the launch (i.e. the misrepresentation adidas made to V Magazine) and later provided a letter confirming that LPD and adidas had collaborated on the Collaboration Capsule. *See* Fainlight Decl. ¶¶ 72, 47; Exs. 37-38.

### III.    ARGUMENT

A.    *LPD Sufficiently Plead All of Its Causes of Action*

Without endeavoring to explain how, adidas suggests that LPD's Complaint fails to allege facts sufficient to support any of LPD's causes of action.  This claim is meritless.  In eighty-eight detailed paragraphs of its Complaint (¶¶ 15-103), LPD painstakingly lays out the underlying facts for its causes of action.  LPD's Complaint does not merely state that adidas offered to develop a fashion collaboration with LPD, that LPD accepted that offer, that the Parties exchanged consideration and mutually assented to be contractually bound to design, market, manufacture, and sell merchandise from that collaboration.  Nor does it merely state that adidas breached the Parties' contract.  Instead, LPD's Complaint quotes or summarizes much of the Parties' written and oral exchanges to illustrate that, by words and acts, the Parties formed a sufficiently definite contract, which adidas breached by (1) authorizing LPD to use adidas trademarks and later claiming that the LPD/adidas collaboration was illegitimate and claiming that LPD infringed on those trademarks, (2) failing to fund pattern making and sample production costs as it agreed, (3) failing to co-market and co-promote the collaboration, (4) failing to co-sell collaboration merchandise.

Similar, LPD's Complaint provides a detailed factual predicate for it defamation claim by, *inter alia*, highlighting the fact that adidas knew that the LPD/adidas collaboration was, in its words, "a full go" but, despite this, later denied its legitimacy to the fashion press.

LPD's Complaint also illustrates that adidas authorized LPD to use adidas trademarks but failed to (1) control the quality of collaboration merchandise marked with adidas trademarks, (2) dictate product specifications for that merchandise, (3) monitor LPD's manufacturing of that merchandise, (4) ever inspect that merchandise. These facts are sufficient to justify the declaratory relief LPD seeks, including a declaration that it did not infringe on LPD's trademarks and that adidas abandoned those trademarks by granting LPD a naked license.

Finally, LPD's Complaint carefully details the actions LPD took to design the Classics and Collaboration pieces and market its own ***and adidas's*** contributions thereto to buyers around the world. These facts sufficiently undergird LPD unjust-enrichment cause of action, asserted in the alternative to its breach-of-contract cause of action.

Ultimately, LPD need not prove its case in its Complaint; its factual allegations need only "raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Here, they plainly do.

B.  *The Material Terms of the Parties' Contract Are Sufficiently Definite*

adidas argues that LPD's claim for breach of contract must be dismissed because the Parties did not mutually assent to sufficiently definite material terms. adidas is wrong.

While it is true that, "to create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms," "***not all terms of a contract need be fixed with absolute certainty***." *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 693 N.Y.S.2d 857 (1999) (citation omitted) (emphasis added). "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but "parties . . . should be held to their

promises." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.E.2d 203, 548 N.Y.S.2d 920 (1989).

> 1. *adidas May Not Disavow Its Contractual Obligations by Claiming the LPD-adidas Contract Omits Purported "Material Terms" that adidas Never Saw Fit to Address during Negotiations*

adidas claims that the material terms in a collaboration such as the one at issue here necessarily include "pricing, profit sharing, royalties, intellectual property rights (e.g. trademark rights), marketing costs and cost sharing, the duration of the contract, and the parties' respective rights and obligations under the contract, amongst others." adidas Memorandum, p. 9. adidas cites no authority for the assertion that the material terms in a collaboration such as the one at issue here necessarily include the foregoing. And adidas's suggestion that there is some objective blueprint for the collaboration such as the one at issue here is belied by its own recognition that "this [was a] first for adidas basketball and coordinating with a fashion brand so the rules are really what [adidas and LPD] want[ed] them to be." Fainlight Decl. ¶ 15, Ex. 6. Indeed, the adidas proposed back-dated licensing agreement does not even include all of the terms adidas now claims are required. Fainlight Decl. ¶ 77, Ex. 39.

