**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**LPD NEW YORK, LLC,**

                       **Plaintiff,**

             -against-

**ADIDAS AMERICA, INC., et al.,**

                       **Defendants.**
-----------------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**

**15-CV-6360 (MKB)**

**ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:**

Plaintiff LPD New York, LLC ("LPD" or "plaintiff") pleads claims for breach of contract, defamation, and unjust enrichment, and seeks a series of declarations under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, related to certain intellectual-property rights that it claims to possess. See Complaint (Nov. 5, 2015) ("Compl.") ¶¶ 104-131, Electronic Case Filing ("ECF") Docket Entry ("DE") #1. Defendant adidas America Inc. ("adidas America") moves to dismiss the complaint in its entirety for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").[1] See Defendant's Notice of Motion and Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) (Mar. 28, 2016), DE #20; Memorandum of Law in Support of Defendant adidas America, Inc.'s Motion to Dismiss the Complaint (Mar. 28, 2016) ("Def. 12(b)(6) Mem."), DE #21. Plaintiff cross-moves for summary judgment on the breach of contract, defamation, and declaratory judgment claims. See Notice of Plaintiff LPD New York, LLC's Motion for

---

[1] The names of both defendants are styled as "adidas" in the complaint and motion papers, with no capitalization, even when the name "adidas" commences a sentence.

Partial Summary Judgment (Mar. 28, 2016), DE #24; Memorandum of Law in Support of Plaintiff LPD New York, LLC's Motion for Partial Summary Judgment (Mar. 28, 2016) ("Pl. SJ Mem."), DE #24-1.

For the reasons that follow, this Court recommends that defendant adidas America's motion to dismiss under Rule 12(b)(6) of the FRCP be granted with respect to the breach of contract and declaratory judgment claims, and denied with respect to the defamation and unjust enrichment claims. This Court also recommends that plaintiff's motion for partial summary judgment be denied.

## BACKGROUND

I.   *The Parties' Purported Agreement*

Plaintiff LPD is a New York limited liability company ("LLC"), see Compl. ¶ 2, that is in the business of designing and manufacturing "athletic jersey-inspired tee-shirts[,]" id. ¶ 15. Its founder and sole member is Benjamin Fainlight ("Fainlight"). See Declaration of Benjamin Fainlight (Mar. 28, 2016) ("Fainlight Decl.") ¶ 2, DE #24-4.[2] Defendant adidas AG ("adidas AG") is a German joint-stock company with its principal place of business in Germany. See Compl. ¶ 5. Defendant adidas America is a Delaware corporation with its principal place of business in Oregon, see id. ¶ 4, and "directs all U.S.-based operations on behalf of adidas AG," id. ¶ 6.

The complaint alleges that, on October 2, 2013, "adidas contacted LPD" by email to

---

[2] An LLC, for the purpose of diversity jurisdiction, takes the citizenship of each of its members. See Order to Show Cause (May 27, 2016) at 2, DE #32. As Fainlight is a citizen of New York, see Letter Responding to the Court's May 27th Order to Show Cause (June 1, 2016), DE #33, so too is LPD.

"open up a line of communication in hopes of a future collaboration between adidas and LPD."
Id. ¶ 18 (internal quotation marks omitted); see also id. ¶ 18 n.1.[3]  In particular, "adidas"
expressed its hope that "LPD could 'design 5 unique styles for some of the most storied
college basketball teams' and a 'street-to-court campaign' . . . to 'add the "streetwear" status
that LPD's brand has' to adidas's brand."  Id. ¶ 19 (brackets in original omitted).[4]  "LPD
responded the same day to express its interest in collaborating with adidas on an 'athletic/street
crossover' collaboration."  Id. ¶ 20.

Thus began an extensive email correspondence between "LPD" and "adidas" that ran
for more than a year.  See generally id. ¶¶ 22-71.  After the initial exchange of emails,

> LPD developed (1) a series of design proposals for adidas's nominated NCAA
> Basketball Teams, which included prints for tee shirts, basketball jerseys,
> basketball shorts, and team jackets, that could be featured with adidas's own
> contributions to a collaborative NCAA-Basketball-related capsule ("Classics
> Capsule"), and (2) a series of design proposals for basketball jerseys, tee-shirts,
> outerwear, jackets, hats, shorts, sports bras, lanyards, and pants for the
> LPD/adidas "athletic/street crossover" collaboration ("Collaboration Capsule").

_____

[3] The complaint deliberately blurs the distinction between the two adidas entities.  See, e.g.,
Compl. ¶ 7 ("adidas America, Inc. and adidas AG, as well as any predecessors or related
entities, will hereafter collectively be referred to as 'adidas.'"); id. ¶ 13 ("This Court has
personal jurisdiction over adidas because they (1) have marketed, distributed, offered for sale,
and/or sold products to persons within New York; (2) regularly transact and conduct business
within New York; and/or (3) otherwise have made or established contacts within New York to
permit the exercise of personal jurisdiction.").  The Background section of this opinion will
refer to "adidas," consistent with the usage in the complaint.

[4] The complaint uses direct quotations extensively without providing citations to what is being
quoted.  It appears that these quotations are from emails exchanged between Fainlight and
Jarrett Mann, an employee of adidas America (collectively, the "Mann-Fainlight Emails"), see
Exhibits 2 through 28, 30 through 32, 35 through 37 to Fainlight Decl., DE #24-6 to #24-32,
#24-34 to #24-37, #24-39 to #24-41, and that these emails form the basis of the purported
contract between "LPD" and "adidas," see Fainlight Decl. ¶¶ 10-11.

Id. ¶ 21.

"LPD" provided "adidas" with its preliminary designs for the Classics Capsule on October 17, 2013.  See id. ¶ 22.  "adidas" responded that same day to express its "excite[ment]" regarding these designs.  See id. ¶ 23.  One month later, on November 17, 2013, "LPD" inquired as to "how these [pieces] should/will be branded (with both LPD and Adidas logos) and how/where they will be distributed (in Adidas stores/distributors or otherwise)?"  Id. ¶ 24 (brackets in original).  On November 21, 2013, "adidas" replied, suggesting several possible options for co-branding and retailing the products.  See id. ¶ 25. "LPD" responded later that day, as follows:

> On the branding front [LPD] would love to co-brand the collaboration items, [and] think[s] this will really bring together the brands and the visions we're bringing to life.  [LPD would] love to work on a tag or label for the items, if you or your designers have any ideas that come to mind.  Would [LPD] be able to get those from [adidas's] production so we can attach them to the items on our end?  When the time comes of course.
>
> For retail [LPD] would love to explore all three options.  [LPD] thinks some of [its] retailers would definitely jump at the chance to carry these items, both within and outside the USA, and retailing them online is a no brainer.  The stop-in-shop is an amazing idea [LPD] would absolutely *love* to be involved with. [LPD] think[s] visuals will be crucial, and as soon as we have samples of the first approved products [LPD] can start doing visuals on [its] end.  [LPD has] a great stylist who's done work for Vogue, Purple, W Mag, and a host of others – [who] came straight to mind . . . because . . . he can make really striking images that will really nicely round out the vision.
>
> Two other questions came to mind this week too.  **First, [LPD] was wondering if it would be possible to get a letter of intent for the collaboration?** . . . Second, [LPD is] starting to ramp up planning for [its] [Autumn/Winter 2014] show happening this February in NYC . . . [is] there[] some opportunity for [LPD] to use Adidas shoes in the show?  [LPD] figured it might be a nice way to begin bringing the brand association together as well as attention for each brand.

Id. ¶ 26 (italics, brackets, and ellipses in original; boldface added).

That same day, adidas replied:

For the labels [adidas] would love if [LPD] could work on those. [adidas's] production team could turn trim samples in about 30-45 days. So, yes [adidas] could definitely get them through [its] production and have the[5] available to badge the product. As of right now [adidas's nominated] teams are aligned to wear [the adidas designed pieces from the Classics Capsule] around 1/1. But the retail could launch earlier, potentially before holiday time to catch sales and drive momentum. [adidas] looks forward to visuals, as [it has] seen things from the past that were really impressive and drew [adidas] toward [LPD's] brand.

