UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

LPD NEW YORK, LLC,

                              Plaintiff,

               v.

ADIDAS AMERICA, INC. and ADIDAS AG,

                              Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-6360 (MKB) (RLM)

MARGO K. BRODIE, United States District Judge:

On November 5, 2015, Plaintiff LPD New York, LLC ("LPD") commenced the above-caption action against Defendants Adidas America, Inc. and Adidas AG, bringing claims for breach of contract, defamation and unjust enrichment. (Compl. ¶¶ 1, 104–16, 126–31, Docket Entry No. 1.) Plaintiff also seeks declaratory relief pertaining to disputes regarding its use of Defendants' trademarks under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. (*Id.* ¶¶ 117–25.) Defendant Adidas America moved to dismiss the Complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Def. Adidas America Mot. to Dismiss ("Adidas Am. Mot."), Docket Entry No. 20.) Plaintiff moved for partial summary judgment on its claims for breach of contract, defamation and declaratory relief, pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Pl. Mot. for Summ. J. ("Pl. Mot."), Docket Entry No. 24.)

By order dated April 6, 2016, the Court referred both motions to Chief Magistrate Judge Roanne L. Mann. (Order dated Apr. 6, 2016.) By report and recommendation dated August 25, 2016, (the "R&R"), Judge Mann recommended that the Court grant Adidas America's motion to dismiss as to Plaintiff's breach of contract and declaratory judgment claims, deny the motion as

to Plaintiff's defamation and unjust enrichment claims, and deny Plaintiff's motion for partial summary judgment.  (R&R, Docket Entry No. 39.)  Plaintiff objects to the R&R in part.  (Pl. Obj. to the R&R ("Pl. Obj."), Docket Entry No. 49.)  Adidas America did not file objections.

On June 27, 2016, after Adidas America moved to dismiss and Plaintiff moved for summary judgment, Plaintiff served Adidas AG with the summons and Complaint.  (Adidas AG Ltr. dated July 18, 2016, Docket Entry No. 37.)   On September 6, 2016, Adidas AG moved to dismiss the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure and for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Def. Adidas AG Mot. to Dismiss ("Adidas AG Mot."), Docket Entry No. 40.)

For the reasons discussed below, the Court adopts Judge Mann's recommendations in their entirety, which recommendations are that the Court grant Defendants' motion to dismiss as to Plaintiff's breach of contract and declaratory relief claims, deny Defendants' motion to dismiss as to the defamation and unjust enrichment claims, deny Plaintiff's motion for summary judgment as to the defamation, breach of contract and declaratory relief claims and grant Plaintiff leave to amend the Complaint to assert quasi-contract claims.  The Court also denies Adidas AG's separate motion to dismiss for lack of personal jurisdiction, which was filed after the R&R.

I.  **Background**

LPD is a New York limited-liability company based in Brooklyn, New York; Adidas America is a Delaware corporation based in Portland, Oregon; and Adidas AG is a German company based in Herzogenaurach, Germany.[1]  (Compl. ¶¶ 2–5.)  According to Plaintiff, Adidas

---

[1]  For the purposes of deciding Defendants' motion to dismiss, the Court assumes the truth of the allegations in the Complaint.

America conducts any and all operations related to the United States for Adidas AG.  (*Id.* ¶ 6.)  Defendants "conduct substantial business in New York, including advertising, promoting, marketing, distributing, and selling" Adidas merchandise through physical and online stores.  (*Id.* ¶¶ 8–9.)

LPD is a fashion company that creates "streetwear" products.  (*Id.* ¶¶ 15–16.)  In October of 2013, Defendants contacted LPD to discuss a possible "collaboration" in which LPD would create unique streetwear-style designs for Defendants' brand and five National Collegiate Athletic Association ("NCAA") basketball teams sponsored by Defendants.[2]  (*Id.* ¶ 19.)  LPD expressed interest in the collaboration and later developed two design "capsules" for the collaboration: a "Classics Capsule" and a "Collaboration Capsule."  (*Id.* ¶¶ 20–21.)  The Classics Capsule consisted of "a series of design proposals for NCAA Basketball Teams, which included prints for tee shirts, basketball jerseys, basketball shorts, and team jackets" that Defendants would help design in conjunction with LPD.  (*Id.* ¶ 21.)  The Collaboration Capsule consisted of "a series of design proposals for basketball jerseys, tee-shirts, outerwear, jackets, hats, shorts, sports bras, lanyards and pants" for an athletic-streetwear collection designed primarily by LPD.  (*Id.*)  After receiving some of the designs for the Classics Capsule, Defendants responded that they were "excited" about the designs.  (*Id.* ¶¶ 22–23.)

On November 17, 2013, LPD asked Defendants how the pieces from the Classics Capsule "should/will be branded (with both LPD and Adidas logos) and how/where they will be distributed (in Adidas' stores/distributors or otherwise)."  (*Id.* ¶ 24.)  Defendants responded that "the rules are really what [the parties] want them to be" because the project was the first time

---

[2]  Throughout the Complaint, Plaintiff refers to Adidas America and Adidas AG as one entity, Adidas.  (*See* Compl., Docket Entry No. 1.)  Thus, the Court is unable to determine what allegations relate to Adidas America, Adidas AG, or both.

Adidas's basketball division was "coordinating with a fashion brand." (*Id.* ¶ 25.) Defendants

subsequently proposed that:

> Branding
>
>> Due to NCAA rules the uniforms can only be branded adidas. So our actual on court product we will be badged as adidas.
>>
>> There is an opportunity for co-branding on your retail pieces and our Satin Jacket. Our designers could collab for a cool jocktag or woven label that would be badged with both logos.
>>
>> If you want to just badge your product LPD only we understand the option but we would want to at least show a true collaboration to demonstrate "court to street."
>
> Retail
>
>> This part is also new. But after having [internal] discussion[s] . . . we have a few options of where we would retail.
>>
>> Adidas.com - Our own retail would love to feature this [as] an exclusive collection. Your retail pieces are at a price point where we could feature our retail shorts with your retail pieces and make it an exclusive release online.
>>
>> Your retailers - because these pieces are at a higher price point than our sales reps deal with your access to boutique and footprint accounts.
>>
>> NYC stop-in-shop. We would do an in-store collab where we split the store in half with your retail and some of our higher price point retail and highlight this collection but gain momentum for both brands.
>>
>> Or the option of all 3. Let me know your thought as I think we will have to write our rules because this has not happened with an actual on-court kit before.

(*Id.* (alterations in original).) LPD replied that it liked the idea of the true collaboration and

wanted to get to work on the tags and labels for the pieces, was interested in exploring all of the

proposed retail options, and could get to work on "visuals" as soon as it had "samples of the first approved products." (*Id.* ¶ 26.) In addition, LPD asked if "it would be possible to get a letter of intent for the collaboration." (*Id.*) Defendants thought "a letter of intent [would be] perfect" and agreed to "work on putting some of this into a document with the purpose of this along with details." (*Id.* ¶ 27 (alterations omitted).)

On January 13, 2014, LPD informed Defendants that it was going to begin creating samples from the Classics Capsule design proposal. (*Id.* ¶ 29.) On February 25, 2014, LPD sent Defendants "a concept proposal for the Collaboration Capsule." (*Id.* ¶ 33.) By March of 2014, Defendants had not responded, and LPD followed up to get Defendants' feedback regarding the Collaboration Capsule and a letter of intent. (*Id.* ¶ 34.) A week later, Defendants replied, stating that they approved of the designs for the Collaboration Capsule and that "[t]he letter of intent is a work in progress" due to some "developmental boundaries." (*Id.* ¶ 35.) Defendants also provided "some key next steps," which included "[l]etter of intent finalization." (*Id.*) LPD then asked how the parties would divide or allocate the "sales and profits," to which Defendants responded that the products from the Classics Capsule would be provided to the NCAA teams at no cost, Defendants' licensed apparel division would purchase the Collaboration Capsule materials related to the NCAA teams, and the "royalties [from those sales] would go to the schools," and the "capsule collection profits would likely be primarily profits to LPD because Defendants' products were mainly 'on court school products.'" (*Id.* ¶¶ 36–37.) Defendants also stated that the details of the collaboration would be finalized and confirmed "once the mission statement is complete." (*Id.* ¶ 37.) In response, LPD asked that Defendants "just let LPD know the specifics and that everything is confirmed once [Defendants] know for sure." (*Id.* ¶ 38.)

