UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

LPD NEW YORK, LLC,

                                        Plaintiff,

                v.

ADIDAS AMERICA, INC. and ADIDAS AG,

                                        Defendants.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-6360 (MKB) (RLM)

MARGO K. BRODIE, United States District Judge:

Plaintiff LPD New York, LLC ("LPD") commenced the above-captioned action against

Defendants Adidas America, Inc. ("Adidas America") and Adidas AG on November 5, 2015,

bringing claims for breach of contract, defamation and unjust enrichment. (Compl. ¶¶ 1, 104–16,

126–31, Docket Entry No. 1.) LPD also sought relief under the Declaratory Judgment Act, 28

U.S.C. §§ 2201, 2202, pertaining to disputes regarding its use of Defendants' trademarks.

(*Id.* ¶¶ 117–25.) Defendant Adidas America moved to dismiss the Complaint for failure to state a

claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.[1] (Def. Adidas America Mot. to Dismiss ("Adidas Am. Mot."), Docket Entry No. 20;

Def. Adidas America Mem. in Supp. of Adidas Am. Mot. ("Adidas Am. Mem."), Docket Entry

No. 21.) LPD moved for partial summary judgment on its claims for breach of contract,

defamation and declaratory relief, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

(Pl. Mot. for Summ. J. ("Pl. Mot."), Docket Entry No. 24.)

---

[1] In its motion to dismiss, Defendant Adidas America explained that Adidas AG, while
named in the Complaint, had not been served. (Def. Adidas America Mot. to Dismiss ("Adidas
Am. Mot.") 1 n.1, Docket Entry No. 20.) Thus, for purposes of that motion to dismiss, the
undersigned counsel only appeared on behalf of Defendant Adidas America. (*Id.*)

By order dated April 6, 2016, the Court referred both motions to Chief Magistrate Judge Roanne L. Mann. (Order dated Apr. 6, 2016.) By report and recommendation dated August 25, 2016 (the "R&R"), Judge Mann recommended that the Court grant Adidas America's motion to dismiss LPD's breach of contract and declaratory judgment claims, deny the motion as to LPD's defamation and unjust enrichment claims, and deny LPD's motion for partial summary judgment. (R&R, Docket Entry No. 39.) LPD objected to the R&R in part. (Pl. Obj. to the R&R ("Pl. Obj."), Docket Entry No. 49.) Adidas America did not file objections.

By Memorandum and Order dated March 27, 2017 (the "March 2017 Decision"), the Court adopted Judge Mann's recommendations in their entirety. *See LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2017 WL 1162181 (E.D.N.Y. Mar. 27, 2017). The Court granted Defendants' motion to dismiss LPD's breach of contract and declaratory relief claims, denied the motion as to the defamation and unjust enrichment claims, denied LPD's motion for summary judgment as to the defamation, breach of contract and declaratory relief claims, and granted LPD leave to amend the Complaint to assert quasi-contract claims.[2] *See id.* at *1.

LPD now moves the Court to reconsider the portion of the March 2017 Decision dismissing LPD's breach of contract and declaratory judgment claims, and alternatively moves the Court to certify the contract formation issue for appeal in the event the Court denies the reconsideration motion. (Pl. Mot. for Recons. ("Pl. Recons. Mot."), Docket Entry No. 59; Pl.

---

[2] On June 27, 2016, after Adidas America moved to dismiss and LPD moved for summary judgment, LPD served Adidas AG with the summons and Complaint. (Adidas AG Letter dated July 18, 2016, Docket Entry No. 37.) On September 6, 2016, Adidas AG moved to dismiss the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure and for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Def. Adidas AG Mot. to Dismiss ("Adidas AG Mot."), Docket Entry No. 40.) The Court denied Adidas AG's separate motion to dismiss for lack of personal jurisdiction, which was filed after the R&R. *LPD N.Y., LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2017 WL 1162181, at *1 (E.D.N.Y. Mar. 27, 2017).

Mem. in Supp. of Pl. Recons. Mot. ("Pl. Recons. Mem."), Docket Entry No. 60.) For the reasons

discussed below, the Court denies LPD's reconsideration motion in its entirety.

## I. Background

The Court assumes familiarity with the facts as detailed in the R&R and the March 27,

2017 Decision and provides only a summary of the pertinent facts and procedural background.

*See LPD*, 2017 WL 1162181.