"Material terms," generally speaking, are "contractual provision[s] dealing with [] significant issue[s]." BLACK'S LAW DICTIONARY, 1608 (9th ed. 2009). Ultimately, the contracting parties' negotiations determine whether an issue is significant and a term material. *See Teachers Ins. and Annuity Assoc. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (explaining that a "fully formed contract" "occurs when the parties have reached complete agreement (including the agreement to be bound) on ***all the issues perceived to require negotiation***" (emphasis added)). For example, in *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100 (C.D. Cal. 2002), the U.S. District Court for the Central District of California held that it had to look to the parties' negotiations to

determine whether terms addressing "license termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute resolution" were material to a license agreement. *Id*. at 1123. That court concluded that, because the parties chose not to address those terms during their negotiations, they were not material, and the parties' license agreement was "sufficiently definite" despite the omission of those terms. *Id*.   Similarly, in *Core-Vent Corp. v. Implant Innovations, Inc*., 53 F.3d 1252 (Fed. Cir. 1995), the U.S. Court of Appeals for the Federal Circuit enforced a license agreement (which did not address, *inter alia*, duration of the parties' rights thereunder) exclusively by reference to the terms negotiated by the parties rather than finding the agreement lacked what was alleged to be a material term (that royalties would no longer be due if the patent was later found to be unenforceable). *Id*. at 1257-58.  The Federal Circuit Court reasoned that, if such a term was material, the party claiming it was material should have insisted that such a provision was included in the agreement. *Id*.

The foregoing cases and adidas's recognition that it was crafting a first-of-its-kind agreement with LPD counsel against allowing adidas to disavow its contractual obligations by invoking, after the fact, any terms it now conveniently claims are material that were not raised during the Parties' negotiations.

2.      *The LPD-adidas Contract Addresses Nearly All Terms adidas Claims Are Material*

Even assuming (without conceding) that the terms adidas claims are material are, in fact, material to the Parties' agreement here, the Parties addressed and agreed on nearly all of them during their negotiations.

a.      *Price, Profit Sharing, Royalties & Merchandise Pricing*

Although adidas lists price, profit sharing, and royalties separately, they singularly relate to the consideration LPD was exchanging with adidas for entering their contract.  adidas also suggests that merchandise "pricing" is a material term, but this is plainly not the "price" referred to when courts consider material terms.[4, 5]  Despite this, LPD will address the issue all the same.

Respecting price, profit sharing, and royalties – the consideration LPD exchanged with adidas – from the beginning, adidas recognized it sought to collaborate with LPD to "add[] the 'streetwear' status that [LPD's] brand has" to adidas's brand.  Complaint ¶ 19; Fainlight Decl. ¶ 10; Ex. 2.  When the Parties initially discussed profit sharing, adidas advise that "the capsule collection profits would likely be primarily profits to LPD" because adidas was "seeking [LPD's] status and many of [its] creative ideas here."  Complaint ¶ 37; Fainlight Decl. ¶ 24, Ex. 13.  Later, adidas reiterated in writing that LPD would "receive the dollar sales" from the sale of collaboration merchandise and orally stated that, because adidas was really interested in capitalizing on LPD's "cool factor," profits from sales of pieces from the Collaboration Capsule would go to LPD alone and that no royalties would be owed to adidas.[6]  Complaint ¶ 42; Fainlight Decl. ¶ 27, Ex. 16.  Therefore, there can be no doubt that the Parties expressly agreed on price, profit sharing, and royalties.

---

[4] For example, adidas itself recognized that pricepoint information would merely be "helpful" for adidas to consider. Fainlight Decl. ¶ 34, Ex. 22.  After receiving LPD's response on the matter, adidas did not raise the issue again indicating that it agreed on that LPD explanation of the anticipated pricepoint for collaboration merchandise was fine or otherwise did not consider the issue to be material to the contract.

[5] If it was, then retailer-purchasers would always have to specify in their purchase contracts with wholesale-sellers, not only what price was being paid for purchased goods, but also the price at what those goods would be sold. Requiring this would essentially lock retailer-purchasers into an inflexible resale price that could not be modified to accord with dictates of the market.  And because resale price is rarely specified in contract, declaring such a "price" a material term would render nearly all sales contracts unenforceable for want of definiteness.