**[adidas] think[s] the letter of intent is perfect . . . [and] will work on putting some of this into a document with the purpose of this along with details . . . .**

Also, [adidas] would love to provide [LPD] shoes.

Id. ¶ 27 (non-footnote brackets and ellipses in original; footnote and boldface added).

In January 2014, "adidas reiterated that it would like to collaborate on LPD's fashion show and that it would supply LPD with adidas shoes for that show and for LPD's fashion 'look book' for LPD's Autumn/Winter 2014 collection." Id. ¶ 28. On January 23, 2014, "LPD advised adidas that it would begin to have samples made from its designs for the Classics Capsule." Id. ¶ 29. The next month, "LPD" provided "adidas" with both a "look book" for its Autumn/Winter 2014 collection and a concept proposal for the Collaboration Capsule. See id. ¶¶ 32-33.

On March 3, 2014, "LPD advised that it would be sending adidas some tee shirt samples from its Autumn/Winter 2014 collection" and also "sought adidas's feedback on its

---

[5] The complaint contains a typographical error; the word in the quoted email is "them." See 11/21/13 5:59 p.m. Email from Jarrett Mann to Benjamin Fainlight, Exhibit 7 to Fainlight Decl., DE #24-11 at 2.

concept proposal for the Collaboration Capsule . . . ."  Id. ¶ 34.  LPD "again asked about a

letter of intent and press strategy for the collaboration."  Id.  On March 11, 2014, "adidas"

responded regarding the letter of intent:

> The letter of intent is currently a work in progress, [adidas] [is] currently
> working on clearing all development boundaries and expecting finalized samples
> [for its portion of the Classics Capsule] here in the next two weeks.  Of which
> [adidas] will send [LPD] a full set along with some other blank samples that you
> can embellish and potentially elevate for additional pieces.  In terms of next
> steps let's begin to put down milestones and checklists so that we can remain
> connected . . . .

Id. ¶ 35 (brackets and ellipses in original).  LPD replied the same day that it was "[h]appy" to

be "on the same page so we can get things rolling!"  Id. ¶ 36.

> [LPD] also wanted to make sure [LPD and adidas were] on the same page with
> sales and profits/etc - what did [adidas] have in mind for the collab? [LPD]
> remember[ed] it being OK that [it] s[ell] directly online and to the stores selling
> LPD, but what kind of breakdown on the sales dollar side w[as] [adidas]
> thinking?

Id. (brackets in original).

> On March 12, 2014, "adidas advised":

> As far as the sales and profits, on [adidas's] side our finished products [from the
> Classics Capsule] will be issue[d] to the teams at no cost.  We would also
> purchase all of the collaboration product[s] for our teams to have.  [adidas] ha[s]
> a licensed apparel side that would sell the game shorts and jersey's and those
> royalties would go to the schools.  However the capsule collection profits would
> likely be primarily profits to LPD.  We are seeking [LPD's] status and many of
> [its] creative ideas here and because a lot of our product is on court school
> products, the primary retail profits would come from your end.  [adidas] will
> have . . . to confirm this, but once the mission statement is complete those
> details will be in that document.

Id. ¶ 37 (brackets and ellipses in original).

LPD responded that same day:

> OK great – thanks for the clarification. . . . All below sound[s] good to [LPD] – just let [LPD] know the specifics and that everything is confirmed **once [adidas] know[s] for sure**. [LPD has] been . . . trying to figure out the calendar for sales - do[es] [adidas] have a preference if [LPD] start[s] selling according to the fashion calendar or not? For [LPD] to capitalize best on buyers [LPD] think[s] it would be best to start selling during men's and women's market weeks, which is from July through August (roughly). The buyers could sign non-disclosure agreements so [LPD could] make sure nothing about the collab leaked until [adidas] [was] ready to go ahead and publicize.

Id. ¶ 38 (brackets and ellipses in original; boldface added).

On March 31, 2014, "LPD advised adidas that it was making arrangements for pattern making and sampling for the Classics and Collaboration Capsules' pieces and asked if adidas would cover the costs associated with this process in the first instance or if LPD should cover them first and then get reimbursed from adidas." Id. ¶ 39. Later that day, "adidas" responded that "it would pay for pattern making and sampling the Classics and Collaboration Capsules' pieces and that adidas would provide a 'budget code' to be charged for those costs." Id. ¶ 40. LPD also inquired as to who would be manufacturing these pieces, see id. ¶ 41, and "adidas replied that the Classics and Collaboration Capsules' pieces could be manufactured in adidas facilities, with the production lots sold directly by LPD or by adidas (applying adidas's royalty coding so LPD 'could receive the dollar sales')[,]" id. ¶ 42.

On April 28, 2014, "adidas advised that it had received the samples LPD sent from its Autumn/Winter 2014 collection." Id. ¶ 45. The next day, "adidas supplied the budget code it promised to provide to cover the costs of pattern making and sampling for the Classics and Collaboration Capsules." Id. ¶ 46. Thereafter, on May 21, 2014, "LPD advised adidas that

LPD's pattern-and-sample maker did not accept adidas's budget code for billing purposes, that LPD had to accordingly pay pattern making and sampling costs, and that LPD was seeking reimbursement from adidas because adidas had agreed to cover those costs." Id. ¶ 47.

In early June 2014, LPD notified "adidas" that it had begun discussing the Capsules with fashion buyers, that it would need to start finalizing sales in the near future, see id. ¶ 48, and that rap mogul Jay-Z was interested in pieces from the Collaboration Capsule, see id. ¶ 49. "adidas" replied on June 12, 2014 that there had been a "large realignment within [its] group so many of [adidas's] projects ha[d] been put on hold[,]" but that "[adidas] still want[s] to see [its] project [with LPD] come to life." Id. ¶ 50 (brackets in original). Regarding pricing the Collaboration Capsule, LPD responded that it was

> hard to pin down exactly since it depends on production (specifically whether [LPD is] producing the pieces here or at [adidas's] facilities abroad and how many units of each style are ordered), but [LPD] is making sure that it hits a lower price point then [sic] the main collection as much as possible.

Id. ¶ 51 (brackets in original). LPD also requested "some sort of confirmation that the collaboration between adidas and LPD will be happening and that any designs meant for this collaboration will be kept confidential for these purposes." Id. "adidas" responded on June 16, 2014 that "none of LPD's designs would be shared and that the collaboration would only be confirmed once adidas was '100% on board' at which time it would dedicate more funding for the collaboration." Id. ¶ 52.

On June 18, 2014, "LPD sent to adidas its design proposal for the Collaboration Capsule, which incorporated various adidas trademarks . . . ." Id. ¶ 53. "adidas" responded on June 26, 2014 that it "'fe[lt] very strongly about the [design proposal] [LPD] sent over,'

that adidas's upper management approved the designs, and that adidas gave its 'permission to move forward' with the collaboration." Id. ¶ 54 (brackets in original). Several weeks later, on July 14, 2014, "adidas reiterated to LPD that it would pay the pattern making and sample production costs LPD incurred and that it would have an internal meeting to further discuss the LPD/adidas collaboration to establish a marketing budget and promotional plan." Id. ¶ 60.