As LPD began making arrangements to prepare samples of products for both capsules, it contacted Defendants to determine whether Defendants or LPD would cover the costs of producing the samples and to specify the location of the manufacturing for the final products. (*Id.* ¶¶ 39, 41.)  Defendants gave LPD a "budget code" to pay for the production of the samples and told LPD that the final products would be manufactured in Defendants' facilities.  (*Id.* ¶¶ 40, 42.)  Because LPD's "pattern-and-sample maker" refused to accept Defendants budget code to cover the sample production costs, LPD paid the costs and sought reimbursement from Defendants.  (*Id.* ¶ 47.)

On June 12, 2014, Defendants notified LPD that there was "a large re-alignment within its group[,] so many of [Defendants'] projects had been on hold."  (*Id.* ¶ 50 (alterations omitted).)  Nevertheless, Defendants told LPD that it wanted to finalize and launch the collaboration and instructed LPD to do the following: (1) send the "art" from the capsules for Defendants' to review, (2) send information regarding the Classics Capsule for Defendants' "teams" to "agree and sign off," and (3) keep any information regarding the teams involved in the collaboration confidential.  (*Id.*)  Defendants also agreed to reimburse the sample production costs and told LPD that further details regarding the collaboration should be handled in "the next few weeks." (*Id.*)  As to the prices for the collaboration products, LPD informed Defendants that they could not "pin down exact[] [pricing] since it depends on production (specifically whether LPD is producing the pieces here or at [Defendants'] facilities abroad and how many units . . . are ordered."  (*Id.* ¶ 51 (alterations omitted).)  LPD also requested "some sort of confirmation that the collaboration . . . will be happening."  (*Id.*)  Defendants responded that "the collaboration would only be confirmed once [Defendants] were '100% on board'" and could "dedicate more funding to the collaboration."  (*Id.* ¶ 52.)

The following week, LPD followed up, again asking about the location of the manufacturing and also sending Defendants its final design proposal for the collaboration. (*Id.* ¶ 53.) Defendants responded that "upper management approved the designs" and gave LPD "permission to move forward with the collaboration." (*Id.* ¶ 54.) Defendants subsequently sent LPD sample products that it produced based on the Classics Capsule and allowed LPD to pitch products from both capsules to potential buyers. (*Id.* ¶¶ 56–57.) Thereafter, LPD notified Defendants that its buyers were interested in the products and inquired as to the status of the reimbursement for the sample production costs it had incurred. (*Id.* ¶ 58–59.) Defendants expressed their intent to reimburse the sample production costs, noted that they were having a meeting soon to discuss "a marketing budget and promotional plan," and stated that they had "enough signoff to continue to push through and continue on with the collab[oration]." (*Id.* ¶ 60 (alterations omitted).) During a subsequent telephone call, LPD informed Defendants it would soon begin producing "marketing materials" to promote the collaboration. (*Id.* ¶ 63.)

On September 8, 2014, LPD began selling women's clothing items from the collaboration.[3] (*Id.* ¶ 69.) LPD also secured promotional publications with several online and print media outlets and continued to promote the collaboration in various places. (*Id.* ¶¶ 69, 72–73, 76.) As a part of its promotion efforts, LPD created a "provocative" marketing video for the Collaboration Capsule. (*Id.* ¶ 76.) In November of 2014, V Magazine reached out to LPD, seeking to secure an exclusive feature of the Collaboration Capsule. (*Id.* ¶ 77.) LPD agreed. (*Id.* ¶ 78.) After V Magazine published the feature, a representative from Defendants called one

---

[3] It is unclear from the Complaint whether the sales were from the Classics Capsule, the Collaboration Capsule, or both.

of V Magazine's senior editors and told her that the collaboration was "illegitimate." (*Id.* ¶¶ 79–80.) As a result, V Magazine withdrew the feature. (*Id.* ¶ 82.)

LPD obtained the contact information for Defendants' representative that contacted V Magazine, and provided him with the information for the people LPD had been in contact with concerning the collaboration. (*Id.* ¶¶ 83–84.) LPD also reached out to their contacts at Defendants' company, seeking clarification of the basis for the statement made by Defendants' representative to V Magazine. (*Id.* ¶ 85.) Defendants responded that the promotional material regarding the collaboration "took another route" than that which the parties discussed and "raised some flags" with its public relations team. (*Id.* ¶ 86.) Defendants also told LPD that the executive who approved the collaboration was no longer with the company and while they "did provide initial green lights to proceed[,] . . . all content needed to be approved by [Defendants'] higher ups." (*Id.*) LPD expressed its confusion and sent Defendants copies of all the materials it had regarding the collaboration. (*Id.* ¶ 87.) Defendants then told LPD that "products are good to go" but the promotional video could not be show anymore and any sales from the Classics Capsule had to be placed on hold because it could cause legal issues with the NCAA teams. (*Id.* ¶ 88.)

LPD continued to promote and sell items from the Collaboration Capsule but, in January of 2015, a buyer refused to accept delivery and pay for the items because he doubted the legitimacy of the collaboration. (*Id.* ¶¶ 90, 94, 95.) To resolve the issue, LPD requested that Defendants send the buyer a letter confirming the collaboration's legitimacy. (*Id.* ¶ 96.) Defendants sent the letter but the buyer requested additional assurance, and LPD requested further confirmation of the collaboration. (*Id.* ¶¶ 97–99.)

In May of 2015, Defendants sent LPD a "back-dated licensing agreement" dated June 1, 2014, which provided that LPD had the right to "use the [A]didas name and Three-Stripes trademark" for both capsules "provided that LPD paid 10% royalties" to Defendants. (*Id.* ¶ 100.) The proposed licensing agreement also sought to "terminate LPD's right to manufacture and sell pieces from the Classics and Collaboration Capsules" as of May 1, 2015. (*Id.*) LPD refused to sign the agreement and again requested reimbursement for the sample production costs. (*Id.* ¶¶ 101–02.) Defendants threatened to sue LPD for trademark infringement. (*Id.* ¶ 102.)

Based on the foregoing, LPD filed the Complaint in this action. (*Id.* ¶ 1.)

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a de novo standard of review. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only conclusory or general objections, or simply reiterates its original arguments. *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 187 (E.D.N.Y. 2015) ("General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error." (citation omitted)); *see also DePrima v. N.Y.C.*

*Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *3 (E.D.N.Y. Mar. 20, 2014) (collecting cases).

### ii. Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[a] plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (citing *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)); *see also Thackurdeen v. Duke Univ.*, 660 F. App'x 43, 44–45 (2d Cir. 2016) ("In opposing a motion to dismiss for lack of personal jurisdiction, plaintiffs bear the burden of establishing that the court has jurisdiction over defendants." (citations, alterations and internal quotation marks omitted)). The showing a plaintiff must make to meet that burden is governed by a "sliding scale," which "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). If a defendant challenges personal jurisdiction by filing a Rule 12(b)(2) motion, "the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Id.* at 85 (quoting *Ball*, 902 F.3d at 197); *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) (same). Prior to discovery, a plaintiff need only plead "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Dorchester*, 722 F.3d at 84 (quoting *Ball*, 902 F.3d at 197); *see also Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) ("A *prima facie* case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185

(2d Cir. 1998))).  After discovery, the plaintiff's *prima facie* showing must be factually supported.  *Dorchester Fin. Sec.*, 722 F.3d at 85 (quoting *Ball*, 902 F.3d at 197).

The court must "construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *Grundstein v. Eide*, 598 F. App'x 45, 46 (2d Cir. 2015) (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)).  However, the court need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013), *cert. denied sub nom. O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870 (2014) (quoting *Jazini*, 148 F.3d at 185).  In resolving a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), a district court may consider materials outside the pleadings.  *Dorchester Fin. Sec.*, 722 F.3d at 86 (citing *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)); *Pinto-Thomaz v. Cusi*, No. 15-CV-1993, 2015 WL 7571833, at *3 (S.D.N.Y. Nov. 24, 2015) (citing *DiStefano*, 286 F.3d at 84).