### a. Factual background

LPD is a fashion company that creates "streetwear" products. (Compl. ¶¶ 15–16.) In

October of 2013, Defendants contacted LPD to discuss a possible "collaboration" in which LPD

would create unique streetwear-style designs for Defendants' brand and five National Collegiate

Athletic Association ("NCAA") basketball teams sponsored by Defendants.[3] (*Id.* ¶ 19.) LPD

expressed interest in the collaboration and later developed two design "capsules" for the

collaboration: a "Classics Capsule" and a "Collaboration Capsule." (*Id.* ¶¶ 20–21.) The Classics

Capsule consisted of "a series of design proposals for NCAA Basketball Teams, which included

prints for tee shirts, basketball jerseys, basketball shorts, and team jackets" that Defendants

would help design in collaboration with LPD. (*Id.* ¶ 21.) The Collaboration Capsule consisted

of "a series of design proposals for basketball jerseys, tee-shirts, outerwear, jackets, hats, shorts,

sports bras, lanyards and pants" for an athletic-streetwear collection designed primarily by LPD.

(*Id.*) After receiving some preliminary prints for the Classics Capsule, Defendants responded

that they were "excited" about the designs. (*Id.* ¶¶ 22–23.)

On November 17, 2013, LPD asked Defendants how the pieces from the Classics

---

[3] Throughout the Complaint, LPD refers to Adidas America and Adidas AG as one entity, Adidas. (*See* Compl., Docket Entry No. 1.) Thus, the Court is unable to determine what allegations relate to Adidas America, Adidas AG, or both.

Capsule "should/will be branded (with both LPD and Adidas logos) and how/where they will be distributed (in Adidas' stores/distributors or otherwise)." (*Id.* ¶ 24.) Defendants responded that "the rules are really what [the parties] want them to be" because the project was the first time Adidas' basketball division was "coordinating with a fashion brand." (*Id.* ¶ 25.) Defendants subsequently proposed that:

Branding

Due to NCAA rules the uniforms can only be branded adidas. So our actual on court product we will be badged as adidas.

There is an opportunity for co-branding on your retail pieces and our Satin Jacket. Our designers could collab for a cool jocktag or woven label that would be badged with both logos.

If you want to just badge your product LPD only we understand the option but we would want to at least show a true collaboration to demonstrate "court to street."

Retail

This part is also new. But after having [internal] discussion[s] . . . we have a few options of where we would retail.

Adidas.com — Our own retail would love to feature this [as] an exclusive collection. Your retail pieces are at a price point where we could feature our retail shorts with your retail pieces and make it an exclusive release online.

Your retailers — because these pieces are at a higher price point than our sales reps deal with your access to boutique and footprint accounts.

NYC stop-in-shop. We would do an in-store collab where we split the store in half with your retail and some of our higher price point retail and highlight this collection but gain momentum for both brands.

Or the option of all [three]. Let me know your thought as I think we will have to write our rules because this has not happened with an actual on-court kit before.

(*Id.* (alterations in original).)  LPD replied that it liked the idea of the collaboration and wanted to get to work on the tags and labels for the pieces, was interested in exploring all of the proposed retail options, and could get to work on "visuals" as soon as it had "samples of the first approved products."  (*Id.* ¶ 26.)  In addition, LPD asked if "it would be possible to get a letter of intent for the collaboration." (*Id.*)  Defendants thought "a letter of intent [would be] perfect" and agreed to "work on putting some of this into a document with the purpose of this along with details."  (*Id.* ¶ 27 (alterations omitted).)

On January 13, 2014, LPD informed Defendants that it was going to begin creating samples from the Classics Capsule design proposal.  (*Id.* ¶ 29.)  On February 25, 2014, LPD sent Defendants "a concept proposal for the Collaboration Capsule."  (*Id.* ¶ 33.)  By March of 2014, Defendants had not responded, and LPD followed up to get Defendants' feedback regarding the Collaboration Capsule and a letter of intent.  (*Id.* ¶ 34.)  A week later, Defendants replied, stating that they approved of the designs for the Collaboration Capsule and that "[t]he letter of intent is a work in progress" due to some "development[al] boundaries."  (*Id.* ¶ 35.)  Defendants also provided "some key next steps," which included finalization of the "[l]etter of intent."  (*Id.*)  LPD then asked how the parties would divide or allocate the "sales and profits," to which Defendants responded that the products from the Classics Capsule would be provided to the NCAA teams at no cost.  (*Id.* ¶¶ 36–37.)  Defendants further stated that their licensed apparel division would purchase the Collaboration Capsule materials related to the NCAA teams, the "royalties [from those sales] would go to the schools," and the "capsule collection profits would likely be primarily profits to LPD" because Defendants' products were mainly "on court school products."  (*Id.* ¶ 37.)  Defendants also stated that the details of the collaboration would be finalized and confirmed "once the mission statement is complete."  (*Id.*)  In response, LPD asked

that Defendants "just let [LPD] know the specifics and that everything is confirmed once [Defendants] know[] for sure." (*Id.* ¶ 38.)