[6] This allocation also makes perfect sense because LPD also designed the Classics Capsule understanding that it would not earn profits from the sale of merchandise from that Capsule.

Respecting merchandise pricing, from the beginning, adidas knew the retail price of LPD merchandise ("[LPD's] retail pieces are at a price point where we could feature our retail shorts with your retail pieces and make it an exclusive release online").  Complaint ¶ 25; Fainlight Decl. ¶ 15, Ex. 6.  On 12 June 2014, adidas mentioned that it would be "helpful" to know LPD's anticipated price point for pieces from the Collaboration Capsule, and LPD advised that was "hard to pin down exactly" but "that it [will] hit[] a lower price point then [sic] the main collection as much as possible."  Complaint ¶ 51; Fainlight Decl. ¶ 35, Ex. 23.  adidas accepted this explanation and, on 16 September 2014, provided LPD with pricing information for adidas's contributions to the Classics Capsule, so LPD could market those pieces together with those from the Collaboration Capsule.  *See* Complaint ¶ 71; Fainlight Decl. ¶ 49, Ex. 31.  These exchanges make clear the Parties agreed on merchandise pricing.

b. *Branding, Trademarks & Logos*

Respecting branding, trademark, and logos, from the beginning, the Parties agreed that, if the collaboration moved forward, they would co-brand collaboration merchandise (other than "on-court product," which "[d]ue to NCAA rules . . . [could] only be branded adidas").  Complaint ¶ 25; Fainlight Decl. ¶ 15, Ex. 6.

On 12 June 2014, "to see [its] project [with LPD] come to life," adidas suggested, *inter alia*, that the Parties develop a jocktag or lockup logo for collaboration merchandise.  Complaint ¶ 50; Fainlight Decl. ¶ 34, Ex. 22.  The same day, LPD responded and advised that it would be putting together its design proposal for the Collaboration Capsule and would like to get the jocktag and lockup logo in process.  Complaint ¶ 51; Fainlight Decl. ¶ 35, Ex. 23.  LPD also insisted that "before [it] can do anything [it] need[ed] . . . confirmation that the collaboration between adidas and LPD [would] be happening and that any designs meant for th[at] collaboration [would] be kept confidential for th[o]se purposes."  Complaint ¶ 51; Fainlight Decl. ¶ 35, Ex. 23.

14

On 16 June 2014, adidas advised that, for other collaborations, it had "simpl[y] lock[ed] up logo's [sic] with an 'x' representing the collaboration," so LPD could do the same for the Classics and Collaboration Capsules' jocktags/logo, but "[b]ecause this is pure basketball collaboration[,] [LPD and adidas] [would have to] use [adidas's] performance logo (mountain shape, rather than trefoil); this is brand regulation."  Complaint ¶ 52; Fainlight Decl. ¶ 35, Ex. 23. adidas also confirmed that none of LPD's designs would be shared and that the collaboration would only be confirmed once adidas was "100% on board," at which time it would dedicate more funding to the collaboration.  Complaint ¶ 52; Fainlight Decl. ¶ 35, Ex. 23.

On 18 June 2014, LPD sent to adidas its design proposal for the Collaboration Capsule, which incorporated adidas trademarks into the designs.  Complaint ¶ 53; Fainlight Decl. ¶ 36, Ex. 24.  On 26 June 2014, adidas advised that it "fe[lt] very strongly" about LPD's Collaboration Capsule design proposal, that adidas's upper management approved the designs, and that adidas gave its "permission to move forward" with the collaboration.  Complaint ¶ 54; Fainlight Decl. ¶ 36, Ex. 24.  adidas also stated, "once [LPD's] product is lined up next to [adidas's] we have a solid collection."  Complaint ¶ 60; Fainlight Decl. ¶ 36, Ex. 24.