The communication between LPD and "adidas" appears to have continued harmoniously for several months. See id. ¶¶ 61-74. This changed in November 2014 after LPD produced a marketing video for the Collaboration Capsule that it admits was "provocative," though "in line with LPD's marketing efforts for its prior collections and industry practice in general." Id. ¶ 76. On November 19, 2014, V Magazine -- "a fashion publication that had previously publicized LPD's prior collections," id. ¶ 77 -- published an "exclusive story on the Collaboration Capsule" on its main website, see id. ¶ 79. The next day, a senior editor at V Magazine "contacted LPD to advise that an adidas representative claimed during a telephone call that the LPD/adidas collaboration was 'illegitimate' . . . ." Id. ¶ 80. That same day, LPD expressed to adidas its confusion over this situation, see id. ¶ 85, and received the following email response:

> The press of the collaboration was brought to [adidas's] attention today. The original pitch was to collaborate on bringing light to our NCAA Classics Concept. [adidas] feel[s] as though this took another route and with no knowledge of the press being put out or no visibility to what was being shown . . . our PR group raised some flags.

> [adidas and LPD] have not been able to connect in quite some time and with [the previous adidas executive] who approved this [project] leaving, we were left on an island without much material to present to the new [adidas] management. [adidas] did provide initial green lights to proceed but all content needed to be approved by [adidas's] higher ups.

> [I]f [LPD] provide[s] . . . some marketing tools & materials . . . [that would] help the case. Please send those over . . . asap so [adidas] can discuss [internally].
>
> Are there any of the NCAA properties being used on any of the products?

Id. ¶ 86 (brackets and ellipses in original).

LPD replied that it had thought that "everything was agreed upon and green lit for the [Collaboration] capsule as [LPD] designed it." Id. ¶ 87 (brackets in original). On November 21, 2014, "adidas" responded:

> Thank you for your response.
>
> Our PR team is pretty unhappy now due to the lack of knowledge they had about the material being put out. Also the content was somewhat polarizing so this caused some further disruption.
>
> From [adidas's] side the products are good to go, but they ask is that[6] the video including the "nudity" must be taken down. We may also run into an issue with any products with our NCAA properties names used on it. We may be able to have a promotional opportunity with those to put on court but selling those without royalties could cause issues. We are walking a fine line but because [adidas] gave approval adidas is willing to allow this to go forward but we are just trying to avoid any legal issues.
>
> [adidas] will need this content to stop being produced ASAP or our legal department will take action. Unfortunately the content has rubbed our higher ups the wrong way due to the content.

Id. ¶ 88 (non-footnote brackets in original; footnote added). Upon receiving this email, LPD replaced the original marketing video with a "slightly edited version and advised V Magazine that adidas had confirmed the legitimacy of the LPD/adidas collaboration." Id. ¶ 89. V Magazine, which had pulled its story from its website, see id. ¶ 82, refused to republish a

---

[6] The grammatical error appears in the complaint and quoted email. See 11/21/14 3:35 p.m. Email from Jarrett Mann to Benjamin Fainlight, Exhibit 36 to Fainlight Decl., DE #24-40 at 2.

corrected version of the story, see id. ¶ 89.

Despite these tensions, LPD "continued to attempt to publicize the LPD/adidas collaboration and market pieces from the Collaboration Capsule . . . ." Id. ¶ 91. "adidas" never publicly acknowledged the "legitimacy" of its collaboration with LPD, nor did it market either of the Capsules. See id. ¶ 93. Still, as of the filing of the complaint,

> LPD continues to market and sell pieces from the Collaboration Capsule and intends to continue to manufacture, market, and sell those pieces. LPD, however, decided not to fill orders for the pieces it manufactured from its portion of the Classics Capsule and retains those pieces, fully reserving its rights therein.

Id. ¶ 94.

In January 2015, after one of LPD's Japanese customers questioned the legitimacy of its collaboration with "adidas," see id. ¶ 95, LPD requested that "adidas" provide a letter confirming the collaboration, see id. ¶ 96. On February 3, 2015, "adidas provided a brief letter stating that LPD and adidas had collaborated." Id. ¶ 97. This was followed up in May 2015 with a proposal by "adidas" that LPD sign a "back-dated licensing agreement[,]" dated June 1, 2014, that "acknowledged LPD's right to 'use the adidas name and the Three-Stripes trademark (collectively "adidas trademarks")' but sought to limit that right to the Classics and Collaboration Capsule pieces LPD had already manufactured to date – provided LPD paid 10% royalties on its sales to adidas." Id. ¶ 100. The "proposed back-dated licensing agreement" also would have "terminate[d] LPD's right to manufacture and sell pieces from the Classics and Collaboration Capsules" as of May 1, 2015. Id. (brackets added); see also Trademark Permission Agreement ("Proposed Licensing Agreement"), attached as Exhibit 39 to Fainlight Decl., DE #24-43. LPD refused to sign this agreement, due its belief that it "did not comport

with LPD's and adidas's original agreement . . . ." Compl. ¶ 102. LPD sought "reimbursement for pattern making and sampling costs" that it believes "adidas" had agreed to pay. Id. "adidas," in turn, threatened to sue LPD for trademark infringement. Id.

II.      *The Procedural Posture of this Case*

Plaintiff commenced this action on November 5, 2015. See generally id. The complaint includes a claim for breach of contract, with the contract comprising the "oral and written exchanges" between LPD and "adidas" described in the foregoing section. See id. ¶ 105. Specifically, according to the complaint,

> LPD and adidas formed a contract . . . under which, *inter alia*, (1) LPD agreed (a) to design the Classics and Collaboration Capsules, which consisted (in whole or in part) of pieces containing certain adidas trademarks, (b) co-market and co-promote those Capsules, (c) co-produce pieces from those Capsules, (d) and co-sell the pieces from those Capsules; and (2) adidas agreed (a) to allow LPD to use certain adidas trademarks without restriction, (b) agreed to fund pattern making and sample production costs for the Classics and Collaboration Capsules, (c) agreed to co-manufacture the Classics and Collaboration Capsules' pieces in adidas manufacturing facilities, (d) agreed to co-market and co-promote the Classics and Collaboration Capsules, and (e) agreed to co-sell pieces from the Classics and Collaboration Capsules.

Id. The pleading further alleges that "adidas" breached this contract by, *inter alia*,

> (1) authorizing LPD to use certain adidas trademarks without restriction and later claiming that the LPD/adidas collaboration was illegitimate and claiming that LPD infringed on adidas trademarks, (2) failing to fund pattern making and sample production costs for the Classics and Collaboration Capsules, (3) failing to manufacture the Classics and Collaboration Capsules' pieces in adidas manufacturing facilities, (4) failing to co-market and co-promote the Classics and Collaboration Capsules, and (5) failing to co-sell pieces from the Classics and Collaboration Capsules.

Id. ¶ 109.

The complaint additionally includes a claim for defamation due to "adidas's" "false allegation" to V Magazine that its collaboration with LPD was "illegitimate." See id. ¶¶ 112-113. The pleading further complains of unjust enrichment, in that plaintiff's marketing and promotion of the Classics Capsule "conferred a substantial benefit on adidas[,]" id. ¶ 127, for which "adidas" failed to compensate plaintiff, see id. ¶ 128.

The complaint also seeks a series of declaratory judgments confirming that:

> (1) LPD did not infringe on any adidas trademark; (2) LPD owns all intellectual property rights in the Collaboration Capsule; (3) vis-à-vis LPD and adidas, LPD owns all intellectual property rights in the LPD-designed portion of the Classics Capsule; (4) LPD is free to manufacture, market, and sell merchandise from the Collaboration Capsule; and (5) adidas abandoned all of the adidas trademarks LPD used in the Collaboration Capsule.

Id., Third Cause of Action, at pp. 26-27 (original text in all caps). Plaintiff seeks damages in excess of $50 million, as well as punitive damages, attorney's fees, and declaratory relief. See id., *ad damnum* clause ¶¶ A-J.

On December 2, 2015, counsel for adidas America requested a pre-motion conference before the Honorable Margo K. Brodie in anticipation of filing a motion to dismiss under Rule 12(b)(6) of the FRCP. See Letter Motion for Pre-Motion Conference by Adidas America, Inc. (Dec. 2, 2015), DE #10. Among other things, the letter-request noted that adidas AG had not yet been properly served. See id. at 1 n.1. Judge Brodie denied the request for a pre-motion conference, but instructed the parties to submit a proposed briefing schedule for the motion to dismiss. See Order Denying Motion for Pre-Motion Conference (Dec. 9, 2015).