In a case based on diversity jurisdiction, personal jurisdiction is determined by the law of the state in which the court sits.  *Ash v. Richards*, 572 F. App'x 52, 53 (2d Cir. 2014) (citing *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).  The court must first look to the state's long-arm statute.  *Whitaker*, 261 F.3d at 208.  If the court can exercise jurisdiction pursuant to the long-arm statute, the court must subsequently determine whether the exercise of personal jurisdiction over the defendant would comport with the Due Process Clause of the United States Constitution.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) ("If, but only if, our answer is in the affirmative, we must then determine whether asserting jurisdiction under that provision would be compatible with requirements of due process

established under the Fourteenth Amendment to the United States Constitution." (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945))).

### iii. Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assoc's, L.P. v. Entm't Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### iv. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine

factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id*. The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co*., 221 F.3d 394, 398 (2d Cir. 2000).

### b. Unopposed recommendations

Adidas America does not object to Judge Mann's recommendations that the Court deny its motion to dismiss Plaintiff's defamation and unjust enrichment claims and grant Plaintiff leave to file an amended complaint to add quasi-contract claims. (Adidas Am. Opp'n to Pl. Obj. ("Adidas Am. Opp'n"), Docket Entry No. 52.)

The Court has reviewed the unopposed portions of the R&R and, finding no clear error, the Court adopts these recommendations pursuant to 28 U.S.C. § 636(b)(1). Accordingly, the Court denies Adidas America's motion to dismiss Plaintiff's claims for defamation and unjust enrichment and grants Plaintiff leave to file an amended complaint asserting quasi-contract claims.

### c. Plaintiff's objections to the R&R

Plaintiff objects to Judge Mann's recommendations that the Court dismiss its breach of contract and declaratory relief claims and deny summary judgment as to its defamation claim. (Pl. Obj. 22–46.) For the reasons discussed below, the Court adopts Judge Mann's recommendations in their entirety.

### i. Breach of contract claim

Judge Mann recommended that the Court dismiss the breach of contract claim, reasoning that Plaintiff's allegations fail to show the formation of a contract. (R&R 21–25.) Judge Mann found that exchanges detailed in the Complaint illustrated that the parties never agreed upon the profit-sharing arrangements, the duration of any licensing regarding Defendants' trademarks, royalties and quantity of the merchandise to be sold. (*Id.*) Judge Mann examined the discussions where the parties agreed or expressed an intention to complete a formalized document regarding the collaboration but concluded that no formal agreement was ever completed. (*Id.*)

Plaintiff argues that Judge Mann erred in recommending dismissal of the breach of contract claim because: (1) neither party expressed an intention not to be bound absent a formalized agreement; (2) the parties abandoned any intention to formalize an agreement; (3) the absence of a formal agreement does not preclude finding that the parties formed a contract; (4) the parties agreed on the "material terms" of the contract and New York law gap-fills any terms that were not agreed upon; and (5) Defendants' conduct "expressly recognized" the existence of a contract.[4] (Pl. Obj. 22–34, 37–42.) Adidas America argues that Judge Mann's recommendation was sound because, given the nature of the alleged agreement, Plaintiff fails to show that the parties agreed to the material terms necessary to form a contract.[5] (Adidas Am.

---

[4] Plaintiff also argues that the R&R erred by raising and applying the Statute of Frauds. (Pl. Obj. 34–37.) The Court does not address the Statute of Frauds arguments as the Statute of Frauds was an alternative finding in the R&R that is not relevant where, as here, there is no contract between the parties.

[5] Adidas AG separately moved to dismiss the complaint for failure to state claim upon which relief may be granted but incorporated by reference Adidas America's arguments. (Adidas AG Mem. of Law in Support of Adidas AG Mot. ("Adidas AG Mem.") 7, Docket Entry No. 42.) Therefore, the Court's analyses and decisions as to the substance of Plaintiff's claims apply to both Defendants.

Opp'n 3–12.)  For the reasons explained below, the Court finds that Plaintiff's allegations fail to establish the existence of a binding contract.

Under New York law,[6] a plaintiff alleging breach of contract must show "(1) the existence of a contract, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Hudson & Broad, Inc. v. J.C. Penny Corp., Inc.*, 553 F. App'x 37, 39 (2d. Cir. 2014) (internal quotation marks omitted) (citing *Harasco Corp. v. Sequi*, 91 F.3d 337, 348 (2d Cir. 1996)).  Where the allegations establish that the parties failed to execute a formalized written agreement, the existence-of-a-contract analysis depends on whether the parties entered a "binding preliminary agreement." *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008); *Bear Stearns Inv. Prods. Inc. v. Hitachi Auto. Prods. Inc.*, 401 B.R. 598, 617 (S.D.N.Y. 2009); *Tri-Cty. Motors Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 169–70 (E.D.N.Y. 2007).

"Binding preliminary agreements fall into one of two categories" — "Type I" and "Type II." *Vacold*, 545 F.3d at 124 (alteration and internal quotation marks omitted) (citing *Adjustrite Sys. Inc. v. G.A.B. Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998); *see Bear Stearns*, 401 B.R. at 617–18.  Type I preliminary agreements are "fully binding preliminary agreements, which are created when the parties agree on all points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Vacold*, 545

---

[6] As Judge Mann noted in the R&R, based on the parties' motion papers, they assume without explicitly stating that New York law applies.  Accordingly, because a substantial amount of the conduct at issue occurred in New York, the Court assumes that New York law governs the dispute.  *See Vacold LLC v. Cerami*, 545 F.3d 114, 122-23 (2d Cir. 2008) (holding that New York law applies where a substantial amount of the conduct at issue underlying the contract-formation dispute occurred in New York and the defendant raised no objection to the application of New York law).

F.3d at 124 (citations, alterations and internal quotation marks omitted); *see Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996) ("Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities."). Type I preliminary agreements adhere to the "well-settled principle of New York law" that a contract is formed if it is "reasonably certain in its material terms." *Hudson*, 553 F. App'x at 39 (citing *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 105, 109 (1981)). Conversely, "if an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Id.* (citing *Cobble Hill*, 74 N.Y.2d at 109)). The Second Circuit has established the following four-factor test to determine if an agreement is a Type I preliminary agreement:

> (1) whether there is an expressed reservation of right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of agreement that is usually committed to writing.

*Vacold*, 545 F.3d at 124 & n.2 (citing *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005)).

Type II preliminary agreements, on the other hand, are "binding preliminary commitments [where] . . . the parties agree on certain major terms, but leave other major terms open for further negotiation." *Id.* (first citing *Adjustrite*, 145 F.3d at 548 and then citing *Shann*, 84 F.3d at 77); *see Bear Stearns*, 401 B.R. at 624 (explaining that Type II preliminary agreements are "incomplete agreement[s]" that bind the parties "to negotiate together in good faith in an effort to reach a final agreement within the scope that has been settled in the preliminary agreement." (citation omitted)). The difference between a Type II preliminary agreement and an unenforceable "agreement to agree" is that Type II preliminary agreements "leave discrete material terms unspecified but nevertheless set mechanisms for objectively

setting material terms in the future." *Hudson*, 553 F. App'x at 39 (citing *Abitron Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 137 (2d Cir. 2005)). Under a Type II preliminary agreement, if the parties fail to reach a final agreement after a good-faith effort to settle the open terms, "there is no further obligation." *Vacold*, 545 F.3d at 124 (citation omitted); *see Bear Stearns*, 401 B.R. at 624 (explaining that a Type II preliminary agreement provides an agreement regarding negotiation, not an agreement that "a final contract will result" (citation omitted)). The Second Circuit has established the following five-factor test to determine if an agreement is a Type II preliminary agreement:

> (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Vacold*, 545 F.3d at 124 & n.2 (citing *Brown*, 420 F.3d at 157).

The predominant factor under both tests is "whether the parties intended to be bound, and if so, to what extent." *Id.* at 125 (citing *Adjustrite*, 145 F.3d at 548–49); *see Tri-Cty. Motors*, 494 F. Supp. 2d at 170 ("Court confronted with the question of whether there is a preliminary agreement . . . must first look to the intent of the parties: whether the parties intended to be bound, and if so, to what extent." (citing *Adjustrite*, 145 F.3d at 548–49)).

Given the substantial similarity between the tests for determining whether an agreement is a Type I or Type II preliminary agreement, the Court will simultaneously address whether the parties executed a Type I or Type II preliminary agreement, if any, noting any differences between the two tests where necessary. *See Vacold*, 545 F.3d at 125–29 (simultaneously analyzing whether the parties executed a Type I or Type II preliminary agreement or had no agreement at all).