After beginning to make arrangements to prepare samples of products for both capsules, LPD contacted Defendants to determine who would cover the costs of producing the samples and to specify the location of the manufacturing for the final products. (*Id.* ¶¶ 39, 41.) Defendants gave LPD a "budget code" to pay for the production of the samples and stated that the final products would be manufactured in Defendants' facilities. (*Id.* ¶¶ 40, 42.) Because LPD's "pattern-and-sample maker" refused to accept Defendants budget code to cover the sample production costs, LPD paid the costs and sought reimbursement from Defendants. (*Id.* ¶ 47.)

On June 12, 2014, Defendants notified LPD that there was a "large re-alignment within [its] group," [placing] many of [Defendants'] projects . . . on hold." (*Id.* ¶ 50.) Nevertheless, Defendants told LPD that it wanted to finalize and launch the collaboration and instructed LPD to do the following: (1) send the "art" from the capsules for Defendants to review, (2) send information regarding the Classics Capsule for Defendants' "teams" to "agree and sign off," and (3) keep any information regarding the teams involved in the collaboration confidential. (*Id.*) Defendants also agreed to reimburse the sample production costs and told LPD that further details regarding the collaboration should be handled in "the next few weeks." (*Id.*) As to the prices for the collaboration products, LPD informed Defendants that they could not "pin down exact[] [pricing] since it depends on production (specifically whether LPD is producing the pieces here or at [Defendants'] facilities abroad and how many units . . . are ordered."). (*Id.* ¶ 51 (alterations omitted).) LPD also requested "some sort of confirmation that the collaboration . . . will be happening." (*Id.*) Defendants responded that "the collaboration would only be confirmed once [Defendants] were '100% on board'" and could "dedicate more funding for the

collaboration." (*Id.* ¶ 52.)

The following week, LPD followed up, again asking about the location of the manufacturing and also sending Defendants its final design proposal for the collaboration. (*Id.* ¶ 53.) Defendants responded that "upper management approved the designs" and gave LPD "'permission to move forward' with the collaboration." (*Id.* ¶ 54.) Defendants subsequently sent LPD sample products that it produced based on the Classics Capsule and allowed LPD to pitch products from both capsules to potential buyers. (*Id.* ¶¶ 56–57.) Thereafter, LPD notified Defendants that its buyers were interested in the products and inquired as to the status of the reimbursement for the sample production costs it had incurred. (*Id.* ¶¶ 58–59.) Defendants expressed their intent to reimburse the sample production costs, noted that they were having a meeting soon to discuss "a marketing budget and promotional plan," and stated that they had "enough signoff to continue to push through and continue on with the collab[oration]." (*Id.* ¶ 60 (alterations omitted).) During a subsequent telephone call, LPD informed Defendants it would soon begin producing "marketing materials" to promote the collaboration. (*Id.* ¶ 63.)

On September 8, 2014, LPD began selling women's clothing items from the collaboration.[4] (*Id.* ¶ 69.) LPD also secured promotional publications with several online and print media outlets and continued to promote the collaboration in various places. (*Id.* ¶¶ 69, 72–73, 76.) As part of its promotion efforts, LPD created a "provocative" marketing video for the Collaboration Capsule. (*Id.* ¶ 76.) In November of 2014, V Magazine reached out to LPD, seeking to secure an exclusive feature of the Collaboration Capsule. (*Id.* ¶ 77.) LPD agreed. (*Id.* ¶ 78.) After V Magazine published the feature, a representative from Defendants called one

---

[4] It is unclear from the Complaint whether the sales were from the Classics Capsule, the Collaboration Capsule, or both.

of V Magazine's senior editors and told her that the collaboration was "illegitimate." (*Id.* ¶¶ 79–80.) As a result, V Magazine withdrew the feature. (*Id.* ¶ 82.)

After getting in touch with the representative who had contacted V Magazine, LPD provided him with information about Defendants' personnel through whom the collaboration had been taking place. (*Id.* ¶¶ 83–84.) LPD also reached out to their contacts at Defendants' company, seeking clarification of the basis for the statement made by Defendants' representative to V Magazine. (*Id.* ¶ 85.) Defendants responded that the promotional material regarding the collaboration "took another route" than what the parties had discussed and "raised some flags" with its public relations team. (*Id.* ¶ 86.) Defendants also told LPD that the executive who approved the collaboration was no longer with the company and while they "did provide initial green lights to proceed, . . . all content needed to be approved by [Defendants'] higher ups." (*Id.*) LPD expressed its confusion and sent Defendants copies of all the materials it had regarding the collaboration. (*Id.* ¶ 87.) Defendants then told LPD that the "products are good to go" but the promotional video could not be shown anymore and any sales from the Classics Capsule had to be placed on hold because it could cause legal issues with the NCAA teams. (*Id.* ¶ 88.)