On 14 July 2014, adidas reiterated that it "had enough signoff . . . to continue to push through and continue on with the collab[oration]," and on 17 July 2014, adidas reconfirmed that "we are a full go for this collaboration!"  Complaint ¶ 60; Fainlight Decl. ¶¶ 40-41, Exs. 26-27.

Through these exchanges, the Parties agreed (at adidas's suggestion) that LPD was authorized to co-brand collaboration merchandise and to use the adidas trademarks incorporated into the Collaboration Capsule designs.

c.    *Marketing and Advertising*

15

As explained in detail in Section II.C, *supra*, pp. 4-7, on 11 March 2014, adidas advised that it wanted "to co-brand this collaboration and market it as a full on collaboration" and "***would like to lead with some of the imagery and concepts that [LPD] can produce***" but agreed that it "closer to our launch date [adidas's] PR team can begin teasing product/concepts/images." Complaint ¶ 35; Fainlight Decl. ¶¶ 23-24, Exs. 11, 13.  LPD replied the same day and advised that it would "start working on imagery as soon as [it] start[s] getting samples for everything," including producing "a few styles of still photos paired with some video, so [LPD] can mix and match things for social and other distribution.  Complaint ¶ 36; Fainlight Decl. ¶ 24, Ex. 13.

Thereafter, in line with the Parties' agreement, LPD produced promotional material for the collaboration, which it distributed to the fashion press, and marketed collaboration merchandise to fashion buyers.  Complaint ¶¶ 55, 59, 63-65, 67, 69 72-73, 75-76, 90-91; Fainlight Decl. ¶¶ 38-40, 42-43, 47-49, 51-58, 70-71; Ex. 25-26, 28-29, 31.  On 14 July 2014, LPD advised adidas that it had received a great response from buyers and the fashion press and that it was interested in discussing "promotion/release/distribution/etc soon so [LPD and adidas] could start directing people to the right outlets."  Complaint ¶ 59; Fainlight Decl. ¶ 40, Ex. 26.  The same day, adidas advised that it was working to establish a marketing budget and promotional plan for the collaboration.  Complaint ¶ 60; Fainlight Decl. ¶ 24, Ex. 13.  On 16 September 2014, adidas provided LPD with an update on its roll out of its contribution to the Classics Capsule and reiterated that it was "still very excited about . . . pushing the [Collaboration] capsule side of the collection and still co-merchandising and advertising."  Complaint ¶ 71; Fainlight Decl. ¶ 40, Ex. 26.  This foregoing illustrates that both LPD and adidas agreed to use their best efforts to market and advertise the collaboration and merchandise from the collaboration Capsules.

d.    *Costs*

Respecting costs, on 31 March 2014, the Parties expressly agreed that adidas would pay for pattern and sample making costs for the Classics and Collaboration Capsules.   adidas acknowledge this obligation on 12 June 2014 and 14 July 2014.    Complaint ¶ 39-40, 50, 60; Fainlight Decl. ¶26, 30, 34, 40; Ex. 15, 19, 22, 26.

e.     *Distribution*

Regarding distribution, on 21 November 2013, the Parties' agreed that, if the collaboration came to pass, collaboration merchandise could be offered on the Parties' respective websites, to LPD's vendors, in adidas's stores.   Complaint ¶ 26-27, 36 (wherein LPD reiterates it understanding that it could "s[ell] directly online and to the stores selling LPD").   On 16 April 2014, adidas advised that it "would have no issue with [LPD] [beginning] [sales] in . . . in July [2014] and "fe[lt] [selling strategy] [was] [LPD's] world considering [adidas's] sales people typically deal with large wholesale vendors . . . ."   Complaint ¶ 44.   On 26 June 2014, after LPD demanded to know if the collaboration was going forward, adidas advised that its upper management approved the designs and asked LPD to "[p]lease move forward ***with all [LPD] sales propositions***."   *See* Complaint ¶ 53-54; Fainlight Decl. ¶36, Ex. 24.   On 27 June 2014, LPD assured adidas that it would move forward with all propositions in time for sales in July 2014 during men's market week and in preparation for the main season market in September 2014.   *See* Complaint ¶55; Fainlight Decl., ¶38, Ex. 25.   Therefore, it cannot be said that the Parties did not, at minimum, agree that LPD would be able to distribute collaboration on the internet and to fashion buyers.