On December 9, 2015, plaintiff filed its own letter requesting a pre-motion conference in anticipation of moving for partial summary judgment. See Letter Motion for Pre-Motion

Conference by LPD New York, LLC (Dec. 9, 2015), DE #12. Judge Brodie denied this request as well, and instructed the parties to submit a briefing schedule for both cross-motions. See Order Denying Motion for Pre-Motion Conference (Dec. 10, 2015). When the parties were unable to agree upon a briefing schedule, Judge Brodie set one, with the fully briefed motion to be filed by March 28, 2016. See Order re Request for Briefing Schedule (Dec. 18, 2016).

The parties submitted their motion papers according to schedule. In support of its Rule 12(b)(6) motion to dismiss the complaint in its entirety, adidas America argues that "LPD's elaborate pleading is utterly devoid of factual allegations capable of showing that a definite and enforceable contract ever existed between the parties." Def. 12(b)(6) Mem. at 1 (emphasis omitted).[7] adidas America argues further that plaintiff's defamation and declaratory judgment claims are dependent on the existence of a valid contract, see id. at 14, 17, and that plaintiff has not set forth sufficient factual allegations to support its unjust enrichment and declaratory judgment claims, see id. at 15, 17-19.

LPD, in opposition, argues that, through their "written and oral communications, LPD and adidas unquestionably manifested intent to be bound to an agreement." Memorandum of Law in Opposition to Defendant adidas America, Inc.'s Motion to Dismiss (Mar. 28, 2016)

---

[7] adidas America's Rule 12(b)(6) memorandum reiterated that adidas AG had not been served or appeared in the action. See Def. 12(b)(6) Mem. at 1 n.1. adidas AG has now been served, and is represented by the same counsel as adidas America. See Motion for Pre-Motion Conference by Adidas AG, Adidas America, Inc. (July 18, 2016), DE #37. adidas AG intends to move to dismiss for, *inter alia*, lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the FRCP. See id. at 1. Judge Brodie set a briefing schedule for this motion to dismiss, with the fully briefed motion to be served by October 10, 2016. See Order granting Letter Application Regarding Briefing Schedule (Aug. 10, 2016).

("Pl. 12(b)(6) Opp.") at 1, DE #23.[8]  In the alternative, plaintiff argues that LPD would

nevertheless be entitled to damages under "quasi-contractual theories of liability such as unjust

enrichment, promissory estoppel and/or detrimental reliance[,]" id. at 2; see also id. at 21-23

-- though the complaint pleads only one of these three theories, for unjust enrichment, see

Compl. ¶¶ 126-131.  Plaintiff also contends that its defamation claim is not dependent on the

existence of an enforceable contract, see Pl. 12(b)(6) Opp. at 2, 23-24, and, with respect to its

declaratory judgment claims, that "adidas" authorized LPD to use the "adidas" trademarks,

which "adidas" abandoned, see id. at 24-25.

　　　　LPD cross-moves for summary judgment on the breach of contract, defamation, and

declaratory judgment claims (but not the unjust enrichment claim).  See Pl. SJ Mem. at 2.

LPD appends to its summary judgment motion the Mann-Fainlight Emails, see Exhibits 2

through 28, 30 through 32, 35 through 37 to Fainlight Decl., DE #24-6 to #24-32, #24-34 to

#24-37, #24-39 to #24-41, which LPD contends show that there can be no genuine dispute as

to the existence of a contract between LPD and "adidas," see Pl. SJ Mem. at 19.  adidas

America, in opposition, argues that "numerous issues of material fact preclude LPD's

requested relief."  adidas America, Inc.'s Opposition to Plaintiff's Motion for Partial Summary

Judgment (Mar. 28, 2016) ("Def. SJ Opp.") at 1, DE #26.

　　　　On April 6, 2016, Judge Brodie referred plaintiff's motion for partial summary

---

[8]  According to plaintiff, "although LPD negotiated with adidas America to form the contract
at issue here (under which LPD was authorized to use adidas trademarks), adidas America
bound adidas AG to that contract because it had actual authority to do so."  Pl. 12(b)(6) Opp.
at 1 n.1.  adidas America rejects this contention.  See adidas America, Inc.'s Reply in Support
of Its Motion to Dismiss the Complaint (Mar. 28, 2016) ("Def. 12(b)(6) Reply") at 1 n.1, DE
#22.  That dispute is not now before this magistrate judge.

judgment and adidas America's motion to dismiss to the undersigned magistrate judge for a report and recommendation.  See Order Referring Motion (Apr. 6, 2016).

## DISCUSSION

I.    *adidas America's Motion to Dismiss*

### A. The Legal Standard Under Rule 12(b)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the FRCP, a court must accept the complaint's factual allegations as true, and draw all reasonable inferences in favor of the plaintiff.  See, e.g., Sherman v. Town of Chester, 752 F.3d 554, 560 (2d Cir. 2014).[9]  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678

---

[9]  In a throw-away footnote at the very end of its brief in opposition to plaintiff's summary judgment motion, adidas America suggests that, "in light of adidas's motion to dismiss this action, this Court has the power under Rule 56 [of the FRCP], to grant summary judgment in adidas' favor in light of the utter absence of evidentiary support for the claims that LPD makes in the Complaint."  Def. SJ Opp. at 18 n.7.  adidas America has not, however, submitted a statement of the "material facts as to which [it] contends there is no genuine issue to be tried[,]" S.D.N.Y./E.D.N.Y. Local Civ. R. 56.1(a), and its response to LPD's Rule 56.1 statement is less than illuminating, see generally adidas America, Inc.'s Response to Plaintiff LPD New York, LLC's Local Civil Rule 56.1 Statement of Undisputed Facts (Mar. 28, 2016), DE #27.  Nor does adidas America address the standards pursuant to which a court, in its discretion, may convert a motion to dismiss under Rule 12(b)(6) to one for summary judgment.  See generally Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC, 151 F.Supp.3d 287, 291 (E.D.N.Y. 2015); see also Fed. R. Civ. P. 12(d).  Accordingly, the Court declines adidas America's half-hearted invitation to treat its motion to dismiss as one for summary judgment, but instead analyzes that motion under the Rule 12(b)(6) standard.

(2009). A plaintiff need not, however, allege "detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 70 (2d Cir. 2014).

### B. The Breach of Contract Claims

#### 1. The Applicable Law

"To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Soley v. Wasserman, 823 F.Supp.2d 221, 229-30 (S.D.N.Y. 2011) (quoting Williams v. Time Warner Inc., No. 09 Civ. 2962(RJS), 2010 WL 846970, at *6 (S.D.N.Y. Mar. 3, 2010)).[10]

The first element -- the existence of a contract -- requires "an offer, acceptance, consideration, mutual assent and intent to be bound." Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC, 760 F.Supp.2d 384, 397 (S.D.N.Y. 2011) (quoting Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F.Supp.2d 329, 337 (S.D.N.Y. 2006)). Under New York law, an enforceable contract does not exist unless there is "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect

---

[10] The parties' briefs appear to assume, without stating explicitly, that New York law governs the common law claims in this action. See, e.g., Def. 12(b)(6) Mem. at 8 ("[U]nder New York law, a court cannot enforce a contract unless it can determine what the parties agreed to do."); id. at 14 ("Under New York law, a claim for defamation requires . . ."); Pl. SJ Mem at 8 ("To establish a breach of contract under New York law . . ."). Because the parties are in agreement that New York law governs these claims, this Court applies New York law. See Integrity Elecs., Inc. v. Garden State Distribs., Inc., No. 14 Civ. 3197 BMC, 2016 WL 3637004, at *5 (E.D.N.Y. June 30, 2016) ("Where the parties have agreed to use the substantive law of one state, their consent concludes the choice of law inquiry. This includes implied consent by the conduct of the parties." (internal citation omitted)).

to all material terms." Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P., No. 08 Civ. 10578(RJS), 2010 WL 1257326, at *4 (S.D.N.Y. Mar. 12, 2010) (quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999)); accord Berkson v. Gogo LLC, 97 F.Supp.3d 359, 392 (E.D.N.Y. 2015) ("In order to be enforceable, a contract must be sufficiently definite as to its 'material terms[.]'" (quoting 17A Am. Jur. 2d Contracts § 190 (2015))); Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (1981) ("[D]efiniteness as to material matters is of the very essence of contract law."); Maffea v. Ippolito, 668 N.Y.S.2d 653, 654 (2d Dep't 1998) ("[B]efore a plaintiff may secure redress for the breach of an agreement, the promise made must be sufficiently certain and specific so that the parties' intentions are ascertainable.").