### 1. Intent of the parties

The intent of the parties is the most important factor. *Adjustrite*, 145 F.3d at 548–49; *Tri-Cty. Motors*, 494 F. Supp. 2d at 170 ("The first factor — the language of the [alleged] preliminary agreement — is the most important." (citing *Arcadian Phosphates Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1996)). In assessing the parties' intent, "a court must look to the words and deeds of the parties." *Adjustrite*, 145 F.3d at 549; *Bear Stearns*, 401 B.R. at 618 (noting that "courts in this Circuit look to what the parties said (and/or did), and at the language of the [alleged] preliminary agreement for an indication [as to] whether . . . they intended not to be bound until the conclusion of final formalities." (citations and internal quotation marks omitted)). "There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation of and execution of contract documents." *Bear Stearns*, 401 B.R. at 619 (citation omitted); *Miller v. Tawii*, 165 F. Supp. 2d 487, 492 (S.D.N.Y. 2001) (citation omitted). The presumption may be overcome if the party seeking to establish a binding preliminary agreement points to language indicating that the parties entered a "binding agreement." *Miller*, 165 F. Supp. 2d at 492 (citation omitted). "[A] party that wishes to be bound can very easily protect itself by refusing to accept language that shows an intent not to be bound." *Id.* (citation and alterations omitted).

Here, the parties' communications reflect that Defendants lacked the intent to be bound absent a formal agreement. Defendants repeatedly expressed that they intended to proceed with the collaboration, but wanted to ensure that a final agreement was consummated. Shortly after the parties' negotiations began, Defendants stated that a "letter of intent is perfect" and that they would "work on putting some of this into a document." (Compl. ¶ 27.) Two months later, in March of 2014, Defendants stated that "[t]he letter of intent is currently a work in progress" and

explained that a "key next step[]" was "[l]etter of intent finalization." (*Id.* ¶ 35.) That same month, Defendants responded to Plaintiff's inquiry as to profit allocation and stated that they would "confirm" any arrangements "once the mission statement is complete [and] those details will be in that document." (*Id.* at 37.) In June of 2014, Defendants advised Plaintiff that the collaboration "would only be confirmed once [Adidas] was 100% on board." (*Id.* at 53.) In addition, after disagreements arose between the parties concerning the collaboration, Defendants sent Plaintiff "a back-dated licensing agreement" that limited Plaintiff's right to sell the collaboration merchandise and included a royalty charge. (*Id.* ¶ 100.) Plaintiff refused to sign the agreement. (*Id.* ¶ 101.) Like Defendants, Plaintiff also expressed its intent to execute a formal agreement by raising and following up on the completion of a letter of intent. (*Id.* ¶¶ 26, 34.) However, the parties never completed a letter of intent or a mission statement.

Based on the parties' communications, the Court finds that Defendants never expressed an intent to be bound to a preliminary agreement. Courts in this Circuit have repeatedly found that language anticipating future preparation and execution of contract documents, as expressed by both Plaintiff and Defendants, prevents a finding of intent to be bound. *See Adjustrite*, 145 F.3d at 549–50 (holding that the parties never expressed an intent to be bound because they contemplated the future "execution of a sales agreement contract"); *Bear Stearns*, 401 B.R. at 619 (finding no intent to be bound because, after the parties negotiated some of the contract terms, Bear Stearns stated that it would have its "lawyers start drafting" an agreement); *Spencer Trask Software and Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 442 (S.D.N.Y. 2003) (finding no intent to be bound because the defendants stated that they were "prepared to move promptly to consummate this transaction following the execution" of a letter agreement); *Miller*, 165 F. Supp. 2d at 492 (finding no intent to be bound because the defendant's letter stated

that "an employment contract outlining the [terms] will be prepared and submitted for agreement" (alteration omitted)); *Gorodensky v. Mitsubishi Pulp Sales, Inc.*, 92 F. Supp. 2d 249, 255 (S.D.N.Y. 2000) (finding no intent to be bound because defendant stated, *inter alia*, that it was "prepared to enter into a commercial agreement").  In light of Defendants' repeated statements that they wanted to execute a formal agreement, Plaintiff could have insisted on the completion of a binding agreement.  *See Gorodensky*, 92 F. Supp. 2d at 255; *see also Miller*, 165 F. Supp. 2d at 492 (finding that a party seeking to be bound "can very easily protect itself" by insisting on binding language).  In addition, similar to *Adjustrite*, the Court's finding that there was no intent to be bound is bolstered by the fact that the parties never executed a letter of intent or completed any draft agreements, even though they contemplated such completion.  *See Adjustrite*, 145 F.3d at 545–47, 550 (holding that the intent of the parties weighed against finding the existence of an agreement because any agreement "was expressly contingent . . . []on the execution of a sales agreement contract" that the parties never executed).  Therefore, Plaintiff fails to overcome the presumption that a binding agreement does not exist where the parties expressed that they planned on executing a formal contract but never executed a contract.  *See Bear Stearns*, 401 B.R. at 619.  The first factor accordingly weighs heavily in Defendants' favor and supports a finding that the parties did not have a binding preliminary agreement.[7]  *See id.*

---

[7] For the same reasons articulated in this section, Plaintiff's allegations fail to establish the existence of an implied-in-fact contract.  *See Turner v. Temptu Inc.*, 586 F. App'x 718, 721–22 (2d Cir. 2014) (holding that a plaintiff failed to establish the existence of an "implied-in-fact contract" because the parties never "manifested the requisite intent to enter into a binding . . . agreement"); *Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495, 512–13 (S.D.N.Y. 2001) (finding that the plaintiff failed to establish the existence of an implied-in-fact contract because the defendant's conduct indicated that it did not want to be bound absent a formal, written agreement).

## 2. Partial performance

Partial performance of the agreed-upon bargain under the terms of the alleged agreement is a "factor of major significance when one party has partially performed and that performance has been accepted by the party disclaiming the contract." *CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x 802, 805 (2d Cir. 2013) (citation and internal quotation marks omitted); *see also Bear Stearns*, 401 B.R. at 619. But if a party's performance is inconsistent with the terms of the alleged agreement, it does not support finding a binding preliminary contract. *See CAC Grp. Inc.*, 523 F. App'x at 805; *see also Miller*, 165 F. Supp. 2d at 493 n.8.

In this case, the partial-performance factor weighs slightly in Plaintiff's favor. As alleged in the Complaint, the primary focus of the collaboration was for Defendants to capitalize on the "cool factor" and "streetwear status" of Plaintiff's brand. (Compl., ¶¶ 19, 25, 35, 37, 51.) In furtherance of the collaboration, Plaintiff created design proposals, produced sample products, developed a marketing and publicity campaign, and eventually sold items from the collaboration. (*Id.* ¶¶ 21–22, 26, 29, 31, 33, 36, 43, 48, 53, 59, 63–64, 68–69, 72–79, 90–91.) Defendants partially accepted Plaintiff's performance as they approved the design proposals, agreed to reimburse Plaintiff for the sample production costs, and allowed Plaintiff to publicize and market items from the collaboration, essentially delivering, in part, on boosting the "streetwear status" of Defendants' brand. (*Id.* ¶¶ 23, 27, 35, 40, 44, 46, 50, 54, 60, 66.)

The weight of Plaintiff's partial performance, however, is diminished by the fact that Defendants had to advise Plaintiff that it could not sell items from the Classics Capsule without one of the parties paying royalty fees to the NCAA teams, instructed Plaintiff to stop showing its marketing video for the collaboration, and eventually sought to prohibit Plaintiff from selling any more merchandise from the collaboration. (*Id.* ¶¶ 86, 88, 100.) Defendants' actions demonstrate

that they were not fully satisfied with LPD's partial performance, and indeed, refused to accept some of it. Thus, Plaintiff's performance conferred on Defendants only slight benefits, and accordingly, this factor slightly favors Plaintiff. *See CAC Grp. Inc.*, 523 F. App'x at 805 (holding that the plaintiff's partial performance does not weigh in favor of finding a binding preliminary agreement if that performance is not fully accepted by the defendants); *Spencer Trask*, 383 F. Supp. 2d at 444 (finding that the partial-performance factor slightly favored the plaintiff because it conferred some, albeit disputable, benefit on the defendant); *Miller*, 165 F. Supp. 2d at 493 n.8 (finding that the partial-performance factor weighed against the plaintiff because its performance did not comport with the terms set forth in the alleged agreement); *Tri-Cty. Motors*, 494 F. Supp. 2d at 171 (finding that the partial-performance factor weighed against the plaintiff because there was no evidence that its actions conferred any benefit on the defendant).