LPD continued to promote and sell items from the Collaboration Capsule but, in January of 2015, a buyer refused to accept delivery and pay for the items because he doubted the legitimacy of the collaboration. (*Id.* ¶¶ 90, 94–95.) To resolve the issue, LPD requested that Defendants send the buyer a letter confirming the collaboration's legitimacy. (*Id.* ¶ 96.) Defendants sent the letter but the buyer requested additional assurance, and LPD requested further confirmation of the collaboration. (*Id.* ¶¶ 97–99.)

In May of 2015, Defendants sent LPD a "back-dated licensing agreement" dated June 1, 2014, which provided that LPD had the right to "use the [A]didas name and the Three-Stripes trademark" for both capsules "provided LPD paid 10% royalties" to Defendants. (*Id.* ¶ 100.) The proposed licensing agreement also sought to "terminate LPD's right to manufacture and sell pieces from the Classics and Collaboration Capsules" as of May 1, 2015. (*Id.*) LPD refused to sign the agreement and again requested reimbursement for the sample production costs. (*Id.* ¶¶ 101–02.) Defendants threatened to sue LPD for trademark infringement. (*Id.* ¶ 102.)

### b. Procedural background

Based on the foregoing, LPD filed the Complaint in this action, bringing claims for, *inter alia*, breach of contract and seeking declaratory relief pertaining to disputes regarding its use of Defendants' trademarks. (*Id.* ¶¶ 1, 104–26.) After Defendants moved to dismiss and LPD moved for partial summary judgment, the Court referred both motions to Judge Mann. (Order dated Apr. 6, 2016.)

As relevant here, Judge Mann recommended that the Court dismiss the breach of contract claim, finding that LPD's allegations failed to show the formation of a contract. (R&R 21–25.) Judge Mann also recommended that the Court dismiss LPD's trademark abandonment claims because, even assuming that Defendants gave LPD a license to use their trademarks, Defendants exercised sufficient control over LPD's use of their trademarks. (*Id.* at 28–30.)

LPD objected to the R&R, arguing that Judge Mann erred in recommending dismissal of the breach of contract claim because: (1) neither party expressed an intention not to be bound absent a formalized agreement; (2) the parties abandoned any intention to formalize an agreement; (3) the absence of a formal agreement does not preclude finding that the parties formed a contract; (4) the parties agreed on the "material terms" of the contract and New York

law gap-fills any terms that were not agreed upon; and (5) Defendants' conduct "expressly recognized" the existence of a contract.  (Pl. Obj. 22–34, 37–42.)  LPD also argued that Judge Mann erred because Defendants "expressly authorized" LPD to use Defendants' trademarks and Defendants granted LPD a "naked license" because they never inspected the quality of the collaboration merchandise.  (Pl. Obj. 42–44.)  Because LPD objected to Judge Mann's recommendations as to LPD's breach of contract and trademark abandonment claims, the Court reviewed Defendants' motion as to those claims *de novo*.  *See LPD*, 2017 WL 1162181, at *4, *6–14.

In the March 2017 Decision, the Court dismissed LPD's breach of contract claim because LPD's allegations failed to establish the existence of a binding contract between LPD and Defendants.  *See id.* at *6–13.  Because the parties never executed a formal written contract, the Court analyzed whether the parties had entered either a Type I or Type II preliminary agreement.  *See id.*  The Court explained that under Second Circuit law:

> to determine if an agreement is a Type I preliminary agreement [courts must consider] (1) whether there is an expressed reservation of right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of agreement that is usually committed to writing, . . . [and] to determine if an agreement is a Type II preliminary agreement [courts must consider] (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Id.* at *7–8 (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 124 & n.2 (2d Cir. 2008)).  The Court found that LPD failed to establish the existence of a contract because:

> The two most important factors — intent of the parties and open material terms — weigh heavily in Defendants' favor, the context of the negotiations also weighs in Defendants' favor, partial

10

performance weighs slightly in [LPD's] favor, and whether the agreement is customarily reduced to writing does not weigh in favor of either party.

*Id.* at \*13.  The Court also dismissed LPD's trademark abandonment claim because:

[LPD's] primary argument is that Defendants failed to physically inspect the final merchandise produced.  The law, however, does not require physical inspection of products; it requires [LPD] to show that Defendants exercised *no control* over the nature or quality of the goods or services provided in connection with the mark.

*Id.* at \*14 (citation and internal quotation marks omitted).

## II.  Discussion

### a.  Standard of review

The standard for granting a motion for reconsideration is strict, and "[r]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 628 F. App'x 793, 796 (2d Cir. 2015) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)); *see also Oparah v. N.Y.C. Dep't of Educ.*, 670 F. App'x 25, 26 (2d Cir. 2016) ("The standard for granting a motion to reconsider 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked.'" (quoting *Shrader*, 70 F.3d at 257)); *see also* Local Civ. R. 6.3 (The moving party must "set[] forth concisely the matters or controlling decisions which counsel believes the Court has overlooked.").