3.     *Although LPD and adidas Did Not Expressly Address Duration of Their Contract During Negotiations, New York Law Fills that Gap*

The only alleged "material" term identified by adidas that was not addressed and agreed to by the Parties during negotiations was the duration of their contract.   However, under

New York law, "[i]n the absence of an express provision [respecting duration or termination], a contract is terminable [only] after a reasonable duration with reasonable notice." *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87 Civ. 6294 (MJL), 1988 U.S. Dist. LEXIS 4422, at *5-6 (S.D.N.Y. May 10, 1988).  Therefore, because New York law fills this gap, adidas cannot invoke the Parties failure to agree on the duration of their contract as a basis for claiming that it is insufficiently definite.

The foregoing makes clear that, even if adidas's alleged material terms were, in fact, material to the Parties' contract, the Parties definitely agreed on them such that their contract does not fail for indefiniteness.

C.    *Even if Certain Material Terms Were Not Sufficiently Definite, adidas Should be Held to those Terms that Were Because It Assented to the Parties' Contractual Objective and Manifested Its Intent to be Bound*

Even if certain terms were found to not be made sufficiently definite (which is denied), the record makes clear that the Parties mutually assented to their contractual objective in June and July 2014 and that adidas unequivocally manifested its intent to be bound in contract by accepting LPD's contractual performance and repeatedly recognizing the contract (even after having denied the legitimacy of the LPD/adidas collaboration).

On 12 June 2014, adidas advised LPD that there has been a "large realignment within [its] group so many of [adidas's] projects ha[d] been put on hold" but also advised that it "still want[ed] to see [its] project [with LPD] come to life."  Fainlight Decl. ¶ 34, Ex. 22.  It, therefore, proposed that, "[o]ver the next few weeks [LPD and adidas] connect back and forth over email to confirm dates, details." *Id.* ¶ 34, Ex. 22.  The same day, LPD responded that it remained excited about the possibilities presented by the LPD/adidas collaboration and that it would be putting together its design proposal for the Collaboration Capsule. *Id.* ¶ 35, Ex. 23. However,

18

LPD insisted that "before [it] can do anything [it] need[ed] . . . confirmation that the collaboration between adidas and LPD [would] be happening and that any designs meant for th[at] collaboration [would] be kept confidential for th[o]se purposes." *Id.* ¶ 35, Ex. 23. A day later, adidas confirmed that none of LPD's designs would be shared and that the collaboration would be confirmed once adidas was "100% on board" at which time it would dedicate more funding for the collaboration. *Id.* ¶ 35, Ex. 23.

With adidas's assurances in hand, on 18 June 2014, LPD sent adidas its design proposal for the Collaboration Capsule, which incorporated various adidas trademarks. *Id.* ¶ 36, Ex. 24. On 25 June 2014, LPD advised that it needed to know if the collaboration was going forward because LPD's sales manager needed to send out marketing invites if it was. *Id.* The following day, adidas advised that it "fe[lt] very strongly" about LPD's Collaboration Capsule design proposal, that adidas's upper management approved the designs, and that adidas gave its "permission to move forward" with the collaboration. *Id.* adidas also asked LPD to "[p]lease move forward with all [LPD] sales propositions as [adidas] do[es]n't want to hold up any of [LPD's] timelines" and noted that, "once [LPD's] product is lined up next to [adidas's] we have a solid collection." *Id.*

On 14 July 2014, adidas reiterated that it "had enough signoff . . . to continue . . . on with the collab[oration]," and on 17 July 2014, adidas again confirmed that "we are a full go for this collaboration!" *Id.* ¶ 40 and Ex. 26 thereto. After receiving adidas's green light, LPD went on to perform as it had previously agreed by marketing, manufacturing, and selling merchandise from the collaboration with adidas's knowledge and approval. See Section II.C, *supra*, pp. 4-7.

These exchanges, adidas's unambiguous declaration that the collaboration was a "full go," LPD's performance, and adidas's acceptance thereof confirm that the Parties mutually assented to their contract. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir.