"A 'material term' in a contract is '[a] contractual provision dealing with a significant legal issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'" Berkson, 97 F.Supp.3d at 392 (quoting Black's Law Dictionary 1608 (9th ed. 2009)) (brackets in original); see also, e.g., Local 917, Int'l Bhd. of Teamsters v. NLRB, 577 F.3d 70, 74 (2d Cir. 2009) (material terms include, but are not limited to, "price, quantity, and the means by which the product is delivered" (citations omitted)); Caruso v. Grace, No. Civ. 2353(SAS), 2011 WL 4472479, at *9 (S.D.N.Y. Sept. 27, 2011) ("The failure to state the duration of an agreement is also a material term in a contract whose absence can render an agreement unenforceable."). Under New York law, a price term is an essential element of any binding agreement. See Piven, 2010 WL 1257326, at *4 (citing Cooper Square Realty, Inc. v. A.R.S. Mgmt. Ltd., 581 N.Y.S.2d 50, 51 (1st Dep't 1992); McCollester v. Chisholm, 478 N.Y.S.2d 691, 692 (2d Dep't 1984)).

"If the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract." Benicorp, 447 F.Supp.2d at 337. An ambiguity exists when "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Prince of Peace, 760 F.Supp.2d at 397 (quoting Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010)). "[C]ourts applying New York law have found agreements unenforceably vague where they amount to a 'mere agreement to agree, in which a material term is left for future negotiations.'" Piven, 2010 WL 1257326, at *5 (quoting Schumacher, 52 N.Y.2d at 109-10 (finding a lease's renewal clause unenforceable where the rent for the renewal period was "to be agreed upon")); accord Cooper Square Realty, 581 N.Y.S.2d at 50 (finding sales contract void where it provided that defendants would pay plaintiff "a commission to be separately determined"); N.Y. Military Acad. v. NewOpen Grp., No. 2014-01792, 2016 WL 4099193, at *1 (2d Dep't Aug. 3, 2016) (reversing lower court's denial of motion to dismiss breach of contract and related claims where the parties' letter of intent "conclusively establish[ed]" that the parties had "a mere agreement to agree").

A contract "is unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion." Prince of Peace, 760 F.Supp.2d at 397 (quoting Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997)). At the same time, New York courts have acknowledged that "the concept of definiteness cannot be reduced to a precise,

universal measurement." <u>Piven</u>, 2010 WL 1257326, at *4 (quoting <u>Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.</u>, 74 N.Y.2d 475, 482 (1989)). As such, the New York Court of Appeals has instructed that courts should "apply the 'definiteness doctrine' sparingly, because 'at some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract.'" <u>Id.</u> (quoting <u>Cobble Hill</u>, 74 N.Y.2d at 483). In particular, a price term "is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula." <u>Cobble Hill</u>, 74 N.Y.2d at 483. An agreement's price term may be sufficiently definite if "the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage." <u>Id.</u>

New York law recognizes implied contracts as well as express contracts. <u>See, e.g.</u>, <u>Soley</u>, 823 F.Supp.2d at 230 (citing <u>Jemzura v. Jemzura</u>, 36 N.Y.2d 496, 503-04 (1975)) (emphasis omitted). "Absent a written agreement between the parties, a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." <u>Id.</u> (brackets and internal quotation marks omitted); <u>see also</u> <u>Hercules Inc. v. United States</u>, 516 U.S. 417, 424 (1996) ("An agreement implied in fact is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." (internal quotation marks

omitted)). While "[a]n implied-in-fact contract is just as binding as an express contract arising from declared intention," Soley, 823 F.Supp.2d at 230, "a contract cannot be implied in fact where the facts are inconsistent with its existence . . . or where there is an express contract covering the subject-matter involved[,]" id. (quoting Ludemann Elec., Inc. v. Dickran, 903 N.Y.S.2d 532, 534 (2d Dep't 2010)) (emphasis omitted).

### 2. The Law As Applied to the Factual Allegations

Here, the complaint alleges that, "[t]hrough their oral and written exchanges, LPD and adidas formed a contract[,]" Compl.¶ 105 -- that is, that the parties agreed that each would perform certain acts in exchange for consideration, see id. ¶¶ 106-107. More specifically, according to the complaint, LPD agreed: "(a) to design the Classics and Collaboration Capsules, which consisted (in whole or in part) of pieces containing certain adidas trademarks, (b) co-market and co-promote those Capsules, (c) co-produce pieces from those Capsules, (d) and co-sell the pieces from those Capsules[.]" Id. ¶ 105. In return, "adidas" agreed:

> (a) to allow LPD to use certain adidas trademarks without restriction, (b) agreed to fund pattern making and sample production costs for the Classics and Collaboration Capsules, (c) agreed to co-manufacture the Classics and Collaboration Capsules' pieces in adidas manufacturing facilities, (d) agreed to co-market and co-promote the Classics and Collaboration Capsules, and (e) agreed to co-sell pieces from the Classics and Collaboration Capsules.

Id. The complaint asserts that LPD performed its contractual obligations, see id. ¶ 108, while "adidas" breached its obligations to LPD through five different acts or omissions, see id. ¶ 109.[11]

---

[11] The complaint states that "adidas breached the Contract by, *inter alia*," the aforesaid five acts or omissions, Compl.¶ 109 -- thus implying that "adidas" breached the contract in some

(continued…)

In moving to dismiss the breach of contract claim, adidas America argues that the facts asserted in the complaint

> make clear that many, many supposed terms of the alleged "contract" that LPD seeks to enforce were *never* made definite. Material terms in a collaboration project such as LPD alleges to exist include, for example, and at a minimum, pricing, profit sharing, royalties, intellectual property rights (e.g., trademark rights), marketing costs and cost sharing, the duration of the contract, and the parties' respective rights and obligations under the contract, among others. Nowhere in the Complaint does LPD allege facts capable of showing that the parties agreed to any of these material terms.

Def. 12(b)(6) Mem. at 9 (emphasis in original).

In opposing the motion to dismiss, plaintiff argues that, through the Mann-Fainlight Emails, the parties did agree to all material terms, and that those terms left open or ambiguous were not, in fact, material. See Pl. 12(b)(6) Opp. at 11-13. While acknowledging that "price, profit sharing, and royalties" were "the consideration LPD exchanged with adidas[,]" LPD argues that "there can be no doubt" that the parties agreed on these terms. Id. at 13.[12] Yet plaintiff's own argument highlights the internal inconsistencies in the Mann-Fainlight

---

[11](...continued)
other ways that are as-yet unenumerated.