### 3. Open terms

"The existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement." *Vacold*, 545 F.3d at 128 (citation omitted). Indeed, "there can be no . . . binding contract where material terms remain to be negotiated." *Bear Stearns*, 401 B.R. at 620 (citing *Ciarmella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 325 (2d Cir. 1997)). Thus, plaintiffs asserting the existence of a contract face a "strong presumption" that a binding agreement cannot exist where there are material "open terms." *Vacold*, 545 F.3d at 128; *Tri-Cty. Motors*, 494 F. Supp. 2d at 172.

Here, there is a plethora of material open terms. During the parties' communications, the only terms they appeared to agree upon were branding and design. (*See* Compl. ¶¶ 25–27, 35–36, 50–54, 61, 88.) The parties had significant back-and-forth communications regarding the branding and design of the products and eventually agreed on and produced merchandise for

sale. (*See id.*)  But the parties never reached an agreement on the majority of the remaining terms they discussed, including, but not limited to, profit sharing, retail sales locations, manufacturing, royalties and price.[8]

First, regarding profit sharing, the parties appeared to have an understanding as to how the profits would be allocated. (*See id.* ¶ 37.)  Defendants stated that "the capsule collection profits would likely be primarily profits to LPD . . . [but] [we] will have to confirm this . . . once the mission statement is complete." *Id.*  As noted above, the parties never completed a mission statement and therefore left the profit-sharing arrangement unconfirmed. *See Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (finding that the parties' failure to complete an anticipated agreement supported finding that material terms remained open).

Second, as to retail sales locations, Defendants proposed three options. (*Id.* ¶ 25.)  Plaintiff replied that it "would love to explore all three options," but the parties engaged in little-to-no discussion concerning retail sales locations thereafter. (*See id.* ¶¶ 25–102.)  Thus, sales locations was a material term on which the parties failed to agree and accordingly weighs against finding that the parties had a binding preliminary agreement. *See Tri-Cty. Motors*, 494 F. Supp. 2d at 172 (finding that the location for a vehicle dealership was a material term that the parties left open and therefore weighed against finding a binding preliminary agreement).

---

[8] In addition, there is no indication that the parties agreed on the duration of the collaboration or the quantity of merchandise to be sold, (*see* Compl. ¶¶ 25–102), which are additional open terms that weigh against finding a binding preliminary agreement. *See Hudson & Broad, Inc. v. J.C. Penny Corp. Inc.*, 553 F. App'x 37, 40 (2d Cir. 2014) (holding that an alleged contract for the manufacture of a "large number of light fixtures" was too vague as to quantity to be enforceable); *Miller v. Tawil*, 165 F. Supp. 2d 487, 493 n.8 (S.D.N.Y. 2001) (noting that the duration of the contract is a material term that, if left open, weighs against finding a binding preliminary agreement); *cf. Scientific Components Corp. v. Isis Surface Mounting, Inc.*, 539 F. Supp. 2d 653, 658 (E.D.N.Y. 2008) (noting that quantity is a material term, but finding that the parties had agreed upon it).

Third, the parties initially discussed that the manufacturing of the collaboration merchandise would occur at Defendants' facilities. (*Id.* ¶¶ 41–42.) Plaintiff, however, subsequently manufactured some of the merchandise on its own, not at Defendant's facilities, and Defendants later sought to prohibit Plaintiff from manufacturing any further items. (*Id.* ¶¶ 51, 75, 91–92, 94, 100.) The parties conduct illustrates that they failed to agree on the terms of the manufacturing location. *See Tri-Cty. Motors*, 494 F. Supp. 2d at 172; *see also Bear Stearns*, 401 B.R. at 621 (noting that plaintiff's argument that the parties agreed on certain terms was undermined by the fact that the parties' behavior was inconsistent with conduct that would evidence the existence of agreed-upon terms).

Fourth, as evidenced by Defendants' proposed back-dated licensing agreement, the parties failed to agree on the royalty arrangements. (*See id.* at 100.) Initially, the only discussion regarding royalties pertained to the royalties that Defendants owed the NCAA teams for using the school names and logos. (*Id.* ¶ 37.) However, the royalty arrangements were unsettled. It appears that Plaintiff sold merchandise from the Classics Capsule without paying any royalties, and Defendants requested a ten-percent royalty fee on all sales in the proposed back-dated licensing agreement, which Plaintiff rejected. (Compl. ¶¶ 42, 72–75, 86, 88, 100); *see Hanwha Corp. v. Cedar Petrochem., Inc.*, 760 F. Supp. 2d 426, 433 (S.D.N.Y. 2011) (finding that when a dispute arose of a contract term, it was an indication that it was a material term that the parties had not agreed upon).

Finally, the parties' communications reflect that they never agreed on the price for the merchandise. In June of 2014, Defendants requested Plaintiff's input on pricing for the merchandise, to which Plaintiff responded that a "price point" was "hard to pin down exactly since it depends on production . . . ." (Compl. ¶¶ 50–51.) While it appears that the parties settled

on pricing for Defendants' pieces in the Classics Capsule, (*see id.* ¶¶ 69, 71), the Complaint contains no further information regarding any discussion related to the pricing for the Collaboration Capsule, (*see id.* ¶¶ 25–102). If the pricing is "uncertain, the contract [is] void of a critical term." *Gorodensky*, 92 F. Supp. 2d at 256 (citation omitted).

The number of open terms weighs heavily against the finding of a binding preliminary agreement.[9] *See Adjustrite*, 145 F.3d at 550 (holding that the "the existence of open items" was a factor that "weigh[ed] strongly in favor of defendants, for there remained numerous open terms"); *Tri-Cty. Motors*, 494 F. Supp. 2d at 172 (finding that "the existence of open terms also weighed strongly in favor of [the defendant]" because it was "clear that the parties never had a true meeting of the minds" on the material terms of the alleged contract).

### 4. Customarily reduced to writing

The fourth factor assesses whether the alleged agreement is "of the type that is usually reduced to writing." *Vacold*, 545 F.3d at 125; *Bear Stearns*, 401 B.R. at 621 ("Whether the agreement at issue is the type that is usually committed to writing is also relevant" to determining "whether a binding preliminary agreement exists." (citation omitted)). In

---

[9] While the standard regarding open terms is more forgiving in determining whether there is Type II preliminary agreement, *see Bear Stearns Inv. Products Inc. v. Hitachi Auto. Products Inc.*, 401 B.R. 598, 626 (S.D.N.Y. 2009), the parties must at least "establish a determinate framework" to reach an agreement on those terms, *Vacold*, 545 F.3d at 128; *see Hudson*, 553 F. App'x at 39 (holding that "agreements to agree" are only enforceable if they leave "discrete material terms unspecified but nevertheless set mechanisms for objectively setting material terms in the future." (citation omitted)). Plaintiff's allegations do not support an inference that the parties had a framework in place to settle the open material terms. (*See* Compl. ¶¶ 25–102.) Further, there can be no preliminary agreement of either type if "the number of material terms left open [is] so large, that the contract is completely unenforceable." *Vacold LLC*, 545 F.3d at 132 n.1 (Hall, J., dissenting) (citing *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007)). As explained above, the number of open material terms weighs against finding the existence of a contract. Accordingly, even under a Type II analysis, the open-terms factor weighs against Plaintiff. *See Hudson*, 553 F. App'x at 40.

determining whether an agreement is of the type that parties customarily reduce to writing, courts in this Circuit consider: (1) the size and complexity of the transaction; (2) the duration of the contract; (3) the subject matter of the contract; and (4) the amount of money to be exchanged. *Rubenstein v. Clark & Green, Inc.*, 395 F. App'x 786, 790 (2d Cir. 2010); *Bear Stearns*, 401 B.R. at 622; *Missigman*, 131 F. Supp. 2d at 495.

Plaintiff fails to set forth any allegations pertaining to the size and complexity of the contract, the duration of the contract or the amount of money at issue. (*See* Compl.) Therefore, the Court is unable to evaluate "whether the agreement is of a type usually reduced to writing" due to the lack of information regarding the alleged agreement. *See Vacold LLC*, 545 F.3d at 125. Accordingly, this factor "does not aid [the Court's] analysis because [the Court] cannot discern what is usual in this context." *See id.*; *cf. Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 415–16 (S.D.N.Y. 2011) (analyzing the factor concerning whether the agreement is customarily reduced to writing because the parties had a prior history of business deals, the parties asserted that licensing agreement had "the potential to be a multi-million dollar venture" and asserted that "[t]hese types of transactions are usually committed to written contracts").