It is thus well settled that a motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 75–76 (2d Cir. 2016) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d

Cir. 2012)).  A motion for reconsideration is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have previously been made."  *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 248 (E.D.N.Y. 2016) (quoting *Simon v. Smith & Nephew, Inc.*, 18 F. Supp. 3d 423, 425 (S.D.N.Y. 2014)), *aff'd*, 663 F. App'x 71 (2d Cir. 2016).  In order to prevail on a motion for reconsideration, "the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion."  *Lichtenberg v. Besicorp Grp. Inc.*, 28 F. App'x 73, 75 (2d Cir. 2002) (citations and internal quotation marks omitted); *see also Stoner v. Young Concert Artists, Inc.*, No. 11-CV-7279, 2013 WL 2425137, at *1 (S.D.N.Y. May 20, 2013) ("A motion for reconsideration is an extraordinary remedy, and this Court will not reconsider issues already examined simply because [a party] is dissatisfied with the outcome of his case.  To do otherwise would be a waste of judicial resources." (alteration in original)).

### b.  Reconsideration

LPD argues that the Court should reconsider the March 2017 Decision as to LPD's breach of contract and trademark abandonment claims.  (Pl. Recons. Mem. 1–26.)  The Court separately addresses LPD's arguments as to each claim.

### i.  Breach of contract claim

LPD argues that the Court erred in finding that the parties lacked a binding contract and, therefore, in dismissing its breach of contract claims because the Court: (1) resolved disputed issues of fact, (2) required LPD to establish that Defendants intended to be bound absent a binding agreement, when such a burden was Defendants', and (3) failed to assess all the allegations and draw all reasonable inferences in LPD's favor.  (Pl. Recons. Mem. 1–25.)  These arguments are meritless.

1. **The Court only addressed undisputed facts and decided issues of law**

LPD argues that the Court resolved disputed issues of fact because "the question of whether a contract has been formed is a question of fact." (Pl. Recons. Mem. 3–5 (alterations and internal quotation marks omitted) (citing *Vacold*, 545 F.3d at 123)).

In *Vacold LLC v. Cerami*, the Second Circuit addressed whether the parties entered a binding contract, where the parties failed to execute a formal written contract. 545 F.3d at 123. The Court explained that when presented with issues of contract formation, "whether a binding agreement exists is a legal issue, not a factual one." *Id.* (citing *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996)). The Court further explained that in cases where the parties "do[] not present disputes about whether particular communications were sent, whether particular words were uttered, or whether the parties entered into prior oral agreements," then "nothing remains for a jury to resolve[;] [t]he dispute instead, is about the legal significance of those facts." *Id.* In addition, the Court explained that "where the evidentiary foundation for determining the formation of the parties' contract is either undisputed or consists of writings, contract formation is a question of law." *Id.* (alterations and internal quotation marks omitted). The Court declined to accept the unqualified statement made by the First Circuit and quoted by LPD, which states that "so long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences, the question of whether a contract has been formed . . . is a question of fact." *Id.* (quoting *Cellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir. 1994)); (Pl. Recons. Mot. 3 (quoting same).). The Court proceeded to determine whether the parties formed a binding contract because "the evidentiary foundation consist[ed] entirely of writings." *Id.*

Here, the Court looked only to the Complaint, which alleges that the parties completed a

binding contract and supports the allegations by reciting email exchanges between the two

parties. *See LPD*, 2017 WL 1162181, at *1–5; (Compl. ¶¶ 15–103). The Court assumed the

truth of the factual allegations in the Complaint and determined that LPD failed to establish that

the parties entered a binding contract. *See LPD*, 2017 WL 1162181, at *1 n.1, *6–13. The Court

therefore did not resolve disputed issues of fact; the Court only resolved an issue of law based on

the facts LPD alleged in the Complaint. *See Vacold*, 545 F.3d at 123; *see also Brown v. Cara*,

420 F.3d 148, 153 (2d Cir. 2005) (holding that "where a question of intention is determinable by

written agreements, the question is one of law"); *cf. Consarc Corp. v. Marine Midland Bank,

N.A.*, 996 F.2d 568, 576 (2d Cir. 1993) (holding, in a case involving disputed allegations as to

whether oral statements aided in or created a binding contract, that contract formation was "a

question of fact to be presented for resolution of the factfinder at trial" (citations omitted)).

2. **The Court applied the controlling law correctly in determining that LPD failed to establish Defendants' intent to be bound absent a formal written contract**

LPD argues that the Court applied controlling law incorrectly by placing the burden on

LPD to establish that the parties intended to be bound absent a formal written contract because

Defendants' "bear[] the burden of proving an 'express' reservation of the right not to be bound

absent the execution of [a] formal agreement." (Pl. Recons. Mot. 5.)