1984) (explaining that "partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect").

      These factors also generally illustrate that the Parties intended to be contractually bound. adidas's specific intent to be bound is also evidenced by its subsequent recognition of the Parties' contract. *Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985) (explaining that "the existence of a contract may be established through conduct of the parties recognizing the contract"). Even after it maliciously misrepresented to V Magazine that the LPD/adidas collaboration was "illegitimate" – adidas recognized that it had authorized LPD to sell Collaboration Capsule merchandise:

> From [adidas's] side ***the [collaboration] products are good to go*** . . . . We may also run into an issue with any products with our NCAA properties names used on it. We may be able to have a promotional opportunity with those to put on court but selling those without royalties could cause issues. We are walking a fine line but ***because [adidas] gave approval adidas is willing to allow this to go forward*** . . . .

*Id*. ¶ 68, Ex. 36. In this way, adidas recognized the existence of its contract with LPD. It also did so subsequently. On 23 December 2014, adidas wrote LPD "to check in and see how the collection [was] doing in terms of sales" and "to apologize for the confusion at the launch" of the collaboration (referring to the V Magazine incident). *Id*. ¶ 72 and Ex. 37 thereto. And on 3 February 2015, adidas provided LPD a letter for an LPD customer confirming that LPD and adidas agreed to collaborate on the Collaboration Capsule. *Id*. ¶ 74 and Ex. 38 thereto.

      adidas's express words and undeniable conduct plainly evidence the fact that it recognized the LPD-adidas contract and that it was bound thereby. No reasonable person cognizant of the Parties' exchanges, conversations, and actions could conclude that LPD and adidas did not enter into a binding, enforceable contract. See *Brooklyn Life Ins. Co. v. Dutcher*,

95 U.S. (5 Otto) 269, 273, 24 L. Ed. 410 (1877) (explaining that "there is no surer way to find out what parties meant, than to see what they have done").

> D. *adidas Should be Estopped from Claiming that the Contract Fails for Indefiniteness Because It Manifested its Intent to Be Bound and allowed LPD to Perform*

adidas should be estopped from claiming the Parties' contract fails for indefiniteness because the record clearly shows that adidas assented to the LPD-adidas contract and plainly expressed its intent to be bound thereby,. Estoppel may arise from silence or inaction as well as from positive words or acts. *See Rothschild v. Title Guar. & Trust Co.,* 204 N.Y. 458 (1912). Estoppel arises when one has (i) a duty to speak, (ii) fails to, and (iii) damages to another by its silence. *LaPorto v. Village of Philmont,* 39 N.Y.2d 7, 12 (1976). Importantly, this duty, which is grounded in notions of fair play and justice, compels one to speak or act when, in all good conscience, an honest person would have. *Simmons v. Westwood Apts. Co.*, 261 N.Y.S.2d 736 (1965), *qff'd.*, 271 N.Y.S.2d 731 (1966).

Here, after procuring adidas' express approval to move forward with the collaboration itself and with marketing and sales of collaboration merchandise, LPD contractually performed by promoting the collaboration and selling merchandise therefrom. In doing so, LPD kept adidas apprised of its efforts, and adidas never even suggested that LPD should stop what it was doing because the Parties' agreement was insufficiently definite. Therefore, because adidas decided to remain silent over the course of LPD's contractual performance, it is estopped from now claiming that its contract with LPD was insufficiently definite.

> E. *Alternatively, Even if the adidas-LPD Contract is Unenforceable for Indefiniteness, LPD Is Still Entitled to Recover Its Damages from adidas under Quasi-Contractual Theories of Liability*

In the same vein, the Court should hold adidas to the "clear and unambiguous promises" it made considering that LPD reasonably relied on those promises to its detriment. *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986) (citing Restatement (Second) of Contracts § 90 (1981) to outline the elements of promissory estoppels).  That is, even if the Court determines that the LPD-adidas contract is unenforceable for indefiniteness, LPD is still entitled to recover its damages under quasi-contractual theories of liability.  *See Seiden Associates, Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 39 (S.D.N.Y. 1991) (explaining that "[q]uasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort" – "obligation[s] . . . imposed by law [even] where there has been no agreement or expression of assent, by word or act, on the part of either party involved" so to "assure a just and equitable result"); *see also Chadirjian v. Kanian*, 123 A.D.2d 596, 598, 506 N.Y.S.2d 880, 882 (2d Dep't 1986) (explaining that "[a]n agreement may be implied under the doctrine of unjust enrichment in order to prevent one person who has obtained a benefit from another without ever entering into a contract with that person from unjustly enriching himself at the other party's expense").