[12]  Plaintiff observes that "pricing" embraces a number of different concepts: the ultimate retail price of the merchandise, the wholesale price at which the merchandise is sold to retailers, the division between LPD and adidas of the profits from the merchandise, or the royalty that LPD would pay adidas for the use of adidas trademarks. See Pl. 12(b)(6) Opp. at 13-14. As plaintiff correctly argues, setting a retail price is not an essential term of a licensing contract such as the one that plaintiff alleges was created here, see id. at 13 n.5; indeed, "contract provisions that impose minimum resale prices" are not enforceable under New York law. People v. Tempur-Pedic Int'l, Inc., 944 N.Y.S.2d 518, 519 (1st Dep't 2012) (quoting N.Y. Gen. Bus. L. § 369-a) (internal quotation marks omitted). Nevertheless, as discussed hereinafter, the facts asserted in the complaint demonstrate a lack of agreement on other terms that are material.

communications regarding such terms.  For example:

> When the Parties initially discussed profit sharing, adidas advise[d] that "the capsule collection profits would likely be **primarily profits to LPD**" because adidas was "seeking [LPD's] status and many of [its] creative ideas here." Complaint ¶ 37; Fainlight Decl. ¶ 24, Ex. 13.  Later, adidas reiterated in writing that LPD would "receive the dollar sales" from the sale of collaboration merchandise and **orally stated that,** because adidas was really interested in capitalizing on LPD's "cool factor," **profits from sales of pieces from the Collaboration Capsule would go to LPD alone and that no royalties would be owed to adidas.**  Complaint ¶ 42; Fainlight Decl. ¶ 27, Ex. 16.

Pl. 12(b)(6) Opp. at 13 (boldface and first set of brackets added).[13]

There is an obvious distinction between a "likely" arrangement whereby LPD would derive the "primar[y]" share of the profits from the collaboration and an oral assurance that LPD would realize 100 percent of those profits.  These shifting contractual terms underscore the fact that the complaint fails to allege that there was an agreed-upon term for sharing the profits -- rather, issues such as profit-sharing were to be determined in a future written agreement.  See Compl. ¶¶ 36-38, 50-52.  Indeed, as the complaint ackowledges, LPD was explicitly cautioned, in the course of these communications regarding the distribution of profits, that "adidas" would have to "confirm" the arrangement "once the mission statement is complete . . . ."  Compl. ¶ 37.

Nor does the complaint allege that the parties agreed upon the duration of a licensing

---

[13]  To the extent that plaintiff relies on oral agreements as the basis for terms in the purported contract, the alleged agreement appears to run afoul of New York's Statute of Frauds, under which "an agreement that by its terms cannot be performed within one year of its creation is void unless it is in writing."  In re Bayou Hedge Fund Litig., 534 F.Supp.2d 405, 419 (S.D.N.Y. 2007) (citing N.Y. Gen. Oblig. Law § 5-701(a)(1)).  Moreover, contracts of indefinite duration -- as this one appears to be -- "are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds."  Id. (collecting cases).

agreement or limitations on the use of adidas's trademarks. See, e.g., Compl. ¶ 105; see also adidas America, Inc's Reply in Support of Its Motion to Dismiss the Complaint (Mar. 28, 2016) ("Def. 12(b)(6) Reply") at 5, DE #22. Indeed, both LPD and "adidas" expressed their intention that these discussions would be memorialized in a letter of intent, to be agreed upon at a later date. See Compl. ¶¶ 26-27, 34.[14] Plaintiff argues that the lack of an explicit duration term is not fatal to contract formation because the Court can fill the gap by providing for a period of "reasonable duration." See Pl. 12(b)(6) Mem. at 18 (citing Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc., No. 87 CIV. 6294 (MJL), 1988 WL 52777, at *2 (S.D.N.Y. May 18, 1988)). While a court may, in appropriate circumstances, similarly fill the gap of an absent price term by referring to "an extrinsic event, commercial practice or trade usage[,]" Cobble Hill, 74 N.Y.2d at 483, the problem here is that the alleged "contract" lacks definiteness as to *any* of the terms that might be considered material: royalties/profit sharing, duration, quantity of merchandise to be sold. To fill these gaps, the Court would essentially be fashioning a contract, not enforcing one. adidas America is correct that a court cannot "fashion an agreement that necessarily encompasses the intellectual property rights of two parties without . . . evidence that the parties ever agreed to the scope of those rights." Def. 12(b)(6) Reply at 5. "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill, 74 N.Y.2d at 482.

In short, even resolving all factual inferences in plaintiff's favor, the Court is

---

[14] The Proposed Licensing Agreement, which LPD rejected, did, by contrast, contain a temporal limitation, percentage royalty agreement, and limitations on LPD's use of the trademarks. See Proposed Licensing Agreement.

nonetheless constrained to conclude that the facts alleged in the complaint show nothing more than an unenforceably vague, "mere agreement to agree . . . ." Piven, 2010 WL 1257326, at *5. As the touchstone of contract law is the parties' mutual assent, and the communications recounted in the complaint create "substantial ambiguity" as to whether this assent is present, "the Court can neither find, nor enforce, a contract." Benicorp, 447 F.Supp.2d at 337.[15] For these reasons, this Court respectfully recommends that the District Court grant adidas America's motion to dismiss the breach of contract claim under Rule 12(b)(6).

Nonetheless, the facts alleged in the complaint could be construed to support a theory of recovery for promissory estoppel, a quasi-contractual cause of action. See Piven, 2010 WL 1257326, at *8 ("Under New York law, promissory estoppel has three elements: (1) an unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) injury as a result of the reliance." (citing Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000))). The complaint alleges that "adidas" agreed to provide LPD with budget codes to cover the cost of LPD's production of sample merchandise at adidas facilities, that "LPD's pattern-and-sample maker did not accept adidas's budget code," and that LPD suffered a resulting loss. See Compl. ¶¶ 40-47, 105. The pleading also avers that "adidas" authorized LPD to use

---

[15] Though the complaint alleges the existence of an *express* contract, created through "oral and written exchanges" between LPD and "adidas," Compl. ¶ 105, plaintiff, in moving for partial summary judgment, argues, alternatively, that the parties "entered an implied-in-fact contract for the development of a fashion collaboration." Pl. SJ Mem. at 1. As discussed *supra* pp. 20-21, New York law recognizes the validity of implied-in-fact contracts "where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." Soley, 823 F.Supp.2d at 230. Here, an implied-in-fact contract fails for the same reason that an express contract fails: the parties did not show their unambiguous mutual assent to the material terms of the agreement by word or deed.

adidas trademarks for the production of these samples and for other promotional purposes, and that LPD did so.  See id. ¶¶ 27-33.  According to the complaint, "adidas" recognized that it made certain promises and representations to plaintiff.  See id. ¶ 88 ("adidas" acknowledged by email that, "because [adidas] gave approval adidas is willing to allow this to go forward but we are just trying to avoid any legal issues.").  Taking the facts alleged in the complaint to be true, a reasonable trier of fact could conclude that the elements of promissory estoppel have been met with respect to the production of samples.

LPD's pleading does not, however, include a claim for promissory estoppel, though plaintiff suggests, in opposing the motion to dismiss, that LPD might, in the alternative, recover under this theory.  See Pl. 12(b)(6) Opp. at 2 ("Alternatively, even if the LPD-adidas agreement was unenforceable for indefiniteness, LPD is still entitled to its damages under quasi-contractual theories of liability such as unjust enrichment, promissory estoppel, and/or detrimental reliance."); id. at 21-23.

Generously construing plaintiff's fallback argument as a request for leave to amend the complaint, this Court recommends that plaintiff be afforded the opportunity to amend its complaint to add a claim for promissory estoppel and other quasi-contractual claims.

## C. The Defamation Claim

To state a claim for defamation under New York law, the plaintiff must allege: "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on the part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"  Tannerite Sports, LLC v. NBCUniversal Media LLC, 135 F.Supp.3d 219, 232 (S.D.N.Y. 2015) (citation, internal

quotation marks, and brackets omitted).  "[A] defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se', and therefore actionable without any proof of special damages."  Yesner v. Spinner, 765 F.Supp. 48, 52 (E.D.N.Y. 1991) (collecting cases).