### 5. Context of the negotiations

The consideration of the context of the negotiations is only relevant to the analysis regarding whether the parties entered a Type II preliminary agreement. *Spencer Trask*, 383 F. Supp. 2d at 446; *see also Vacold*, 545 F.3d at 128 n.2. In making that determination, courts look to whether the parties intended to be bound "to good faith efforts to reach an agreement on the remaining terms" of a preliminary agreement. *Vacold*, 545 F.3d at 128; *see also Bear Stearns*, 383 F. Supp. 2d at 446.

Here, this factor weighs in favor of Defendants. While Defendants repeatedly stated that they were interested in finalizing the collaboration, (Compl. ¶¶ 18, 25, 35, 37, 50, 60, 62, 86, 88, 100), Defendants also repeatedly noted that many of the terms needed to be formalized, approved or documented, and they never expressed that they believed a preliminary agreement was in place, (*id.*). *See Gorodesky*, 92 F. Supp. 2d at 256 (finding that the context of the negotiations weighed against plaintiff because "[n]othing in the context of the negotiations suggests that the parties intended" to enter a "binding preliminary agreement."); *cf. Bear Stearns*, 401 B.R. at 626 (finding that the context of the negotiations weighed in plaintiff's favor because defendant acknowledged that the preliminary "terms were binding" and told one of its teams to "go ahead with Bear Stearns under the current agreement we reached . . ."). The context of the negotiations also tips in Defendants' favor because the parties never executed a draft agreement or a letter of intent. *Cf. Main Street Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 260 (N.D.N.Y. 2015) (finding that the context of the negotiations weighed in the plaintiff's favor because the parties executed a letter of intent and continued to negotiate the terms thereafter); *Gas Natural Inc. v. Iberdola, S.A.*, 33 F. Supp. 3d 373, 381–82 (S.D.N.Y. 2014) (finding that the context of the negotiations weighed in favor of finding a Type II preliminary agreement because "the parties exchanged several drafts of the [letter of intent], which . . . support[s] the existence of a Type II agreement"); *Learning Annex Holdings, LLC*, 765 F. Supp. 2d at 415 (finding that the context of the negotiations favored the plaintiff because the "the document" stated "the parties intent to proceed in good faith toward the contractual goal"); *Spencer Trask*, 383 F. Supp. 2d at 447 (finding that the context of the negotiations weighed in plaintiff's favor because the parties executed a formal-written preliminary agreement and continued to negotiate the outstanding terms thereafter). This factor weighs in Defendants' favor

because the circumstances indicated that Defendants intended not to be bound absent a formal, written agreement and the parties never executed a draft agreement or letter of intent.

In weighing these factors, the Court finds that Plaintiff's allegations fail to establish the existence of a binding preliminary agreement. The two most important factors — intent of the parties and open material terms — weigh heavily in Defendants' favor, the context of the negotiations also weighs in Defendants' favor, partial performance weighs slightly in Plaintiff's favor, and whether the agreement is customarily reduced to writing does not weigh in favor of either party. Thus, there is no binding preliminary agreement because the overall weight of the factors favors Defendants. *See Gorodesky*, 92 F. Supp. 2d at 256. Accordingly, the Court finds that Plaintiff's allegations fail to establish the existence of a contract and therefore adopts Judge Mann's recommendation. The Court grants the motion to dismiss as to the breach-of-contract claim.

### ii. Declaratory relief claims

Judge Mann recommended that the Court dismiss Plaintiff's trademark abandonment claims because, even assuming that Defendants gave Plaintiff a license to use their trademarks, Defendants exercised sufficient control over Plaintiff's use of their trademarks. (R&R 28–30.)

Plaintiff argues that Judge Mann erred because Defendants "expressly authorized" Plaintiff to use Defendants' trademarks and Defendants granted Plaintiff a "naked license" because they never inspected the quality of the collaboration merchandise. (Pl. Obj. 42–44.) Defendants argue that Judge Mann properly dismissed Plaintiff's trademark abandonment claims because Plaintiff fails to show the existence of a valid licensing agreement and Defendants actively monitored Plaintiff's use of their trademarks. (Adidas Am. Opp'n 14–16.) For the reasons explained below, the Court finds that Judge Mann properly dismissed Plaintiff's trademark abandonment claims.

When the owner of a trademark gives a license to another party for the use of its trademark, the owner must exercise some control or supervision over the licensee's use of the mark. *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007) ("The owner of a trademark has not only the right to license the use of its trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark." (citations omitted)); *Hawaii-Pac. Apparel Grp., Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006) ("A licensor . . . is required to exercise some degree of control over the use of the mark by the licensee, at the risk of abandonment of the mark." (citing *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir. 2002))). A licensor's failure to exercise control over its trademark may result in "a naked or uncontrolled license [that] may provide the basis for an inference of abandonment of [the] trademark." *Gen. Motors Corp.*, 786 F.2d at 110; *see also Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596 (S.D.N.Y. 2010) ("A naked license is a license to use a trademark without sufficient quality control provided by the licensor[,]" which may result in the licensor being "deemed to have involuntarily abandoned the rights to the mark." (citation and internal quotation marks omitted)); *Patsy's*, 508 F. Supp. 2d at 212 ("Where a licensor retains no control over the nature or quality of the goods or services provided in connection with the mark, . . . such naked licensing will result in abandonment." (internal quotation marks omitted) (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d Cir. 1959))). A party asserting that it was granted a naked license faces "a high burden of proof." *Patsy's*, 508 F. Supp. 2d at 212 (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983); *see Fendi*, 689 F. Supp. 2d at 596 (quoting *Patsy's*, 508 F. Supp. 2d at 212).

Here, assuming that Defendants granted Plaintiff a license to use their trademarks, Plaintiff's allegations belie its assertion that Defendants issued it a naked license because Defendants exercised sufficient control over Plaintiff's use of the trademarks. The Court finds *Hawaii-Pacific Apparel Group Incorporated v. Cleveland Browns Football Company LLC*, 418 F. Supp. 2d at 506, instructive. In *Hawaii-Pacific*, the plaintiff asserted that the defendant issued it a naked license, thereby abandoning any claims for trademark infringement. *Id.* at 507. The court found that the defendant exercised sufficient control over its mark as to all its licensees, even where one licensee stated that she was only required to "submit artwork to [the defendant] for its approval prior to using it on apparel" and another licensee stated that it was required to submit design approvals. *Id.* at 507–08.

Similarly, here, Plaintiff's allegations establish that Defendants inspected the designs and artwork for the collaboration merchandise, (Compl. ¶¶ 21–23, 35, 50, 53–54, 61, 84, 88), received "samples" of some of Plaintiff's work, (*id.* ¶¶ 34, 45, 61), produced some of the merchandise from the Classics Capsule itself, (*id.* ¶¶ 50, 56), ensured that their trademarks were not placed on the merchandise until the designs were approved, (*id.* ¶¶ 52–54), reviewed photographs of items from the Collaboration Capsule, (*id.* ¶¶ 65–66), decided that the manufacturing of the merchandise should occur at their facilities, (*id.* ¶ 42), and attempted to prevent Plaintiff from continuing to sell and manufacture any of the merchandise from the collaboration, even threatening to sue for infringement if Plaintiff continued to sell and manufacture the merchandise, (*id.* ¶ 100). Defendants' actions cannot be characterized as a failure to exercise control over their trademarks.

Plaintiff primary argument is that Defendants failed to physically inspect the final merchandise produced. (Pl. Obj. 43.) The law, however, does not require physical inspection of

products; it requires Plaintiff to show that Defendants exercised "*no control* over the nature or quality of the goods or services provided in connection with the mark." *See Patsy's*, 508 F. Supp. 2d at 212 (emphasis added); *see also Gen. Motors Corp.*, 786 F.2d at 110 (2d Cir. 1986) ("The critical question . . . is whether the licensees' operations are policed adequately to guarantee the quality of products sold under the mark." (citation omitted)); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 917–18 (S.D.N.Y. 1968) ("A naked license may be the basis for an inference of abandonment where the licensor maintains *no control* over the quality of the good made by the licensee." (emphasis added) (citation and internal quotation marks omitted)).