To defeat a motion to dismiss, a plaintiff's complaint must set forth plausible allegations

that state a claim for relief, which entails setting forth allegations to support each element of the

alleged legal violation and applies to "all civil actions and proceedings in the United States

district courts." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–80, 684 (2009) (citation omitted).

Stating a breach of contract claim requires a plaintiff to establish the parties' intent to be bound

to an agreement. *Vacold*, 545 F.3d 123–25; *Brown*, 420 F.3d at 153–54. If a plaintiff's

allegations establish that a preliminary agreement constitutes a binding contract, a defendant may

nevertheless defeat a breach of contract claim by pointing to language in the agreement that establishes that "the parties will not be bound in the absence of a further, definitive written agreement." *Vacold*, 545 F.3d at 125; *see also Adjustrite Sys. Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 550 (2d Cir. 1998). Importantly, however, "[a] reservation of [the] right not to be bound presumes that there is some expression of commitment or agreement in the writing to begin with," and therefore, "[t]he fact that [an] [a]greement contains no express reservation of the right not to be bound is not dispositive." *Adjustrite*, 145 F.3d at 550 n.7. On the other hand, "where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Id.* at 548 (citing *Shann*, 84 F.3d at 77). "[A] party that *wishes* to be bound can very easily protect itself by refusing to accept language that shows an intent *not* to be bound." *Miller v. Tawii*, 165 F. Supp. 2d 487, 492 (S.D.N.Y. 2001) (emphasis in original); *see also Adjustrite*, 145 F.3d at 550 n.7.

As discussed in the March 2017 Decision, the allegations in the Complaint fail to establish that the parties intended to be bound because during the parties' communications, Defendants repeatedly expressed their intention to complete a formal written agreement, which the parties never completed. *LPD*, 2017 WL 1162181, at *8–9. Because LPD points to no controlling law that the Court overlooked in analyzing whether the parties intended to be bound and only reargues its previously rejected position on the parties' intent to be bound, reconsideration is unwarranted.[5] *See Salveson*, 663 F. App'x at 75–76 (holding that a motion for

---

[5] LPD makes an additional argument regarding the Court's analysis of the parties' intent to be bound, asserting that "LPD has not alleged that the . . . emails constituted preliminary manifestations of assent to contract formation that created binding obligations, [but] [Defendants] claim[] that those [e]mails prove that it did not intend to be contractually bound." (Pl. Recons. Mem. 7.) This argument directly contradicts LPD's prior assertions. (*See* Compl. ¶ 105 (alleging that the "written exchanges [between] LPD and adidas formed a contract"); Pl.

reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple" (citation and internal quotation marks omitted)); *Cedar Petrochem.*, 628 F. App'x at 796 (holding that "[r]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked" (citation omitted)).

### 3. The Court assessed all relevant allegations and drew all reasonable inferences in LPD's favor

LPD argues that the Court overlooked relevant allegations and failed to construe them in its favor in determining that Defendants failed to express an intent to be bound absent a formal written contract. (Pl. Recons. Mot. 8–14.) The Court has reviewed LPD's arguments, the allegations in the Complaint and the Court's analysis finding that the Defendants lacked the intent to be bound absent a formal agreement, and LPD points to no relevant allegations the Court overlooked. While LPD may disagree with the Court's determination of the legal significance of its allegations, reconsideration is unwarranted based on LPD's disagreement with the Court's determination. *See Salveson*, 663 F. App'x at 75–76; *Cedar Petrochem.*, 628 F. App'x at 796.

Accordingly, the Court declines to reconsider the March 2017 Decision as to LPD's breach of contract claim.[6]

_____

Obj. 24–25 (arguing that the parties email "exchanges confirmed the [p]arties' agreement" and "proceed[ed] to formalize their contract via email"); Pl. Recons. Mem. 11 (arguing that "the[] [email] exchanges illustrate that the parties intended to finalize their contract, if at all, via email").) Because other than the emails, there is no basis to find that the parties entered a binding preliminary agreement, the Court rejects LPD's argument.