Here, adidas promised LPD that it could use adidas trademarks to develop designs for a LPD/adidas collaboration.  LPD relied on that promise to design merchandise that incorporated adidas trademarks and provided those designs to adidas.  adidas approved them and authorized LPD to market and sell collaboration merchandise.  LPD then proceed to incur the time and expense to promote the collaboration and enter sales contracts with third parties for the sale of collaboration merchandise.  LPD repeatedly advised adidas of its efforts to market the collaboration and sell collaboration merchandise.  Not only did adidas never instruct LPD to desist in these efforts, it also provided LPD with samples of and price information for its contribution to the Classics Capsule so LPD could sell those products together with

Collaboration Capsule merchandise.  If adidas disputed the definitiveness of the LPD-adidas agreement and the legitimacy of Collaboration Capsule products, then adidas had a duty say as much **before** authorizing LPD to take the foregoing steps.  Yet it never did.

Notably, adidas has not referred the Court or counsel to a single case dismissing a breach-of-contract action on the grounds of indefiniteness where one party performed and the other party stood silent and accepted performance.  Rather, nearly all of the cases cited by adidas are parties attempting to enforce executory (wholly unperformed) agreements that are either oral and indefinite, or written but unenforceable on their face due to lack of specificity.[7]

By allowing LPD to publicize and sell collaboration products, and then stating to fashion publications that the Collaboration Capsule was illegitimate, adidas caused LPD severe financial and reputational damages for which it can be held liable on the basis of quasi-contract theories of liability.  Accordingly, adidas is not entitled to dismiss this action even if it could be said that the LPD-adidas agreement lacked sufficiently definite terms.

F.  *LPD's Defamation Claim Is Not Dependent on Its Breach of Contract Claim*

adidas attempts to misguide this Court into believing that LPD's defamation claim is wholly dependent on its breach of contract by incorrectly asserting that if the Parties' agreement

---

[7] *See Maffea v. Ippolito*, 247 A.D.2d 366 (2d Dep't 1998)(granting summary judgment dismissing a claim premised on a purported oral agreement from nine years earlier that any future lottery winnings of any family member would be shared); *Berstein v. Felske*, 143 A.D.2d 863 (2d Dep't 1988) (dismissing an action premised on a letter of intent for the development of real property which on its face was unenforceable); *Joseph Martin, Jr. Delicatessen v. Schumacher*, 52 N.Y.2d 105, 109 (NY 1981)(finding that a lease option at a rent to be agreed upon was unenforceable); *Willmott v. Giarraputo*, 5 N.Y.2d 250 (NY 1959) (finding that an option agreement to purchase real property that contained an agreement to agree upon material terms was unenforceable); *Carmen v. Solely Boneh Ltd.*, 206 A.D.2d 450 (2d Dep't 1994) (finding that a letter of intent that contained an agreement to agree on material terms was unenforceable); *Caniglia v. Chicago Tribune-N.Y. News Syndicate, Inc.*, 204 A.D.2d 233 (1st Dep't 1994)(finding that a breach of contract claim on a personal services contract lacked any specific factual pleadings and should be dismissed); *Danton Contsr. Corp. v. Bonner*, 173 A.D.2d 759 (2d Dep't 1991)(finding that an agreement to purchase real property that allowed parties to reformat material provisions to the contract was unenforceable); *Carione v. Hickey*, 133 A.D.3d 811 (2015)(finding that a granting of summary judgment on a purported oral contract was supported by the facts); *Charles Hyman, Inc. v. Olsen Industries*, 227 A.D.2d 270, 275 (1st Dep't 1996) (finding that a purported oral agreement to merge two companies was not proven at trial.)

is unenforceable, then adidas' representation that the LPD/adidas collaboration was illegitimate is true.  adidas' argument does not withstand scrutiny.