Here, the complaint alleges that a representative of adidas characterized the LPD/adidas collaboration as "illegitimate" to V Magazine, which then published that statement. See Compl. ¶¶ 112-113.  The pleading further alleges that "adidas" knew this statement to be false, or acted with "reckless disregard" of its veracity.  Id. ¶ 115.

Without citation to any supporting case law, adidas America argues that "absent the existence of a valid contract, LPD's defamation claim necessarily fails as a matter of law." Def. 12(b)(6) Mem. at 15; see also Def. 12(b)(6) Reply at 7.  To be sure, this Court has concluded that the purported contract fails for indefiniteness; nonetheless, plaintiff's defamation claim is not dependent on the existence of a valid contract.  Although adidas America seeks to recast the defamation claim as challenging adidas's "den[ial of] the existence of a contract between the parties[,]" Def. 12(b)(6) Mem. at 14, the crux of that cause of action is that adidas "false[ly] and without basis in fact" advised V Magazine that "the LPD/adidas collaboration was illegitimate[,]"  Compl. ¶ 112.  The suggestion tha LPD's merchandise was "illegitimate" may be found to be defamatory even if LPD and adidas never satisfied all of the requirements of contract formation, particularly where the facts alleged in the complaint are sufficient to support quasi-contractual liability.  Accordingly, this Court respectfully recommends that adidas America's motion to dismiss plaintiff's defamation claim be denied.

**D. The Declaratory Judgment Claims**

The Federal Declaratory Judgment Act provides in pertinent part that:

> In a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

Here, plaintiff argues that adidas authorized LPD to use certain adidas trademarks, while "fail[ing] to exercise any 'degree of supervision and control over' LPD's use thereof (i.e. that is it never inspected the collaboration samples or final products sold to customers)." Pl. 12(b)(6) Opp. at 25 (quoting Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959)). Plaintiff contends that this constitutes "naked licensing," resulting in trademark abandonment. See id. (quoting AmScan Inc. v. Shutter Shades, Inc., No. 13-CV-1112 (CS), slip op. at 8 (S.D.N.Y. Apr. 30, 2015) (dkt. no. 65 in that case)).

"When a licensor fails to exercise sufficient control over the quality of the product that its licensee sells under its mark, such 'naked licensing' will result in abandonment." AmScan, slip op. at 8 (quoting Patsy's Italian Rest., Inc. v. Banas, 508 F.Supp.2d 194, 212 (E.D.N.Y. 2007)) (internal quotation marks omitted). "The central question is whether 'the licensees' operations are policed adequately to guarantee the quality of products sold . . . under the mark.'" Patsy's, 508 F.Supp.2d at 212 (quoting Gen. Motors Corp. v. Gibson Chem. & Oil Corp., 786 F.2d 105, 110 (2d Cir. 1986)) (ellipsis added). "If a licensor fails to play a 'meaningful role' in holding its licensee's products to a standard of quality, it will be found to have abandoned its mark." AmScan, slip op. at 9 (citing Barcamerica Int'l USA Tr. v. Tyfield

Imps., Inc., 289 F.3d 589, 597-98 (9th Cir. 2002)). In order to succeed on such a claim, the party alleging trademark abandonment must meet a "high burden of proof." Patsy's, 508 F.Supp.2d at 212 (quoting Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983)). Recent cases in this Circuit have held that "this high standard of proof is that of clear and convincing evidence[.]" AmScan, slip op. at 9 n.8 (citing Lifeguard Licensing Corp. v. Gogo Sports, Inc., No. 10–CV–9075 (PAC), 2013 WL 4400520, at *3 (S.D.N.Y. Aug. 15, 2013)).

As an intial matter, plaintiff's naked-licensing argument assumes that LPD was a valid licensee of adidas trademarks -- an assumption rejected by adidas America, see Def. 12(b)(6) Mem. at 17 ("Without a valid license agreement, LPD cannot establish that its use of the adidas trademarks was non-infringing."); see also Def. 12(b)(6) Reply at 10, and by this Court in concluding that the complaint fails to allege an enforceable licensing agreement, see supra pp. 21-25.

In any event, even assuming, arguendo, that LPD had an implied license to use adidas trademarks,[16] the facts asserted in the complaint, taken as true, do not plausibly allege that

---

[16] Some courts have, under certain circumstances, recognized implied licenses to use trademarks or copyrights. See, e.g., Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc., 295 F.R.D. 18, 24 (E.D.N.Y. 2013) (concluding, in ruling on a motion to dismiss under Rule 12(b)(6), that it was "plausible to infer that an actual or implied license arose from [the parties'] course of dealing"); Wallack v. Idexx Labs., Inc., No. 11cv2996–GPC (KSC), 2015 WL 5943844, at *8 (S.D. Cal. Oct. 13, 2015) ("In order to determine whether there is an implied license, courts look to the parties' course of conduct." (collecting cases)); but see Microban Prods. Co. v. API Indus., Inc., No. 14 Civ. 41(KPF), 2014 WL 1856471, at *13 (S.D.N.Y. May 8, 2014) ("The Second Circuit has clarified, however, that courts have found implied licenses only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." (internal quotation marks omitted)). Plaintiff has not, however, cited such cases or otherwise argued that LPD had an implied license. See Pl. 12(b)(6) Opp. at 24-25. Moreover, even with an implied
(continued...)

adidas failed to play a "meaningful role" in policing those trademarks. Indeed, according to the complaint, adidas requested that LPD send over art from the Classics Capsule so that adidas could "internally review" it, see Compl. ¶ 50, and adidas requested that LPD use an "x" in place of jocktags or logos representing the collaboration, see id. ¶ 52. After LPD produced a "polarizing" marketing video for the Collaboration Capsule, adidas demanded that the video "be taken down" or adidas would take legal action. See id. ¶ 88. Finally, and most crucially, adidas requested that LPD agree to the Proposed Licensing Agreement, which would have "terminate[d] LPD's right to manufacture and sell pieces from the Classics and Collaboration Capsules" on May 1, 2015. Id. ¶ 100. When LPD refused to sign this agreement, "adidas threatened to sue LPD for trademark infringement." Id. ¶ 102.[17]

Consequently, the facts alleged in the complaint belie the theory articulated by LPD in defending its claims under the Declaratory Judgment Act – i.e., that adidas abandoned its trademarks as used in the Classics and Collaboration Capsules. Accordingly, the Court respectfully recommends that plaintiff's claims under the Declaratory Judgment Act be dismissed.

---

[16](...continued)
license, the alleged licensee "bears the burden of demonstrating that there was 'a meeting of the minds as determined by contract law.'" Microban Prods., 2014 WL 1856471, at *13 (quoting Pavlica v. Behr, 397 F.Supp.2d 519, 526 (S.D.N.Y. 2005)).

[17] Indeed, it is this threat of a suit for trademark infringement that LPD cites as satisfying the actual-controversy requirement in connection with plaintiff's declaratory judgment claims. See Compl. ¶ 118 ("Because adidas threatened to sue LPD for trademark infringement, there is a substantial and continuing controversy between LPD and adidas, and a declaration of the parties' rights is both necessary and appropriate."); accord Nike, Inc. v. Already, LLC, 663 F.3d 89, 96 (2d Cir. 2011) (noting that, in the context of a declaratory judgment action involving trademarks, "the threat of future litigation remains relevant in determining whether an actual controversy exists").

### E. The Unjust Enrichment Claim

Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, it must establish "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Piven, 2010 WL 1257326, at *9 (quoting Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001)). The "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another." Kaye, 202 F.3d at 616 (quoting City of Syracuse v. R.A.C. Holding, Inc., 685 N.Y.S.2d 381, 382 (4th Dep't 1999)).