Because the record demonstrates that Defendants exercised control over Plaintiff's use of Defendants' trademarks, the Court adopts Judge Mann's recommendation and grants Defendants' motion to dismiss Plaintiff's trademark abandonment claims.

### iii. Defamation claim

Judge Mann recommended that the Court deny Plaintiff's motion for summary judgment as to its defamation claim. (R&R 33–35.) Judge Mann found that summary judgment was improper because nothing in the record establishes that Defendants' representative who told V Magazine that the collaboration was "illegitimate" knew that the collaboration was valid. (*Id.*)

Plaintiff argues that the recommendation was erroneous because the representative's awareness of the collaboration is irrelevant. (Pl. Obj. 44–46.) Plaintiff further argues that the representative's statement is facially defamatory and the representative is imputed with knowledge of the collaboration because he worked for Defendants. (*Id.*) Defendants argue that Plaintiff's failure to establish the existence of a contract shows that Plaintiff is not entitled to summary judgment on the defamation claim. (Adidas Am. Opp'n 13–14.) For the reasons discussed below, the Court finds that Judge Mann properly denied the motion for summary judgment.

"Defamation . . . is the invasion of the interest in a reputation and good name" and "consist[s] of the twin torts of libel and slander." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (citations omitted). "Generally, spoken defamatory words are slander; written defamatory words are libel." *Id.* (citations omitted); *see also Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) ("Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." (citation omitted)). To establish a defamation claim under New York law, a plaintiff must show (1) a false statement, (2) about the plaintiff, (3) published without privilege or authorization (4) fault, rising to at least negligence, by the publisher, and (5) special harm or defamation per se. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 169 (2d Cir. 2000); *Tannerite Sports LLC v. NBC Universal Media, LLC*, 135 F. Supp. 3d 219, 232 (S.D.N.Y. 2015); *Lang Sang v. Ming Hai*, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013) ("The elements of a cause of action to recover damages for defamation are a false statement, published without privilege or authorization to a third party, fault and either causing special harm or constituting defamation per se." (citations and alterations omitted)); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 76 (S.D.N.Y. 2012) ("New York law allows a plaintiff to recover for defamation by proving that the defendant published to a third party a defamatory statement of fact that was false, was made with the applicable level of fault, and either was defamatory per se or caused the plaintiff special harm." (citing *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011))). A defamatory statement is one that exposes the plaintiff "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" *Biro*, 883 F. Supp. 2d at 456 (alterations in original) (quoting *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107,

113 (2d Cir. 2005)). "A statement that tends to injure another in his or her trade, business or profession is defamatory per se." *Biro*, 883 F. Supp. 2d at 456 (citation omitted). Statements that tend to injure a business's reputation are statements "made with reference to a matter of significance and importance for the operation of the business . . . ." *Thompson*, 855 F. Supp. 2d at 77 (citation omitted).

Here, Plaintiff is not entitled to summary judgment because it cannot satisfy the fourth element, which requires a showing of fault.[10] Plaintiff must establish that Defendants, through their representative, "culpably published the alleged defamatory statements," meaning that it "must show that [D]efendants were at least negligent with respect to the truth . . ." *Greene v. Paramount Pictures Corp.*, 138 F. Supp. 226, 236 (E.D.N.Y. 2015); *see also Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.NY. 2013) (dismissing plaintiff's defamation action because the complaint failed to allege that the "statements were made with the applicable level of fault" as "no facts . . g[a]ve rise to a plausible inference that [defendants] negligently" published the statements at issue); *Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Pub. Inc.*, 8 F. Supp. 2d 357, 362 (S.D.N.Y. 1998) (noting that a plaintiff asserting a defamation claim must establish that the defendant "was negligent in its failure to ascertain the truth or falsity of the statement before communicating it" (citation omitted)).

Plaintiff's defamation claim is based on the statement that the collaboration was "illegitimate" made by of one of Defendants' public relations employees to V Magazine. (Compl. ¶¶ 111–16.) In support of its motion, Plaintiff submits a declaration from its founder and emails related to the statement at issue. (Decl. of Benjamin Fainlight ("Fainlight Decl."),

---

[10] Because the Court finds that Plaintiff fails to allege fault, the Court does not discuss whether Plaintiff has satisfied the other elements of a defamation claim.

annexed to Pl. Mot. as Ex. 4; Emails re "illegitimate" statement ("V Magazine Emails"), annexed to Fainlight Decl. as Exs. 32, 33, 34, 35 and 36.) Fainlight states that on November 20, 2014, Katherine Zarella, Senior Editor at V Magazine, informed him that an Adidas representative contacted her and told her the collaboration was "illegitimate." (Fainglight Decl. ¶ 59.) Fainglight asked Zarella for the contact information of the representative who made the statement. (*Id.* ¶ 61.) After Zarella replied, Fainglight emailed the representative, Brett Anderson, and explained that Plaintiff and Defendants had been collaborating "for a year at that point and [A]didas had signed off" on the collaboration. (*Id.* ¶ 63.) Fainglight then emailed his contact at Adidas, Jarrett Mann, to gain an understanding of Anderson's statement. (*Id.* ¶ 65.) Mann explained that Plaintiff and Defendants "ha[d] not been able to connect in quite some time," Defendants public relations team had "no knowledge" of the collaboration, and "the press . . . was bought to [their] attention" the day it was released. (*Id.* ¶ 66.) After Fainglight replied, Mann informed him that Defendants' "PR team is pretty unhappy . . . due to the lack of knowledge they had about the material . . . ." (*Id.* ¶ 68.)

Plaintiff's evidence fails to establish that Anderson acted negligently when he told Zarella that the collaboration was illegitimate. First, Plaintiff submits no evidence as to whether Anderson had any knowledge that Plaintiff and Defendants were collaborating. In fact, Plaintiff's evidence indicates that Anderson and Defendants' public relations team had "no knowledge" of the collaboration. (*Id.* ¶ 66.) Second, Plaintiff submits no evidence showing that Anderson acted negligently by failing to investigate whether the collaboration was legitimate. Moreover, the evidence only shows that Anderson was a "representative" of Defendants. Plaintiff submits no evidence regarding Anderson's role in Defendants' companies, what department Anderson worked in, Anderson's office location, or any similarly relevant

information.[11]  (*Id.* ¶¶ 59–64.)  Therefore, Plaintiff has not shown that "[D]efendants were at least negligent with respect to the truth."  *See Greene*, 138 F. Supp. at 236; *see also Albert*, 239 F.3d at 271 (holding that it could not decide the issue of defendant's fault in making the allegedly defamatory statements because the record lacked sufficient evidence on the issue).

Accordingly, the Court finds that Plaintiff failed to state a defamation claim and therefore adopts Judge Mann's recommendation.  The Court denies Plaintiff's motion for summary judgment on the defamation claim.

### d.  Adidas AG's motion to dismiss for lack of jurisdiction

Adidas AG separately moves to dismiss the Complaint, arguing that Plaintiff's allegations fail to establish that the Court can exercise personal jurisdiction over Adidas AG.  (Adidas AG Mem. of Law in Supp. of Adidas AG Mot. ("Adidas AG Mem.") 4–7, Docket Entry No. 42.) Adidas AG contends that it lacks sufficient contacts with New York for general personal jurisdiction, and because Adidas America's actions cannot be imputed to Adidas AG, there is no specific personal jurisdiction.  (*Id.*)  Plaintiff argues that the Court can exercise personal jurisdiction over Adidas AG because it is Adidas America's parent company, and therefore Adidas America was acting on its behalf and for its benefit during the collaboration.  (Pl. Opp'n to Adidas AG Mot. ("Pl. Opp'n") 10–19, Docket Entry No. 46.)  Based on Plaintiff's allegations

---

[11]  Based on the lack of evidence regarding Anderson's role with Defendants, the Court alternatively denies Plaintiff's motion because it fails to establish that Anderson's allegedly defamatory statement may be imputed to Defendants under the doctrine of *respondeat superior*. *See Garrison v. Toshiba Bus. Solutions (USA) Inc.*, 907 F. Supp. 2d 301, 307, 309 (E.D.N.Y. 2012) (dismissing the plaintiff's defamation claim because "[a]n employer is liable for the defamatory conduct of an employee under the [*respondeat superior*] theory only if the employee, in committing the act complained of, was acting within the scope of his employment," which the plaintiff failed to establish).

and Adidas AG's submissions, the Court finds that Plaintiff has not established that the Court has personal jurisdiction over Adidas AG but grants Plaintiff jurisdictional discovery.