[6] LPD makes three additional arguments for reconsideration. First, LPD argues that the Court erred in finding that the partial-performance factor did not weigh heavily in LPD's favor. (Pl. Recons. Mem. 15–18.) In the March 2017 Decision, the Court found that the partial-performance factor weighed slightly in LPD's favor. *LPD*, 2017 WL 1162181, at *9. Because

### ii.    Trademark abandonment claim

LPD's argues that the Court should reconsider its dismissal of its trademark abandonment

claim simply because LPD believes the Court misinterpreted the district court's findings in

*Hawaii Pacific Apparel Group Incorporated v. Cleveland Browns Football Company LLC*, 418

F. Supp. 2d 501, 506–08 (S.D.N.Y. 2006).  (Pl. Recons. Mem. 25–26.)  Although the Court found

---

LPD's arguments merely repeat its prior arguments, (*see* Pl. Obj. 31–33, 39–40), lack any
explanation of why assigning more weight to the partial-performance factor would have changed
the Court's decision, and fail to point to any relevant facts or controlling law the Court
overlooked, reconsideration is unwarranted.  *See Salveson v. JP Morgan Chase & Co.*,
663 F. App'x 71, 75–76 (2d Cir. 2016) (holding that a motion for reconsideration is "not a
vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on
the merits, or otherwise taking a 'second bite at the apple'" (citation omitted)); *Cedar
Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 628 F. App'x 793, 796 (2d Cir. 2015)
(holding that "[r]econsideration will generally be denied unless the moving party can point to
controlling decisions or data that the court overlooked" (citation omitted)).

       Second, LPD argues that the Court misapplied the law in assessing the significance of the
material open terms, (Pl. Recons. Mem. 19–23), but because LPD's arguments on the issue
merely repeat the arguments the Court previously rejected, (*see* Pl. Obj. 30–31; *LPD*, 2017 WL
1162181, at *10–11), and do not point to any relevant facts or controlling law the Court
overlooked, reconsideration is inappropriate, *see Salveson*, 663 F. App'x at 75–76; *Cedar
Petrochem.*, 628 F. App'x at 796.

       Finally, LPD argues that the Court erred in finding that the customarily-reduced-to-
writing factor weighed in neither parties' favor because the alleged agreement "was a first-of-its-
kind arrangement, it cannot be said that the agreement was one that is customarily reduced to
writing."  (Pl. Recons. Mem. 23; *see also* Pl. Obj. 28 (arguing same).)  As the Court noted in the
March 2017 Decision:

> In determining whether an agreement is of the type that parties
> customarily reduce to writing, courts in this Circuit consider: (1) the
> size and complexity of the transaction; (2) the duration of the
> contract; (3) the subject matter of the contract; and (4) the amount
> of money to be exchanged.

*LPD*, 207 WL 1162181, at *11 (citing *Rubenstein v. Clark & Green, Inc.*, 395 F. App'x. 786, 790
(2d Cir. 2010)).  The Court found that because LPD "fail[ed] to set forth any allegations
pertaining to the size and complexity of the contract, the duration of the contract or the amount
of money at issue, . . . the Court is unable to evaluate 'whether the agreement is of a type usually
reduced to writing' due to the lack of information regarding the alleged agreement."  *See id.* at
*12 (citing *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008)); *see also Vacold*, 545 F.3d
at 125 ("[W]hether the agreement is of the type usually reduced to writing, . . . does not aid our
analysis because we cannot discern what is usual in this context.").  LPD points to no controlling
authority undermining the Court's decision or any facts the Court overlooked that are relevant to
determining if an agreement should customarily be reduced to writing.

*Hawaii Pacific* "instructive" and disagrees with LPD's assertion that the Court misinterpreted the case, *Hawaii Pacific* was only one of a number of cases cited in support of the finding that LPD's trademark abandonment claims fails because LPD "faces a high burden of proof" and "the record demonstrates that Defendants exercised control over [LPD's] use of Defendants' trademarks." *LPD*, 2017 WL 1162181, at *13–14 (citing *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596 (S.D.N.Y. 2010); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 917–18 (S.D.N.Y. 1968)).  Reconsideration is therefore unwarranted as LPD points to no relevant facts or controlling law the Court overlooked.  *See Salveson*, 663 F. App'x at 75–76; *Cedar Petrochem.*, 628 F. App'x at 796.

### c.  Certification to appeal

LPD argues that if the Court declines to grant its motion for reconsideration, the Court should "enter a final judgment dismissing LPD's breach-of-contract and declaratory-judgment causes of action," allowing for appeal of the issue of contract formation.  (Pl. Recons. Mem. 2 n.1.)  Defendants oppose the request, arguing that certification is inappropriate because the remaining quasi-contract, i.e. promissory estoppel, and unjust enrichments claims are "'inherently inseparable' from and 'inextricably interrelated'" with the dismissed claims.  (Defs. Mem. in Opp'n to Pl. Recons. Mot. ("Defs. Opp'n.") 7–9, Docket Entry No. 63.)