As explained, the Parties did form a contract here, so adidas's representation that the LPD/adidas collaboration was illegitimate is false.  However, even if the LPD-adidas contract was unenforceable because of technical deficiencies, adidas still defamed LPD by misrepresenting that the LPD/adidas collaboration was "illegitimate" because it had previously declared that collaboration to be a "full go."   In fact, adidas recognized the legitimacy of the collaboration (albeit not to V Magazine) after having misrepresented that it was illegitimate.

Where a court finds that an agreement fails for indefiniteness, it merely finds that it cannot enforce *the agreement* because it does not know its exact terms.  It does not find there was no agreement whatsoever.  Here, it is indisputable that adidas agreed that LPD could use its trademarks for the collaboration and could promote and sell collaboration merchandise.   Thus, even if the Court found that the LPD-adidas agreement was insufficiently definite, it does not follow that *no agreement* ever existed between LPD and adidas.  adidas expressly and repeatedly recognized its collaboration with LPD (before and after the V Magazine incident).  Therefore, adidas's description of the collaboration as "illegitimate" is *inherently* false (e.g. not dependent on an enforceable contract between LPD and adidas) and amounts to actionable defamation.  adidas' false, defamatory statement to V Magazine severely damaged LPD's reputation in the fashion industry and among the fashion press.  Pursuant to New York law, adidas is liable to LPD for those damages (as well as punitive damages) as a matter of law.  *See* LPD Memorandum in Support of its Partial Summary Judgment Motion, p. 19-20.

G.      *adidas Authorized LPD to Use Its Trademarks; Therefore, LPD Did Not Infringe on Them and adidas Abandoned Them Such That They Should Be Cancelled Pursuant to 15 U.S.C §§ 1119 and 1064*

24

adidas authorized LPD to use adidas trademarks with the sole restriction being that it use the Three Tripe Mountain logo be used as opposed to the original Trefoil logo.  While LPD did use the adidas trademarks, adidas failed to exercise any "degree of supervision and control over" LPD's use thereof (i.e. that is it never inspected the collaboration samples or final products sold to customers).  *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959).  "When a licensor fails to exercise sufficient control over the quality of the product that its licensee sells under its mark, 'such 'naked licensing' will result in abandonment.'"  *Amscan Inc. v. Shutter Shades, Inc.*, No. 13-CV-1112, p. 8 (S.D.N.Y. Apr. 30, 2015), Declaration of J.R. Stevenson, Esq., Ex. 2 (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)).  When, as here, a party grants another a naked license, "the best course" is to cancel those trademarks pursuant to U.S.C. §§ 1119 and 1064.  *Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (holding that "[w]here, as here, a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course"); see also *Ditri v. Coldwell Banker Residential Affiliates, Inc*., 954 F.2d 869, 873 (3d Cir. 1992).  Further, because adidas grant it a naked license, LPD is "entitled to a declaration that [its] sales of [apparel bearing adidas's trademarks] did not infringe [adidas's] mark[s]," *Amscan*, *supra*, No. 13-CV-1112 at pp. 15-16, and the other declaratory relief sought in the Complaint.

## <u>CONCLUSION</u>

Based on the foregoing, LPD respectfully requests that adidas's Motion to Dismiss be denied in its entirety.

Dated:  New York, New York        KENNEDY LILLIS SCHMIDT & ENGLISH
March 14, 2016              Attorneys for Plaintiff
LPD NEW YORK, LLC

By:  s/ John T. Lillis
     John T. Lillis Jr.
     75 Maiden Lane – Suite 402
     New York, New York  10038-4816
     Telephone:  212-430-0800

     LAW OFFICES OF J.R. STEVENSON
     Attorneys for Plaintiff
     LPD NEW YORK, LLC

By:  s/ J.R. Steveson
     J.R. Stevenson
     75 Maiden Lane – Suite 402
     New York, New York  10038-4816
     Telephone:  (212) 939-7588