Here, adidas America argues that the complaint fails to allege "any facts that could support a finding that adidas received any benefit from LPD's alleged marketing and promotional activities." Def. 12(b)(6) Mem. at 15 (emphasis omitted). While this Court is of the view that the facts alleged in the complaint more readily suggest a claim for a promissory estoppel as opposed to unjust enrichment,[18] nevertheless, when all plausible inferences are construed in plaintiff's favor, the unjust enrichment claim is adequately pled. The complaint avers that plaintiff conferred a benefit on adidas America by "marketing and promoting adidas's contribution to the Classics Capsule," Compl. ¶ 127, and that adidas America never compensated plaintiff for this benefit, see id. ¶ 128; see also id. ¶¶ 40-46. Whatever the monetary value of this effort, it constituted a benefit to "adidas" and an expense to plaintiff. See Kaye, 202 F.3d at 616. The complaint thus contains plausible factual allegations that, if

---

[18] As noted *supra* p. 26, the complaint does not include a claim for promissory estoppel.

proven, could support an entitlement to relief.  See Keiler, 751 F.3d at 70.[19]  Accordingly, this Court recommends that adidas America's motion to dismiss the unjust enrichment claim be denied.

II.     *Plaintiff's Motion for Summary Judgment*

     **A.  The Legal Standard Under Rule 56**

     Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment may not be granted unless the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Gonzalez v. Kmart Inc., 13-CV-5910 (PKC) (VMS), 2016 WL 3198275, at *2 (E.D.N.Y. June 8, 2016) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Once the movant does so, the non-moving party may not rest upon the allegations or denials of its pleading but must set forth specific facts that raise a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir. 1996).  "In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party."  Sista v. CDC Ixis

---

[19]  adidas America further contends that, "even if there had been a benefit conferred on adidas, LPD fails to allege facts showing that it is against equity and good conscience to permit adidas to retain such a benefit."  Def. 12(b)(6) Mem. at 16.  Dismissal of an unjust enrichment claim under Rule 12(b)(6) may be appropriate in certain cases in which the facts of the case, as alleged, show "little in equity and good conscience that weighs in favor of" disgorgement. Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 339 (2d Cir. 2011) (where sophisticated investor "failed to apprise itself of the publicly disclosed riskiness" of the securities at issue, the pleading's "unjust enrichment claim does not fit the facts of this case").  This is not the case here, however.  The complaint properly alleges that adidas profited from plaintiff's work without compensating it therefor.  See Compl. ¶ 129.  If true, this is sufficient to sustain an unjust enrichment claim.

N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citations omitted).  Summary judgment is

appropriate only where "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party[,]" Gonzalez, 2016 WL 3198275, at *2 (quoting Donnelly v.

Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 141 (2d Cir. 2012)), or where, "after

adequate time for discovery and upon motion . . . [,] a party . . . fails to make a showing

sufficient to establish the existence of an element essential to that party's case, on which that

party will bear the burden of proof at trial[,]" id. (quoting Celotex, 477 U.S. at 322-23)

(ellipses in original).

### B. The Standard As Applied to Plaintiff's Claims

Here, plaintiff -- which bears the ultimate burden of proof at trial on each of its claims

-- moves for summary judgment as to liability on its breach of contract, defamation, and

declaratory judgment claims (but not on the unjust enrichment claim).  See Pl. SJ Mem. at 2.

No discovery has taken place, and neither defendant has answered.  Plaintiff appends, in

support of its summary judgment motion, the Fainlight Declaration and 39 exhibits thereto.

These exhibits include the Mann-Fainlight Emails, see Exhibits 2 through 28, 30 through 32,

35 through 37 to Fainlight Decl., DE #24-6 to #24-32, #24-34 to #24-37, #24-39 to #24-41,

promotional material on LPD, see Exhibit 1 to Fainlight Decl., DE #24-5, and images of

LPD's co-branded merchandise with adidas, see Exhibit 29 to Fainlight Decl., DE #24-33.  In

further support of its defamation claim, plaintiff appends the declaration of Katharine K.

Zarella, a senior editor at V Magazine.  See Declaration of Katharine K. Zarella (Mar. 28,

2016) ("Zarella Decl."), DE #24-3.  adidas America, reiterating the arguments it advanced in

moving to dismiss, contends that "[t]he evidence here supports only that there was *no*

agreement with specific, definite terms, capable of enforcement . . . ." Def. SJ Opp. at 4.

adidas America calls plaintiff's allegations "entirely unsupported by admissible, competent,

definitive evidence . . . ." Id. at 3.

For the reasons stated *supra* pp. 21-25, 28-30, this Court concludes that plaintiff's

breach of contract and declaratory judgment claims cannot survive a motion to dismiss under

Rule 12(b)(6). Accordingly, plaintiff's motions for summary judgment on these claims should

be denied.[20]

At the same time, the Court has concluded that the complaint plausibly states a claim

for defamation. That the defamation claim ought to survive a motion to dismiss does not,

however, entitle plaintiff to summary judgment on that claim. Plaintiff bears the burden of

proving not only the falsity of the characterization of the adidas/LPD collaboration as

"illegitimate," but also that "adidas" acted at least negligently in making this statement. See

Tannerite Sports, 135 F.Supp.3d at 232. This latter issue presents an open question of fact, as

the record is silent as to whether the adidas representative alleged to have made the defamatory

---

[20] Additionally, plaintiff's contract claim also rests on the unproven assumption that Mann --
the "Global Product Manager of adidas basketball," see Fainlight Decl. ¶ 10 -- had some
authority to bind adidas America to a contract. However, plaintiff does not articulate a basis
for that assumption, nor does it explain whether that authority was actual or apparent. See
generally Restatement (Third) of Agency §§ 2.01 (defining actual authority), 2.02 (describing
the scope of actual authority, which encompasses what has been called "implied authority") &
2.03 (defining apparent authority). Plaintiff reiterates in its summary judgment memorandum
the argument that adidas America has "actual authority" to bind adidas AG to contracts, thus
making adidas AG a proper defendant on the breach of contract claim. See Pl. SJ Mem. at 1
n.1. Oddly, the lone case that plaintiff cites for this proposition, Merrill Lynch Interfunding,
Inc. v. Argenti, 155 F.3d 113 (2d Cir. 1998), was one in which the court found that the
purported agent *lacked* any authority to bind its principal to a contract, see id. at 122.

statement – Brett Anderson – was aware of the collaboration.[21]  Plaintiff offers nothing more in this regard than its own *ipse dixit* that "adidas knew the statement was false when made . . . ." Pl. SJ Mem. at 20.[22]  Summary judgment for plaintiff on its defamation claim is therefore inappropriate.

Accordingly, this Court respectfully recommends that plaintiff's motion for partial summary judgment be denied in its entirety.

## CONCLUSION

For the foregoing reasons, this Court recommends that defendant adidas America's motion to dismiss under Rule 12(b)(6) of the FRCP be granted with respect to the breach of contract and declaratory judgment claims, and denied with respect to the defamation and unjust enrichment claims; plaintiff should be granted the opportunity to amend its complaint to include additional quasi-contractual claims.  This Court also recommends that plaintiff's motion for partial summary judgment be denied.

Any objections to the recommendations contained herein must be filed with Judge Brodie on or before September 12, 2016.  Failure to file objections in a timely manner may waive a right to appeal the District Court order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

---

[21]  See Zarella Decl. ¶¶ 6, 9; see also Compl. ¶ 85 ("[LPD] just got an email from V Magazine saying that someone from Adidas PR called them to alert them the collaboration is illegitimate.").

[22]  Plaintiff cites no evidence that *Anderson* -- as opposed to Jarrett Mann or any other adidas America employee -- knew of the collaboration, and cites no case law to support its assumption that knowledge of one corporate employee's dealings should be imputed to all other corporate employees.  Nor does plaintiff explain why adidas AG -- a wholly distinct corporate entity -- should be liable for defamation by an adidas America employee.

6(a), 6(d), 72; <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*).

      **SO ORDERED.**

**Dated:**    **Brooklyn, New York**
            **August 25, 2016**

/s/    *Roanne L. Mann*

**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**