### i. Personal jurisdiction

Plaintiff argues that the Court can exercise specific personal jurisdiction over Adidas AG based on an agency theory of jurisdiction.[12]  (Pl. Opp'n 10–19 (arguing that jurisdiction over Adidas AG is proper because "America is AG's All-Purpose U.S. Agent . . . .").)  Adidas AG argues that the Court lacks personal jurisdiction over it because it has not transacted any business in New York and Adidas America was not acting as its agent with respect to the collaboration because it had no involvement with, or control over, the collaboration.  (Adidas AG Mem. 4–7.)

Under New York law, when a plaintiff seeks to establish the Court's specific personal jurisdiction over a parent company based on the acts of its subsidiary, "the subsidiary must be either an 'agent' or 'mere department' of the foreign parent."  *Jazini*, 148 F.3d at 184 (citation omitted); *see also Gallelli v. Crown Imps., LLC*, 701 F. Supp. 2d 263, 271 (S.D.N.Y. 2010) ("New York C.P.L.R. 301 jurisdiction may be established by attributing the acts of related entities to the named [d]efendant. Specifically, the related entity [must] be either a 'mere department' of the named [d]efendant, or its agent."  (citation omitted)).

To prove that a subsidiary is an agent of a parent company, a plaintiff must establish that the "subsidiary does all the business which the parent corporation could do were it here by its own officials."  *Jazini*, 148 F.3d at 184 (alteration omitted) (quoting *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (1967)); *Gallelli*, 701 F. Supp. 2d at 272.  "[W]hen considering the agency issue, the court[s] consider whether the subsidiary is carrying out its own business or the business of the parent."  *Gallelli*, 701 F. Supp. 2d at 272 (citation omitted).  A plaintiff

---

[12]  The Court does not discuss general personal jurisdiction because Plaintiff argues only that the Court has specific personal jurisdiction over Adidas AG.

demonstrates that a subsidiary was doing all the business of the parent by establishing that the subsidiary's "activities were for the benefit of and with the knowledge and consent of the [parent-company] defendant, and that the [parent-company] defendant exercised some control over the subsidiary in the matter that is the subject of the lawsuit." *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 447 (E.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467 (1988)); *see also Universal Trading & Inv. Co., Inc. v. Credit Suisse*, 560 F. App'x 52, 55 n.1 (2d Cir. 2014) (noting that a parent company's general control over a subsidiary is insufficient to exercise personal jurisdiction over the parent company); *Wilder v. New Corp.*, No. 11-CV-4847, 2015 WL 5853763, at *6 (S.D.N.Y. Oct. 7, 2015) (noting that a court has personal jurisdiction over a company where "the parent exerts pervasive control" over the subsidiary and its action in the forum); *Gallelli*, 701 F. Supp. 2d at 272 (same).

Plaintiff's allegations fail to establish that Adidas America was "do[ing] all the business" of Adidas AG, *see Jazini*, 148 F.3d at 184, because Plaintiff fails to show that Adidas AG had any "knowledge" or "control over [Adidas America] in the matter that is the subject of the lawsuit," *see Ingenito*, 89 F. Supp. 3d at 447. There is no dispute that Adidas America is a wholly owned subsidiary of Adidas AG. (*See* Decl. of Paul Erlich in Supp. of Adidas AG Mot. ("Erlich Aff.") ¶ 4, Docket Entry No. 41 ("[A]didas America, Inc. is a wholly owned subsidiary of [A]didas AG . . . .").) Plaintiff alleges that "[Adidas] America, Inc. directs all U.S.-based operations on behalf of [A]didas AG, including, *inter alia*, sales, brand marketing, product marketing, product design, public relations, distribution, contract formation, licensing of and for [A]didas-branded merchandise, enforcement of [A]didas trademarks, and quality control of [A]didas-branded merchandise . . . ." (Compl. ¶ 6.) Adidas AG, however, is not subsequently

mentioned in the Complaint, (*see* Compl.), and is never mentioned in Fainlight's affidavit, (*see* Fainlight Aff.). Nor does Plaintiff submit any allegations of contact between Adidas America and Adidas AG pertaining to the collaboration. Adidas AG, on the other hand, states that it "has not communicated with Plaintiff regarding any potential collaboration between Plaintiff and [A]didas America or [A]didas AG." (Erlich Aff. ¶ 5.)

While Plaintiff's allegations show a close connection between Adidas AG and Adidas America, Plaintiff's allegations do not show that Adidas AG exercised any control over or had any knowledge of the collaboration between Plaintiff and Adidas America, which collaboration gave rise to Plaintiff's suit. Thus, the Court cannot exercise specific personal jurisdiction over Adidas AG as there is no direct link between Adidas AG and the conduct at issue. *See Sonera Holding BV v. Cukorova Holding A.S.*, 750 F.3d 221, 255 (2d Cir. 2014) ("Specific or conduct linked jurisdiction depends on" a defendant's affiliation with "the underlying controversy . . . ."); *Universal Trading*, 560 F. App'x at 54 (noting that "[s]pecific personal jurisdiction exists" when a defendant has contacts that with the forum that are related to the conduct at issue); *Jazini*, 148 F.3d at 184 (holding that "the presence of a subsidiary alone" is insufficient to establish personal jurisdiction over the parent); *cf. Uebler v. Boss Media, AB*, 432 F. Supp. 2d 301, 305–06 (E.D.N.Y. 2006) (holding that plaintiff established personal jurisdiction over a parent company by showing that the parent was "responsible for processing certain transactions" related to the business dealings giving rise to the plaintiff's suit).

### ii. Jurisdictional discovery

In view of Plaintiff's allegations, the Court grants Plaintiff limited jurisdictional discovery to determine whether there was contact between Adidas America and Adidas AG regarding the collaboration. *See APWU v. Potter,* 343 F.3d 619, 627 (2d Cir. 2003) ("[The] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to

the existence of jurisdiction." (citation and internal quotation marks omitted)).  The bar for granting "jurisdictional discovery" is "low," *Universal Trading*, 560 F. App'x at 55, and it is appropriately granted where a plaintiff's allegations make a "sufficient start" toward establishing personal jurisdiction, *Uebler*, 363 F. Supp. 2d at 506.

Here, Plaintiff has made a sufficient start to establish personal jurisdiction over Adidas AG.  Plaintiff alleges that "[Adidas] America, Inc. directs all U.S.-based operations on behalf of [A]didas AG, including, *inter alia*, sales, brand marketing, product marketing, product design, public relations, distribution, contract formation, licensing of and for [A]didas-branded merchandise, enforcement of [A]didas trademarks, and quality control of [A]didas-branded merchandise . . . ."  (Compl. ¶ 6.)  As discussed above, based on these allegations, Plaintiff's personal jurisdiction argument fails only because it lacks evidence and allegations regarding whether Adidas AG was in any way involved in the collaboration at issue in this case.  Moreover, because Defendants have exclusive knowledge of the facts regarding whether Adidas AG was in any way involved in the collaboration, jurisdictional discovery is warranted.  *See Uebler*, 363 F. Supp. 2d at 506 (noting that allowing "jurisdictional discovery in this case is bolstered by the fact that the facts necessary to establish personal jurisdiction lie within [Defendant's] exclusive knowledge" (citation omitted)).

After jurisdictional discovery concludes, Plaintiff shall submit to the Court evidence it believes establishes the Court's personal jurisdiction over Adidas AG.  If Adidas AG believes Plaintiff still fails to establish personal jurisdiction after such submission, Adidas AG may renew its motion to dismiss.

**III. Conclusion**

For the foregoing reasons, the Court adopts Judge Mann's recommendations in their entirety. The Court therefore grants Defendants' motion to dismiss as to the breach of contract and declaratory relief claims, denies Defendants' motion to dismiss as to the defamation and unjust enrichment claims, and denies Plaintiff's motion for summary judgment as to the defamation, breach of contract and declaratory relief claims. The Court grants Plaintiff leave to amend the Complaint to assert quasi-contract claims.

The Court denies Adidas AG's motion to dismiss for lack of personal jurisdiction and grants Plaintiff jurisdictional discovery. Plaintiff shall file an amended complaint within thirty (30) days of this Memorandum and Order asserting any quasi-contract claims it wishes to pursue.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 27, 2017
      Brooklyn, New York