Certification pursuant to Rule 54(b) of the Federal Rules of Civil Procedure is a "permissive, not mandatory, mechanism to be 'exercised in the interests of sound judicial administration.'"  *B.V. v. Allergan, Inc.*, No. 12-CV-2650, 2016 WL 3390802, at *2 (S.D.N.Y. June 14, 2016) (citing *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)).  Given the

"historic federal policy against piecemeal appeals," "the court's power to enter . . . a final judgment [should] be 'exercised sparingly.'" *Curtiss-Wright Corp.*, 446 U.S. at 8; *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991)). Accordingly, certification is only appropriate where there is "no just reason for delay." Fed. R. Civ. P. 54(b); *Cullen v. Margiotta*, 618 F.2d 226, 228 (2d Cir. 1980).

Here, the dismissed and pending claims are "closely related and stem from essentially the same factual allegations." *Cullen*, 618 F.2d at 228; *NYSA Series Tr. v. Dessein*, 631 F. App'x 54, 56 (2d Cir. 2015). As Plaintiff acknowledges, a determination of an enforceable contract on appeal would "moot" the remaining claims because they "aris[e] out of the same subject matter." (*See* Pl. Reply to Defs. Opp'n. ("Pl. Reply") 15, Docket Entry No. 64.) ("[I]f [the Second Circuit] held that a contract was formed as a matter of law, LPD's quasi-contract and unjust enrichment claims would be mooted."); *see also Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 682 (S.D.N.Y. 2015) (dismissing unjust enrichment claims that were "duplicative" of claims based on breach of enforceable contracts).[7] The quasi-contract, unjust enrichment, and breach of contract claims are also all "closely related" because they require similar factual and legal inquiries. *See Adiel v. Coca-Cola Bottling Co. of New York*, No. 95-CV-0725, 1995 WL 733587, at *1 (S.D.N.Y. Dec. 11, 1995) ("It is possible, since [the promissory estoppel claim] is

---

[7] Plaintiff also fails to allege "unusual hardship" justifying certification. *See Adrian v. Town of Yorktown*, 210 F. App'x 131, 133 (2d Cir. 2006) (citing *Hogan v. Consol. Rail Corp.*, 961 F.2d 1021, 1028 (2d Cir. 1992)). Plaintiff argues that further discovery will be required should the Second Circuit reverse the Court's earlier decision on contract formation. "However, such 'hardships are inherent in *every* denial of Rule 54(b) certification, and hardly rise to the level of hardships that warrant immediate appeal.'" *Negrete v. Citibank, N.A.*, No. 15-CV-7250, 2017 WL 2963494, at *2 (S.D.N.Y. July 11, 2017) (citation omitted). "Moreover, given the factual overlaps discussed, . . . it is not clear that the parties' discovery would be 'considerably more extensive' than would occur at present were Plaintiff[] to prevail on appeal." *Id.* (citation omitted).

closely related to the dismissed contract claims and stems from the same factual allegations, that the trial of the [promissory estoppel claim] could bring to light facts that would have a bearing on the propriety of [the dismissal] of the other claims." (alterations in original)) (citing *Harriscom Svenska AB Harris Corp.*, 947 F.2d at 630); *see also Negrete v. Citibank, N.A.*, No. 15-CV-7250, 2017 WL 2963494, at *2 (S.D.N.Y. July 11, 2017) (denying certification because dismissed and remaining claims arose out of the same factual circumstances, even if implicating different legal questions). Indeed, as Plaintiff recognizes, litigants often plead these claims in the alternative because their viability are interdependent on the existence or lack thereof a single element — an enforceable contract. (Pl. Mem. in Opp'n to Def. Mot. to Dismiss ("Pl. 12(b)(6) Opp'n") 2, Docket Entry No. 23 ("[E]ven if the Court determines that the . . . contract is unenforceable for indefiniteness, [Plaintiff] is still entitled to recover its damages under quasi-contractual theories of liability."); *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006) (pleading unjust enrichment in the alternative to contract claims); *Patchen v. Gov't Emp'r Ins. Co.*, 759 F. Supp. 2d 241, 250 (E.D.N.Y. 2011) (noting that "a plaintiff may proceed in the alternative on both contract and quasi-contract claims" where a genuine dispute exists as to the existence of a contract). Moreover, the Court's "disposition of one or more of the remaining claims could render [the Second Circuit's] opinion advisory or moot." *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1095 (2d Cir. 1992). Because the closely related nature of all the claims, determinations of fact or law in resolving the pending claims may adversely impact the viability of a contract claim, thereby mooting an appellate decision on contract formation. *See Adiel*, 1995 WL 733587, at *1; *see also In re Bayou Hedge Fund Litig.*, No. 06-CV-3026, 2007 WL 2363622, at *4 (S.D.N.Y. Aug. 16, 2007) (finding that an adverse finding common to all the claims would render appellate

review of dismissed claims advisory or moot).

**III. Conclusion**

For the foregoing reasons, the Court denies LPD's motion for reconsideration and

declines to certify the contract formation issue for appeal to the Second Circuit.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: December 11, 2017
        Brooklyn, New York