UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

LPD NEW YORK, LLC,

                     Plaintiff,               **MEMORANDUM & ORDER**
                                               15-CV-6360 (MKB)

       v.

ADIDAS AMERICA, INC. and ADIDAS AG,

                     Defendants.

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff LPD New York, LLC commenced the above-captioned action against

Defendants Adidas America, Inc. ("Adidas America") and Adidas AG ("Adidas AG") on

November 5, 2015.   (Compl., Docket Entry No. 1.)[1]   On May 4, 2018, Plaintiff filed a Second

Amended Complaint ("SAC"), asserting claims for breach of quasi-contract, promissory

estoppel, implied license, unjust enrichment, and defamation.[2]   (SAC, Docket Entry No. 77.)

       Defendants now move for partial summary judgment as to (1) Plaintiff's claims for (a)

promissory estoppel, (b) quasi-contract, and (c) defamation; (2) sixteen of Plaintiff's affirmative

defenses, including (a) trademark abandonment and cancellation, (b) failure to state a claim, (c)

statute of limitations, (d) waiver, (e) laches, (f) unclean hands, (g) acquiescence, (h) estoppel, (i)

failure to mitigate, (j) trademark misuse, (k) descriptive fair use, (l) nominative fair use; (m)

unjust enrichment, (n) no damages, (o) partnership or joint venture, and (p) comportment with

cease-and-desist instruction; and (3) Defendants' counterclaims for trademark infringement and

---

[1]   In the SAC, Plaintiff refers to Adidas America and Adidas AG collectively as
"Adidas."   (SAC ¶ 7, Docket Entry No 77.)   The Court refers to both as "Defendants."

counterfeiting, in violation of sections 32 and 43 the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).[2]

For the reasons explained below, the Court (1) denies Defendants' motion as to Plaintiff's promissory estoppel claim for two promises and defamation claim; (2) grants Defendants' motion as to Plaintiff's quasi-contract claims; (3) grants Defendants' motion as to fifteen of Plaintiff's affirmative defenses, but denies Defendants' motion as to Plaintiff's failure to state a claim defense regarding Defendants' unfair and deceptive trade practice counterclaim; and (4) grants Defendants' motion as to its counterclaims for trademark infringement and counterfeiting.

## I.   Background

The Court assumes the parties' familiarity with the extensive facts and procedural background of the case and provides only the facts pertinent to Defendants' summary judgment motion.

### a.   Factual background

The following facts are undisputed unless otherwise noted.[3]

---

[2]   (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 214; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 215.)   Defendant did not move for summary judgment as to Plaintiff's remaining claim for unfair competition, (*see generally* SAC; Defs.' Mem.); Plaintiff's counterclaims for unfair competition, trademark dilution, unfair and deceptive trade practices, and common law trademark infringement and unfair competition, (*see generally* Pl.'s Am. Answer; Defs.' Mem.); or Plaintiff's affirmative defenses for preemption, implied authorization, and implied in fact contract, (*id.*).

[3]   (Defs.' Stmt. of Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1"), Docket Entry No. 216); Pl.'s Rev'd Response to Defs.' 56.1 ("Pl.'s Counter 56.1"), Docket Entry No. 220; Pl.'s Rule 56.1 Stmt. of Additional Undisputed Facts ("Pl.'s 56.1"), Docket Entry No. 221; Defs.' Response to Pl.'s 56.1 ("Defs.' Counter 56.1"), Docket Entry No. 226.)

### i.    Relevant parties

Plaintiff is a New York limited liability company, (SAC ¶ 2), that is in the business of designing and manufacturing "athletic jersey-inspired tee-shirts[,]" (*id*. ¶ 15).   Its founder and sole member is Benjamin Fainlight.   (Decl. of Benjamin Fainlight ("Fainlight Decl.") ¶ 2, annexed to Notice of Pl.'s Mot. For Partial Summ. J., Docket Entry No. 24-4.)

Defendant Adidas AG is a German joint-stock company with its principal place of business in Germany.   (SAC ¶ 5.)   Adidas America is a Delaware corporation with its principal place of business in Oregon, (*see id*. ¶ 4), and "directs all U.S. based operations on behalf of Adidas AG," (*id*. ¶ 6).   Jarrett Mann began an internship at Adidas America after he graduated from Stanford University in 2012.   (Defs.' 56.1 ¶¶ 15–16.)   After Mann completed his internship in October 2012, Adidas America hired him in an entry level position, as Assistant Product Manager in the Basketball division.   (*Id*. ¶ 17.)

### ii.    Initial discussions between LPD and Adidas

On October 2, 2013, Mann contacted Fainlight by email to "open up a line of communication in hopes of a future collaborative effort."   (*Id*. ¶ 19; Mann-Fainlight Emails dated Oct. 2–3, 2013 ("Oct. 2–3 Mann-Fainlight Emails") 3, annexed to Decl. of Jarrett Mann ("Mann Decl.") Ex. 3, Docket Entry No. 178-3.)   Mann expressed his interest in Plaintiff designing (1) "5 unique styles for some of the most storied college basketball teams," ("Classics Capsule"), and (2) a "court-to-street campaign" to add the "'streetwear' status that [Plaintiff] has" to Defendants' brand, ("Collaboration Capsule"), (collectively the "Collaboration").   (Oct. 2–3 Mann-Fainlight Emails 4.)   Upon receiving Mann's email, Fainlight researched Mann and discovered that he had recently been a basketball player at Stanford.   (Pl.'s Counter 56.1 ¶¶ 20–

21.)   Fainlight responded the same day to express Plaintiff's interest in collaborating with
Adidas America on an "athletic/street crossover" concept.   (Oct. 2–3 Mann-Fainlight Emails 3.)
A few days later, Mann and Fainlight spoke on the phone and Mann told Fainlight about his
previous experience, including his former basketball career and new position at Adidas America.
(Pl.'s Counter 56.1 ¶¶ 21–22; Decl. of Benjamin Fainlight ("Fainlight Dep.") dated Mar. 4, 2019
162:11– 163:12, annexed to Defs.' Aff. in Supp. of Defs.' Mot. as Ex. 3, Docket Entry No.
217-3.)

After the initial exchange of emails, Plaintiff developed (1) a series of design proposals
for the Classics Capsule — which included prints for t-shirts, basketball jerseys, etc., and (2) a
series of design proposals for the Collaboration Capsule — which included basketball jerseys,
t-shirts, etc.   On October 17, 2013, Fainlight provided Mann with preliminary designs for the
Classics Capsule.   (Mann-Fainlight Emails dated Oct. 7–17, 2013 ("Oct. 7–17 Mann-Fainlight
Emails") 2–3, annexed to Mann Decl. Ex. 5, Docket Entry No. 178-5.)   The same day Mann
responded to express his "excite[ment]" regarding Fainlight's designs.   (*Id.* at 2.)   A month
later, Fainlight reached out to Mann to inquire on the "execution of the [C]ollaboration, [and]
specifically, how these [pieces] should/will be branded (with both [Plaintiff's] and [Defendants']
logos) and how/where they will be distributed (in [Defendants'] stores/distributors or
otherwise)."   (Mann-Fainlight Emails dated Oct. 17–Nov. 21, 2013 ("Oct. 17–Nov. 21
Mann-Fainlight Emails") 3, annexed to Mann Decl. Ex. 6, Docket Entry No. 178-6.)   Mann
replied, suggesting several possible options for co-branding and retailing the products.   (*See id*.
at 2.)   Fainlight responded later that day, expressing interest in Mann's retail and co-branding
ideas, and requesting a letter of intent for the Collaboration.   (Second Mann-Fainlight Emails

4

dated Oct. 17–Nov. 21, 2013 ("Second Oct. 17–Nov. 21 Mann-Fainlight Emails") 2, annexed to

Mann Decl. Ex. 7, Docket Entry No. 178-7.)   Mann replied, stating:

> I think the letter of intent is perfect. My supervisors will want
> something as well, so I will work on putting some of this into a
> document with the purpose of this along with details[,] [which] will
> be a positive.   I will try to turn something around by next week or
> early December.

(*Id.* at 1.)   Mann also claimed that the NCAA teams were "aligned to wear [pieces from the

Classics Capsule] around [January 1st][,] [b]ut [that] the retail could launch earlier, potentially

before holiday time to catch sales and drive momentum."   (*Id.*)

In January of 2014, Mann reiterated his interest in developing the Collaboration with

Plaintiff and offered to supply Plaintiff with Defendants' shoes for a fashion "lookbook and

showing."   (Mann-Fainlight Emails dated Jan. 22–23, 2014 ("Jan. 22–23 Mann-Fainlight

Emails") 1–2, annexed to Mann Decl. Ex. 9, Docket Entry No. 178-9.)   Fainlight asked about

the letter of intent again on March 3 and March 11, 2014 and Mann responded that "[t]he letter

of intent is currently a work in progress."   (Mann-Fainlight Emails dated Feb. 25–Mar. 11, 2014

("Feb. 25–Mar. 11 Mann-Fainlight Emails") 1, annexed to Mann Decl. Ex. 11, Docket Entry No.

178-11.)   Mann never provided Fainlight with a letter of intent.   (Pl.'s Counter 56.1 ¶ 59.)

**b.   Plaintiff's creation of physical samples and discussion of profits**

On January 23, 2014, Fainlight contacted Mann "to make sure [Plaintiff] got the OK on

everything so [Plaintiff] can start sampling the tees and prints."   (Jan. 22–23 Mann-Fainlight

Emails 1.)   Mann advised that he was going to "get moving on those samples this week."   (*Id.*)

The next month, Fainlight sent Mann a concept proposal for the Collaboration Capsule.   (Feb.

25–Mar. 11 Mann-Fainlight Emails at 2.)   He also expressed his interest in travelling to Oregon

5

to meet with Mann and show the samples in person.   (*Id.*)   Mann expressed his approval of

Plaintiff's direction with the Collaboration and his interest in meeting with Fainlight to "see this

concept through."   (*Id.* at 1.)

On March 11, 2014 Fainlight asked about a letter of intent again and also asked about a

"press strategy for the [C]ollaboration."   (Mann-Fainlight Emails dated Feb. 25–Mar. 14, 2014

("Feb. 25–Mar. 14 Mann-Fainlight Emails") 1, annexed to Mann Decl. Ex. 13, Docket Entry No.

178-13.)   Mann responded that:

> The letter of intent is currently a work in progress, [and that he is]
> currently working on clearing all development boundaries and
> expecting finalized samples [for the Collaboration] . . . in the next
> two weeks.   Of which [he] will send [Plaintiff] a full set along with
> some other blank samples that [Plaintiff] can embellish and
> potentially elevate for additional pieces.

(*Id.* at 3.)   Mann also provided Fainlight with guidance on sales and profits.   On March 14,

2014, he advised that:

> As far as the sales and profits, on [Defendants'] side [their] finished
> products [from the Classics Capsule] will be issue[d] to the teams at
> no cost.   [Adidas America] would also purchase all of the
> [C]ollaboration product for . . . teams to have.   [Defendants] have a
> licensed apparel side that would sell the game shorts and jersey's
> [sic] and those royalties would go to the schools.   However the
> [Collaboration Capsule] profits would likely be primarily profits to
> [Plaintiff] . . . [but] [Mann] will have [to] ask [his] bosses to confirm
> this, [and] once the mission statement is complete those details will
> be in that document.

(*Id.* at 2.)   Fainlight thanked Mann for the clarification and asked that Mann update him on "the

specifics and that everything [has been] confirmed once [Mann] kn[ew] for sure."   (*Id.* at 1.)

Fainlight also discussed the potential of requiring buyers of the Collaboration merchandise to

6

sign a non-disclosure agreement so that Plaintiff could start selling the merchandise before Defendants had confirmed the Collaboration Capsule and was ready to publicize it.   (*Id.*)

On March 31, 2014, Fainlight advised Mann that Plaintiff was making arrangements for pattern making and sampling for the Collaboration pieces and asked if Adidas America would cover the costs associated with this process in the first instance or if Plaintiff should cover them first and then get reimbursed from Defendants.   (Mann-Fainlight Emails dated Mar. 31– April 14, 2014 ("Mar. 31–April 14 Mann-Fainlight Emails") 3, annexed to Mann Decl. Ex. 17, Docket Entry No. 178-17.)   Mann offered to provide Plaintiff with a "budget code" to cover the pattern making and sampling costs.   (*Id.*)   Mann also offered to manufacture the pieces in Defendants' facilities, with the production lots sold directly by Plaintiff or by applying a royalty code so "that [Plaintiff] will still receive the dollar sales."   (*Id.*)   Fainlight agreed with the plan and expressed his desire to begin sales to retail buyers in July for a September roll out in stores. (*Id.*)   Mann responded that "[Adidas America] has no issue with [Plaintiff] selling [the merchandise] in July [and that Adidas America's] sales team w[ould] begin [their] uniform sales around the same period of time."   (*Id.* at 1.)   Mann determined that a key next step included determining the selling strategy, which he deferred to Plaintiff because it "is in [their] world." (*Id.*)

On April 28, 2014, Mann advised that Adidas America had received the samples Plaintiff sent and that he was going to share them with the design team that same day.   (Mann-Fainlight Emails dated April 28, 2014 ("April 28 Mann-Fainlight Emails") 2, annexed to Mann Decl. Ex. 19, Docket Entry No. 178-19.)   Mann also invited Fainlight to Adidas America's offices "to collaborate with [their] designers and developers," (*id.*), and provided Fainlight with the budget

7

code to cover costs sampling, (*id*. at 1).   Later, Fainlight notified Mann that Plaintiff's

pattern-and-sample maker did not accept the budget code and that Plaintiff fronted the costs and

sought reimbursement from Adidas America.   (Mann-Fainlight Emails dated May 21–29, 2014

("May 21–29 Mann-Fainlight Emails") 4, annexed to Mann Decl. Ex. 20, Docket Entry No.

178-20.)

       Mann did not immediately respond to Plaintiff's requests for reimbursement.   After

Fainlight emailed Mann in May of 2021, Mann did not respond for several days, prompting

Fainlight to reach out to another Adidas Basketball employee, Lauren Jackson.   (Mann-Fainlight

Emails dated May 12–26, 2014 ("May 12–26 Mann-Fainlight Emails") 1–3, annexed to Mann

Decl. Ex. 20, Docket Entry No. 178-20.)   On June 12, 2014, Mann emailed Fainlight stating that

there had been a "large realignment within [his] group so many of [Adidas America's] projects

ha[d] been put on hold," and that Mann was now managing a different area of the business.

(Mann-Fainlight Emails dated June 12–26, 2014 ("June 12–26 Mann-Fainlight Emails") 5,

annexed to Mann Decl. Ex. 23, Docket Entry No. 178-23.)   However Mann "still want[ed] to

see this [Collaboration] come to life."   (*Id*.)   Mann provided Fainlight with some next steps

related to art, sales, and development of timelines, but noted that there would be a delay in

finalizing the Collaboration.   (*Id*. at 5–6.)   With respect to reimbursement, Mann assured

Fainlight that he would "be able to get the invoice for samples and get [reimbursement] taken

care of i[f] our budget code did not work."   (*Id*. at 5.)   With respect to sales, Mann stated that

Plaintiff "was free to show whatever materials at [their] sale shows" because Adidas America

"d[id not] want to hold up any of [Plaintiff's] business planning or strategy."   (*Id*.)   Fainlight

responded that Plaintiff was "excited about the possibilities," but required "some sort of

confirmation that the [C]ollaboration . . . will be happening . . . before [Plaintiff] c[ould] do anything." (*Id.* at 4.) Mann responded that the Collaboration would only be confirmed once Adidas America was "100% on board" at which time Adidas America would dedicate more funding for the Collaboration. (*Id*. at 3.) On June 18, 2014, Plaintiff sent its design proposal for the Collaboration Capsule which incorporated Defendants trademarks, (Defendants' "Marks"). (*Id*. at 2.) Mann responded that Adidas America felt "very strongly" about the design proposal and upper management approved the designs and that Defendants gave "permission to move forward. . .. with all of [Plaintiff's] sales propositions." (*Id*. at 5.) Several weeks later, on July 14, 2014, Mann reiterated that Adidas America would pay the pattern making and sample production costs Plaintiff incurred and that he would have an internal meeting with his superiors to further discuss the Collaboration and to establish a marketing budget and promotional plan. (Mann-Fainlight Emails dated June 12–July 14, 2014 ("June 12– July 14 Mann-Fainlight Emails") 1, annexed to Mann Decl. Ex. 25, Docket Entry No. 178-25.) Mann assured Fainlight that "we have enough signoff on our end to continue to push through and continue on with the collab." (*Id*.) A few days later, Mann characterized the meeting with his superiors as a success and said, "we are [a] full go for this [C]ollaboration." (July 17–July 22, 2014 Mann-Fainlight Emails at 3–4, annexed to Mann Decl. Ex. 27, Docket Entry No. 178-27.) In the summer of 2014, Plaintiff announced the Collaboration in an electronic flyer distributed via email and social media to the fashion press, fashion buyers, and various individuals in public relations, fashion, and advertising. (Defs.' Counter 56.1 ¶ 238.) One of the recipients was

9

Brett Anderson — an employee in Adidas America's public relations department.[4]   (*Id.* at ¶ 239.)

### c.   Defendants' demand that Plaintiff stop using their Marks

On September 8, 2014, Plaintiff began selling women's clothing items from the Collaboration.   (Defs.' Counter 56.1 ¶ 138.)   As a part of its promotion efforts, Plaintiff created a "provocative" marketing video for the Collaboration Capsule, which included nudity.   (*Id.* ¶ 242.)   Plaintiff characterized the video as "in line with [its] marketing efforts."   (*Id.*)   In November of 2014, V Magazine published the marketing video.   (Pl.'s Counter 56.1 ¶ 343.) Anderson contacted V Magazine and stated that the video and the Collaboration were "illegitimate," (*id.* ¶ 344), and V Magazine removed the video, (*see id.* ¶ 364).   As a result of the video, Paul Jackiewicz — head of Adidas America's PR team — learned that Mann had been communicating with Fainlight and asked Mann to demand that Plaintiff remove the video. (Mann- Jackiewicz Emails dated Nov. 20, 2014 ("Nov. 20 Mann- Jackiewicz Emails"), annexed to Mann Decl. Ex. 33, Docket Entry No. 179-1.)

On November 20, 2014, Mann emailed Fainlight and stated that the items marketed in the video published on V Magazine "took another route" from what was pitched in the original Collaboration and that he had "no knowledge of the press being put out."   (Mann-Fainlight Emails dated November 20, 2014 ("November 20 Mann-Fainlight Emails") 1, annexed to Mann

---

[4]   No evidence demonstrates that Anderson actually received the flyer.   The email sent to Anderson triggered an automated "Out of Office" response.   (*See* Anderson Email Response, annexed to Supplemental Decl. of Benjamin Fainlight dated April 2, 2021 (Fainlight's Sec. Dec."), as Ex. 4, Docket Entry No. 223.)

Decl. Ex. 32, Docket Entry No. 178-32.)   Mann clarified that while the Collaboration had

"initial green lights to proceed . . . all content [still] needed to be approved by [his] higher ups."

(*Id*.)   Mann also demanded that "the video including the 'nudity' must be taken down," and that

"th[e] content . . . stop being produced ASAP or [Adidas America's] legal department w[ould]

take action."   (Mann-Fainlight Emails dated November 21, 2014 ("November 21

Mann-Fainlight Emails") 1, annexed to Mann Decl. Ex. 34, Docket Entry No. 178-33.)   In

addition, he revealed that the marketing video "rubbed [Adidas America's] higher ups the wrong

way due to the content."   (*Id.*)   Mann stated that as this juncture, Plaintiff would "run into an

issue" if it continued to sell products from the Classics Capsule.   (*Id.*)   In December of 2014,

Mann apologized for confusion with the launch of the Collaboration and "wish[ed] [Fainlight]

the best with [LPD] and the future of [his] brand."   (December 23, 2014 Mann-Fainlight Email

at 1, annexed to Mann Decl. Ex. 38, Docket Entry No. 178-35.)

     Plaintiff continued to promote and sell items from the Collaboration Capsule and

manufactured pieces from both Capsules to fill previously obtained sales orders.   (SAC Compl.

¶¶ 90–91.)   In January of 2015, one of Plaintiff's retail customers refused to accept delivery and

pay for the items because he doubted the legitimacy of the Collaboration.   (*Id.* ¶ 95.)   On

February 3, 2015, Mann provided a brief letter to one of Plaintiff's retail customers stating that

Plaintiff and Defendants had collaborated.   (Feb. 3, 2015 Letter, annexed to Mann Decl. Ex. 40,

Docket Entry No. 178-37.)   In the Spring of 2015, other retail customers demanded written

proof regarding the legitimacy of the Collaboration.   (Pl.'s Counter 56.1 ¶ 127.)   In response to

these requests, Plaintiff provided customers with portions of Fainlight's email correspondence

with Mann.   (*Id.* ¶ 128.)   Fainlight also amended Mann's February 3, 2015 letter to include

11

specific retailers and a more current date and sent the amended correspondence to Plaintiff's buyers.[5]   (*Id.* ¶ 134.)

Later, Adidas America proposed that Plaintiff sign a back-dated "'Trademark Permission Agreement" [the "Agreement"] providing that Plaintiff's "right to use [Defendants' Marks] shall expire as of May 1, 2015, and [Plaintiff] shall have no sell-off rights for the Collection," and that Plaintiff would pay Defendants a ten percent royalty on net sales of Collaboration products.   *See* the Agreement, annexed to Mar. 28, 2016 Mot. for Partial Summ. J. Ex. 39, Docket Entry No. 24-43.   (*Id.* ¶ 446.)   Plaintiff refused to sign the Agreement because it believed that it "did not comport with [Plaintiff's] and [Defendants'] original agreement. . . ."   (SAC Compl. ¶ 101.) Plaintiff sought "reimbursement for the pattern making and sampling costs" that it believes that Defendants had agreed to pay, (*id.* ¶ 102), and in turn, Defendants threatened to sue Plaintiff for trademark infringement, (*id.*).   Plaintiff continued to market and sell the Collaboration products until it received Defendants' cease-and-desist letter in August of 2018.   (Pl.'s Counter 56.1 ¶ 452.)

### d.   Procedural background

Plaintiff commenced this action on November 5, 2015, asserting claims for breach of contract, defamation, unjust enrichment, and a declaration of non-infringement.   (*See generally*

---

[5]   Plaintiff claims that Fainlight did not amend the letter from Mann and asserts that "[o]n 3 February 2015, Mann provided a Microsoft word template for [Plaintiff] to use to provide the required letters to its customers."   (Pl.'s 56.1 ¶ 307.)   The Court finds that the evidence does not support Plaintiff's characterization of Mann's letter as a template.   Fainlight's own testimony states that Mann provided him with a "brief letter."   (*See* Fainlight Decl. ¶ 74, annexed to Mar. 28, 2016 Mot. for Partial Summ. J. Ex. 4, Docket Entry No. 24-4.)   The Court also notes that Plaintiff only characterizes the letter as a "template in responsive documents." (*See* Pl.'s Am. Answer ¶ 11, Docket Entry No. 152.)

Compl.)   Adidas America moved to dismiss the Complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Adidas America's Mot. to Dismiss Compl. ("Adidas Am. Mot."), Docket Entry No. 20.) Plaintiff cross-moved for partial summary judgment on its claims for breach of contract, defamation and declaratory relief, pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), Docket Entry No. 24.)   By report and recommendation dated August 25, 2016, Judge Mann recommended that the Court grant Adidas America's motion to dismiss as to Plaintiff's breach of contract and declaratory judgment claims, deny the motion as to Plaintiff's defamation and unjust enrichment claims, and deny Plaintiff's motion for partial summary judgment (the "August 2016 R&R").   *LPD New York, LLC v. Adidas Am., Inc*., No. 15-CV-6360, 2016 WL 11264718, at *18 (E.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2017 WL 1162181 (E.D.N.Y. Mar. 27, 2017).   This Court adopted Judge Mann's R&R in its entirety and dismissed Plaintiff's breach of contract claim.   2017 WL 1162181, at *1.   The Court also denied Plaintiff's motion for reconsideration.   *LPD New York, LLC v. Adidas Am., Inc*., 295 F. Supp. 3d 275, 289 (E.D.N.Y. 2017).

On April 4, 2018, Plaintiff filed an Amended Complaint asserting claims for promissory estoppel, quasi-contract, a declaration of noninfringement, and defamation, (*see generally* Am. Compl., Docket Entry No. 74) and on May 4, 2018 replaced it with the SAC.   Defendants filed a motion requesting dismissal of the SAC for "legal deficiencies."   (Letter Mot. to Dismiss SAC ("Defs.' Mot to Dismiss"), Docket Entry No. 81.)   By report and recommendation dated December 12, 2018, Judge Mann recommended that Defendants' request be denied in large part but that certain portions of the SAC be struck (the "December 2018 R&R"), (Dec. 12, 2018

R&R, Docket Entry No. 105), and the Court adopted the December 2018 R&R in its entirety, striking the demand for Defendants' profits, the allegation that Plaintiff was entitled to all the proceeds from the sale of merchandise from the Collaboration Capsule, and the allegation that Defendants published other false statements from the SAC. *LPD New York, LLC. v. Adidas Am., Inc.*, No. 15-CV-6360, 2019 WL 1433055, at *8 (E.D.N.Y. Mar. 29, 2019).

Defendants filed an Answer to the SAC and, along with counterclaim-Plaintiff Adidas International Marketing B.V., asserted seven counterclaims against Plaintiff and counterclaim-Defendant Benjamin Fainlight for trademark counterfeiting, trademark infringement, unfair competition, and trademark dilution, in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and sections 349 and 360 of New York's General Business Law (the "GBL").[6]   (Defs.' Answer 42–62, Docket Entry No. 144.)   Fainlight moved to dismiss the counterclaims against him for insufficient service of process, pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure, and Adidas opposed the motion.   (*See* Letter Mot. to Dismiss ("Fainlight's Mot."), Docket Entry No. 211; Resp. in Opp'n ("Adidas's Opp'n") 1–2, Docket Entry No. 213.)   The Court denied Fainlight's motion to dismiss the counterclaims against him.   *See LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2021 WL 5139252, at *5 (E.D.N.Y. Nov. 4, 2021) (denying motion to dismiss counterclaims against Fainlight because he forfeited his defense of insufficient service of process).

---

[6] Adidas International Marketing B.V. first appeared on record in the Answer to Plaintiff's SAC.

On May 21, 2019, Plaintiff filed an Answer to Defendants' counterclaims and asserted seven counterclaims to Defendants' counterclaims and raised twenty-five affirmative defenses. (Pl.'s Answer, Docket Entry No. 148.)   On June 3, 2019, in response to Plaintiff's Answer to Defendants' counterclaims, Defendants requested leave to move to strike Plaintiff's "counterclaims to counterclaims," as well as several of Plaintiff's affirmative defenses, ("PMC Request").   (Defs.' Mot. for Pre-Mot. Conf. and for Mot. to Strike ("PMC Req."), Docket Entry No. 151.)   On June 11, 2019, Plaintiff filed an Amended Answer and Affirmative Defenses to Defendants' counterclaims, (Pl.'s Am. Answer, Docket Entry No. 152), and by letter filed on June 12, 2019, opposed Defendants' PMC Request.   (Pl.'s Opp'n to PMC Req., Docket Entry No. 154.)   In the Amended Answer, Plaintiff reasserted twenty-five affirmative defenses and asserted five new counterclaims in addition to the seven asserted in the initial Answer.   (Pl.'s Am. Answer at 42–46.)   On June 13, 2019, Defendants responded to Plaintiff's Amended Answer by renewing their PMC Request.   (Defs.' Letter dated June 13, 2019, Docket Entry No. 155.)   Defendants argued that Plaintiff's Amended Answer improperly asserted counterclaims to Defendants' counterclaims and should be construed as a motion to further amend the SAC.   (*Id.* at 1–2.)

By Order dated July 24, 2019, the Court directed Plaintiff to show cause as to why the Court should not strike certain affirmative defenses and counterclaims to counterclaims, (Order to Show Cause dated July 24, 2019), and the parties responded, (*see* Pl.'s Resp. to Defs.' PMC Reqs., Docket Entry No. 165; Pl.'s Suppl. PMC Req., Docket Entry No. 177; Defs. Letter in Further Opp'n to Pl.'s PMC Req., Docket Entry No. 185; Pl.'s Letter in Further Supp. of PMC Req., Docket Entry No. 188.)   By Memorandum and Order dated March 31, 2020 (the "March

2020 Decision"), the Court (1) struck Plaintiff's counterclaims to counterclaims and (2) struck Plaintiff's affirmative defenses for trademark abandonment and cancellation, express contract, implied-in fact contract, binding preliminary agreement, and implied-in-law contract.  *LPD New York, LLC. v. Adidas Am., Inc.*, No. 15-CV-6360, 2020 WL 9886308, at *8 (E.D.N.Y. Mar. 31, 2020).   Plaintiff sought partial reconsideration of the March 2020 Decision and argued that the Court should construe the counterclaims to Defendants' counterclaims as a motion to amend. (Pl.'s Response to Defs.' PMC Reqs. 14; Pl.'s Mot. for Recons., Docket Entry No. 192; Pl.'s Mem. in Supp. of Pl.'s Mot., Docket Entry No. 193.)   By Memorandum and Order dated July 24, 2020, ("July 2020 Decision"), the Court reversed portions of its prior decision and (1) granted Plaintiff leave to amend its pleading to assert defamation counterclaims; and (2) reinstated Plaintiff's affirmative defenses of implied-in-law contract and trademark abandonment and cancellation in relation to third parties.  *LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2020 WL 9816008, at *7–8, 13–14 (E.D.N.Y. July 24, 2020).   Plaintiff did not file an amended pleading.

On April 23, 2021, Defendants moved for partial summary judgment as to (1) Plaintiff's claims for promissory estoppel, quasi-contract, and defamation; (2) sixteen of Plaintiff's affirmative defenses; and (3) its counterclaims for trademark infringement and counterfeiting, in violation of sections 32 and 43 the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).   (Defs.' Mot; Defs.' Mem.)   Plaintiff opposes the motion.   (Pl.'s Opp'n, Docket Entry No. 219.)

## II.   Discussion

### a.   Standard of review

16

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see also Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021); *United States v. Bedi*, 15 F.4th 222, 225 (2d Cir. 2021).   The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."   *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)).   The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."   *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).   A genuine issue of fact exists when "evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson*, 477 U.S. at 248.   The "mere existence of a scintilla of evidence" is insufficient to defeat summary judgment.   *Id.* at 252.   The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."   *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

> **b.   There is a genuine dispute as to whether Mann had authority to bind Defendants**

As a threshold matter, Defendants argue that Plaintiff's claims for promissory estoppel and quasi-contract, and its defenses based on Mann's statements, fail because Defendants are not liable for Mann's representations since Mann was not acting as Defendants' agent when making

them.   (Defs.' Mem. 18.)   In support, Defendants claim that (1) no one at either entity gave Mann actual authority to make any of the three "promises" underlying Plaintiff's promissory estoppel claim;" (2) no one at either entity was aware of the purported "performance" underlying Plaintiff's quasi-contract claim; and (3) no one gave Mann actual authority to grant Plaintiff a license to use Defendants' Marks.   (*Id.*)   In addition, Defendants assert that Plaintiff cannot claim apparent authority because "apparent authority depends on the words or conduct of the principal, not the agent" and Defendants never communicated with Plaintiff and Plaintiff's reliance on Mann's purported authority was unreasonable.   (*Id.* 19–21.)

Plaintiff argues that it is inappropriate to resolve the question of whether Mann had authority at the summary judgment stage because it's a "substantial material fact . . . best left to the collective judgment of the jury."   (Pl.'s Mem 18 (quoting *Herbert Const. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993-98 (2d Cir. 1991)).)   As to the merits of the argument, Plaintiff contends that Defendants conferred actual or apparent authority to Mann, such that his conduct is imputable to Defendants.   (Pl.'s Opp'n at 17.)   In support, Plaintiff argues that, at a minimum, Mann had actual implied authority because he was operating within the scope of his employment as a member of Adidas America's Basketball's Product Management team and received permission to pursue the Collaboration.   (*Id.* at 20–22.)   Plaintiff also argues that Mann has apparent authority because he communicated to Plaintiff that his supervisors were directing Mann to proceed with the Collaboration's development.   (*Id.* at 23–24.)   In addition, Plaintiff asserts that these types of collaborations with third-party designers were not novel.   (*Id.* at 25.) In the alternative, Plaintiff argues that Defendants ratified Mann's actions by not repudiating the Collaboration after they had knowledge of it.   (*Id.* at 26–27.)

18

i.   **There is a genuine issue of fact as to whether Mann had apparent authority to bind Defendants**

A principal can be held vicariously liable for the acts of another under a theory of actual or apparent authority.   *See United States v. Gatto*, 986 F.3d 104, 127 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 710 (2021); *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 286 (S.D.N.Y. 2014) (discussing potential vicarious liability of principal under a theory of actual and apparent authority); *Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 272 (E.D.N.Y. 2012) ("Where a principal does not control an agent, the principal may still be vicariously liable for the agent's actions where the agent is vested with apparent authority." (citing *Green Door Realty Corp. v. TIG Ins. Co*., 329 F.3d 282, 289 (2d Cir. 2003))), *amended by*, No. 10-CV-3983, 2013 WL 5423800 (E.D.N.Y. Sept. 25, 2013); *see also Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 173–74 (E.D.N.Y. 2018) (finding that a defendant may be held vicariously liable under the Telephone Consumer Protection Act consistent with traditional agency principles); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 121 (S.D.N.Y. 2009) (finding a co-defendant indirectly liable for fraud pursuant to an agency theory of vicarious liability).

"Actual authority 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.'"   *Dinaco, Inc. v. Time Warner, Inc*., 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)); *see Gatto*, 986 F.3d at 127 (recognizing that actual authority occurs "when the agent receives 'explicit permission from the principal to act on its behalf'" (quoting *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc*., 697 F.3d 59, 71 (2d Cir. 2012))).   Such authority

"is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *ABM Indus. Groups, LLC v. Int'l Union of Operating Eng'rs, Loc. 30, 30A, 30B, AFL-CIO,* 968 F.3d 158, 163 (2d Cir. 2020) (quoting *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010)).   A court may infer actual authority "from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *United States v. Int'l. Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993).

 "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Highland Cap.*, 607 F.3d at 328; *see Gatto*, 986 F.3d at 127 (recognizing that apparent authority occurs "when an agent has the ability to bind the principal to transactions with third parties because representations that the principal made to the third party make it reasonable for the third party to believe the agent has such an ability"); *Dinaco*, 346 F.3d at 69 ("Apparent authority arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'" (quoting *Minskoff*, 98 F.3d at 708)); *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 232–33 (S.D.N.Y. 2020) (same); *Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equip. Co.*, 867 N.Y.S.2d 547, 549 (N.Y. Sup. Ct. 2008) ("Apparent authority will only be found where words or conduct of the principal — not the agent — are communicated to a third party, which give rise to a reasonable

20

belief and appearance that the agent possesses authority to enter into the specific transaction at issue.").   To prove that an agent has apparent authority, the plaintiff must establish that "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question and (2) the third party reasonably relied on the representations of the agent."   *Star Funding, Inc. v. Tire Ctrs., LLC*, 717 F. App'x 38, 41 (2d Cir. 2017) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993-94 (2d Cir. 1991)).

### 1.   Actual authority

The record does not support a reasonable inference that Mann had actual authority to bind Defendants to the Collaboration.   Mann testified that during the time he was communicating with Plaintiff he never had the authority to sign contracts, enter into an agreement, or enter license agreements on behalf of Defendants.   (Dep. of Jarrett ("Mann Dep.") 28:15–24, 29:1–5, annexed to Defs.' Aff. in Support of Defs.' Mot. as Ex. 10, Docket Entry No. 217-10.)   He also testified that he was the only Adidas employee who negotiated with Plaintiff and that his superiors did not instruct him to enter into an agreement on behalf of Defendants with Plaintiff.[7] *See S & S Textiles Int'l v. Steve Weave, Inc.,* No. 00-CV-8391, 2002 WL 1837999, at *6 (S.D.N.Y. Aug. 12, 2002) ("Whether actual authority exists 'depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the

---

[7]   Mann testified that he shared his negotiations with his team — including some of his supervisors — at some point.   (Dep. of Jarrett Man ("Mann Dep.") dated Oct. 29, 2019 88:4–13, 29:1–5, annexed to Defs.' Aff. in support of Defs.' Mot. as Ex. 10, Docket Entry No. 217-10.) His team thought the Collaboration was a good idea, but instructed Mann to "see where we can go" and never approved of the project.   (*Id.* at 88:13–21.)   Mann described this meeting as a weekly "roundtable" where employees brought everyone up to speed on what projects they were working on.   (*Id.* at 89:2–3, 89:19–24.)

relationship.'"); (*id.* at 30:10–13; 80:4–7; 81:23–25, 81:1–5; 87:6–23; 88:22–25.)   Indeed,

several times throughout his communications with Fainlight, Mann conveyed that he had to

consult and receive the approval of one of his superiors in order to finalize the Collaboration.

(*See* June 12–July 14 Mann-Fainlight Emails; June 12–26 Mann-Fainlight Emails 1; November

20 Mann-Fainlight Emails 1; Feb. 25–Mar. 14 Mann-Fainlight Emails 1.)   In addition,

Defendants and Plaintiff intended to execute a letter of intent, but never exchanged drafts or

finalized a letter.   (Mann Dep. 44:20–22; Pl.'s Counter 56.1 ¶ 59; *see generally* Mann-Fainlight

Emails.)

   Moreover, Plaintiff has not provided any evidence that Defendants signed off on the

Collaboration or gave the go ahead to proceed with marketing and sales.   *See J.B. Sterling Co. v.*

*Verhelle*, 397 F. Supp. 3d 286, 294 (W.D.N.Y. 2019), *reconsideration denied*, 470 F. Supp. 3d

298 (W.D.N.Y. 2020) (not finding actual authority where the plaintiff failed to identify

affirmative acts by the defendants to support a finding of [actual] agency).   Fainlight repeatedly

requested a letter of intent, but never received one and was on notice that Mann did not have

authority to make the final approval for the Collaboration.   *See Ford v. Unity Hosp.*, 32 N.Y.2d

464, 472 (1973) ("One who deals with an agent does so at his peril, and must make the necessary

effort to discover the actual scope of authority.").

### 2. Apparent authority

   The evidence indicates a genuine dispute of material fact as to whether from a third

party's perspective, Defendants' conduct reasonably gave the appearance that Mann was

authorized to act on their behalf.   Defendants claim that "there simply are no words or conduct

from either [] Defendant" that would cause Plaintiff to believe that they consented to the

authority of Mann." (Defs.' Mem. at 19–20.)   However, the evidence indicates that when Fainlight was unable to contact Mann, he reached out to another employee, who appeared to be aware of the Collaboration and indicated that Mann was in charge of the work.   (*See* May 12–26 Mann-Fainlight Emails 1–3 ("I actually don't know all of the details about this so I called [Mann] and he said that he'll work on everything on Monday when he gets back.").)   Defendants made no attempts to put Plaintiff in contact with any other employees, failed to confirm the status of the project or oversee Mann's work, and Mann communicated to Plaintiff that he had successfully presented the project to his superiors and that the Collaboration was a "full go." (July 17–July 22 Mann-Fainlight Emails 3–4.)   Furthermore, Plaintiff received Defendants' budget code from Mann to cover sampling costs.   (April 28 Mann-Fainlight Emails 2.)   Viewed in the light most favorable to Plaintiff, this evidence presents a genuine issue of material fact as to whether Mann had apparent authority to move forward with the Collaboration.   *See EUA Cogenex Corp. v. N. Rockland Cent. Sch. Dist.,* 124 F. Supp. 2d 861, 870 (S.D.N.Y. 2000) (finding a genuine issue of fact where the "[p]laintiff disputes that [purported agent] stated at any point that he knew that the contract would not be valid and binding absent board approval"). Moreover, the Collaboration was not novel or out of the ordinary because Defendants previously formed collaborations with other third-party designers.   (Defs.' Counter 56.1 ¶ 87.)   While there is no dispute as to whether Mann was actually authorized to proceed with the Collaboration without restraint, from the perspective of Fainlight and Plaintiff, a reasonable jury could find that Defendants' statements and conduct (or lack thereof) give the appearance that Defendants, the purported principal, authorized Mann, the purported agent, to pursue the Collaboration on its behalf.

### ii.   Defendants did not ratify Mann's actions

"Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding."   *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011).   Ratification may be express or implied, or may result from silence or inaction. *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22–23 (2d Cir. 2017) (first citing *Suncoast Cap. Corp. v. Glob. Intellicom, Inc.*, 719 N.Y.S.2d 652, 653 (N.Y. Sup. Ct. 2001), and then citing *Rocky Point Props., Inc. v. Sear-Brown Grp., Inc.*, 744 N.Y.S.2d 269, 271 (N.Y. Sup. Ct. 2002)); *Id.* at 692 (alteration and citations omitted); *see also RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 235 (E.D.N.Y. 2009) ("Under New York law, a principal can be held liable for the unauthorized acts of an agent that the principal later ratifies . . . Ratification is the express or implied adoption, i.e. recognition and approval, of the unauthorized acts of another.").   In all cases, ratification requires both "knowledge of a defect in the act to be confirmed" and "the right to reject or ratify it."   *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-4394, 2016 WL 4613390, at *16 (S.D.N.Y. Aug. 31, 2016) (citing *In re Estate of Edgar Wolf Levy*, 893 N.Y.S.2d 142, 144 (App. Div. 2010)). Ratification "must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language."   *Id.* (quoting *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999), *vacated on other grounds sub nom., Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003)); *see also Mun. of Bremanger v. Citigroup Glob. Mkts., Inc.*, No. 09-CV-7058, 2013 WL 1294615, at *21 (S.D.N.Y. Mar. 28, 2013) (holding that the defendant had not ratified the transaction where it accepted the benefits flowing from a sale but

the plaintiffs failed to proffer evidence that the defendant was fully aware of the material facts of the transaction); *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 552 (1997) (holding that an insurance company had not impliedly ratified an agent's contract where it "received no premiums or any other benefit in connection with the fraudulent financing agreements").

Based on the evidence in the record a reasonable jury could not find that Defendants ratified any of Mann's promises.   Plaintiff asserts that Defendants were notified of the Collaboration by virtue of Plaintiff's publication of a promotional flyer to one of Defendants' employees and the feature of the Collaboration Capsule in V Magazine.   (Pl.'s Opp'n at 26–27.) However, the record does not demonstrate that the employee actually received and reviewed the promotional flyer.   *See Precedo Cap. Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 254-55 (S.D.N.Y. 2014) ("[T]he intent to ratify an act 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.'") (quoting *Chem. Bank*, 169 F.3d at 128). Furthermore, after the V Magazine feature, Defendants' representative contacted V Magazine and stated that the video and the Collaboration were "illegitimate."   (Pl.'s Counter 56.1 ¶¶ 343–44.)

Accordingly, the Court finds that while Mann did not possess actual authority and Defendants did not ratify his actions, there is a genuine dispute of material fact with regard to whether Mann possessed apparent authority to act on behalf of Defendants.

### c.   Promissory estoppel claims

Defendants argue that the alleged promises on which Plaintiff premises its promissory estoppel cause of action fail as a matter of law.   Defendants assert that the cause of action is premised on three alleged promises from Mann: (1) "[Plaintiff] could use certain Adidas [Marks]

25

to develop designs for collaboration merchandise;" (2) "[Plaintiff]'s designs were fully approved such that [Plaintiff] was entitled to sell collaboration merchandise bearing certain Adidas [Marks];" and (3) "Adidas would pay for all pattern and sample making costs incurred in developing the Collaboration and Classics Capsules."   (Defs.' Mem. at 23; SAC ¶ 115.) According to Defendants, none of the promises are clear and unambiguous, (*id.* at 24–27), it was unreasonable for Plaintiff to rely upon any of the alleged promises, (*id.* at 27–28), and Plaintiff's reliance did not cause an injury, (*id.* at 28–29).   In addition, Defendants argue that, to the extent that any of Plaintiff's promissory estoppel claims survive, Plaintiff's recovery should be limited to the damages incurred in reliance upon the surviving promises.   (*Id.* at 29–30 citing *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 46 (2d Cir. 1995) ("The district court correctly noted that '[t]he damages recoverable in a promissory estoppel case are sometimes referred to as "reliance damages," namely, the actual expenditure made in preparation for performance or in performing the work which has been induced by the defendant promisor.'").)

Plaintiff contends that Judge Mann already determined that Plaintiff's promissory estoppel claims are actionable.   (Pl.'s Opp'n 27.)   In support, Plaintiff cites to Judge Mann's December 2018 R&R denying Defendants' motion to dismiss the SAC, which held that (1) "[Defendants] clearly and unambiguously promised that [Plaintiff] could use [their] [Marks] to develop designs for the [C]ollaboration merchandise, which were incorporated in the samples," (*id.* at 27–28 (quoting Dec. 2018 R&R 24–25)); (2) "affirmative statements by [Defendants] . . . including asking [Plaintiff] to 'move forward with all [Plaintiff's] sales propositions . . . [and] [Plaintiff] notifying [Defendants] that it had commenced sales" were enough facts to sufficiently allege that Plaintiff was entitled to sell collaboration merchandise bearing certain Defendants'

Marks, (*id.* at 28–29 (quoting Dec. 2018 R&R 26, 30–33)); and that (3) "the SAC alleges that [Defendants] clearly and unambiguously promised to reimburse [Plaintiff] for the costs of pattern making and sample production," and "[t]herefore [Plaintiff] has stated a claim for promissory estoppel for the sample and pattern making production costs," (*id.* (quoting Dec. 2018 R&R 25).)[8]   Plaintiff contends that "[b]ecause all of the SAC allegations cited by Judge Mann are supported by evidence, it is the law of the case that [Plaintiff]'s promissory estoppel claims must proceed to trial."   (Pl.'s Opp'n 29.)

    "Under New York law, promissory estoppel requires '(1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance.'"   *ED Cap., LLC v. Bloomfield Inv. Res. Corp.*, 757 F. App'x 26, 30 (2d Cir. 2018); *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 202 (2d Cir. 2019) ("To establish a claim of promissory

---

[8]   At various points in its opposition briefing Plaintiff argues that one of its claims must survive summary judgment because Judge Mann held that it pled sufficient facts to state a claim and survive a motion to dismiss.   However, the standard Judge Mann relied on to deny Defendants' motion to dismiss the SAC is different from the standard the Court must utilize in analyzing the current motion for partial summary judgement.   *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (noting difference between motion to dismiss standard of review and summary judgment standard).   Surviving a motion to dismiss does not guarantee that Plaintiff's motion will survive summary judgment.   *See Cain v. Esthetique*, 182 F. Supp. 3d 54, 64 (S.D.N.Y. 2016) (recognizing that the summary judgment standard is more demanding than the standard governing motions to dismiss), *aff'd sub nom. Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 F. App'x 8 (2d Cir. 2018); *Nobel Ins. Co. v. City of New York*, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("The law of the case doctrine . . . does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss."); *Golden Pac. Bancorp v. FDIC*, 2003 WL 21496842, at *5 n.14 (S.D.N.Y. June 27, 2003) (noting that a decision on a motion to dismiss does not dictate the law of the case on a subsequent motion for summary judgment after discovery).

estoppel, a plaintiff 'must demonstrate that the [defendant] made a clear and unambiguous promise, upon which the [plaintiff] reasonably relied, to its detriment.'" (quoting *Wilson v. Dantas*, 58 N.Y.S.3d 286 (2017))); *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000) (same). "A promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract." *Benefitvision Inc. v. Gentiva Health Servs., Inc.*, No. 09-CV-0473, 2014 WL 298406, at *9 (E.D.N.Y. Jan. 28, 2014) (alteration and internal quotation marks omitted) (quoting *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, No. 09-CV-8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010)); *Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 158 (2d Cir. 2012) (recognizing that a court may reject a promissory estoppel claim because "a breach of contract claim may not give rise to tort liability unless a legal duty independent of the contract . . . has been violated." (quoting *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571 (App. Div. 2011))); *Goldberg v. Pace Univ.,* 535 F. Supp. 3d 180, 200 (S.D.N.Y. 2021) ("[A] promissory estoppel claim [is] precluded where it relied on the 'exact same policies at issue' in contract claim." (citing *Nungesser v. Columbia Univ.,* 169 F. Supp. 3d 353, 372 (S.D.N.Y. 2016))).

### i. There is no cognizable injury for Defendants' promise that Plaintiff could use their Marks to develop designs for Collaboration merchandise

Plaintiff's promissory estoppel cause of action for the first promise — that "[Plaintiff] could use [Defendants' Marks] to develop designs for [C]ollaboration merchandise"— fails because there is no cognizable injury.   (SAC ¶ 115.)   Plaintiff produced various designs for the Collaboration that utilized Defendants' Marks.   (*See* Oct. 7–17 Mann-Fainlight Emails; June

28

12–26 Mann-Fainlight Emails.)   The designs were then incorporated into samples.   (Mar. 31 Mann-Fainlight Emails 2.)   Mann never promised that Plaintiff could continue utilizing Defendants' Marks to develop designs beyond those designs exchanged for the Collaboration. Plaintiff offers no arguments as to why it may have been entitled to the *continued* use of Defendants' Marks.   (*See* Pl.'s Opp'n at 27–29.)   In addition, Plaintiff does not specify how it could have suffered damages from the alleged failure of this promise.   (*See* SAC ¶¶ 114–25; Pl's Opp'n at 27–29.)   No reasonable factfinder could find that Plaintiff was damaged by its reliance on this promise because Plaintiff did utilize Defendants' trademark on designs exchanged by the Collaboration and did not allege how it may have suffered damages otherwise. *See Herrick v. Grindr LLC*, 765 F. App'x 586, 592 (2d Cir. 2019) (affirming dismissal of promissory estoppel claim because plaintiff "failed to explain how his injury was 'sustained . . . by reason of his reliance' on the alleged promise" (quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986))); *Joshi v. Trustees of Columbia Univ. in City of New York*, 515 F. Supp. 3d 200, 223 (S.D.N.Y. 2021) (granting summary judgment as to promissory estoppel claim because there was no cognizable injury where plaintiff did not receive a benefit, but was not entitled to a continued benefit or promotion); *see also Hallett v. Stuart Dean Co.*, 517 F. Supp. 3d 260, 286 (S.D.N.Y. 2021) (finding that no reasonable factfinder could find that plaintiff has proved damages where he was terminated before he would have been entitled to any compensation).

Accordingly, the Court grants Defendants' summary judgment motion as to Plaintiff's promissory estoppel claim for the promise that Plaintiff could use their Marks to develop designs for collaboration merchandise and dismisses that claim with prejudice.

### ii.   There is a genuine dispute of material fact as to whether it was reasonable for Plaintiff to rely on Defendants' second promise

There is a genuine dispute of fact with respect to whether Plaintiff reasonably relied on the promise "that [Plaintiff]'s designs were fully approved such that [Plaintiff] was entitled to sell collaboration merchandise bearing [Defendants' Marks]."   (SAC ¶ 115.)   The evidence indicates that there was a clear promise that Plaintiff's designs were approved and they could sell them.   In March of 2014, Mann told Plaintiff that "the production lot [for the Collaboration] can . . . be sold directly through [Plaintiff] or that [Adidas America] can sell and use [its] royalty coding so that [Plaintiff] will receive the dollar sales."   (Mar. 31–April 14 Mann-Fainlight Emails.)   In the same month, Fainlight expressed his desire to begin sales to retail buyers in July for a September roll out in stores.   (*Id*. at 2.)   Mann agreed with this proposition and determined that key next steps included determining the selling strategy, which he believed Plaintiff was better equipped to lead because it "is in [their] world."   (*Id.* at 1.)   In June of 2014, Mann instructed Plaintiff to "move forward . . . with all [of Plaintiff's] sales propositions."   (June 12–26 Mann-Fainlight Emails 5.)   Mann stated that Plaintiff "was free to show whatever materials at [their] sale shows" because Adidas America "d[id not] want to hold up any of [Plaintiff's] business planning or strategy."   (*Id*.)   Although material terms were not exchanged, it appears clear and unambiguous that Mann entrusted the sale of Collaboration merchandise to Plaintiff.

However, the record contains conflicting evidence as to whether it was reasonable and foreseeable for Plaintiff to rely on this promise.   The record demonstrates that Fainlight repeatedly requested a letter of intent to confirm the project, but never received one.   (Second Oct. 17–Nov. 21 Mann-Fainlight Emails 2; Feb. 25–Mar. 11 Mann-Fainlight Emails 1; Pl.'s

Counter 56.1 ¶ 59.)   Fainlight also understood that the details of the Collaboration were to be finalized in a "mission statement" confirmed by Mann's bosses.   (Feb. 25–Mar. 14 Mann-Fainlight Emails 2.)   Based on this evidence, a reasonable jury could find that it was unreasonable for Plaintiff to rely on Mann's promise that the Collaboration was fully approved because Plaintiff never received formal approval of the Collaboration from Mann's superiors. On the other hand, a reasonable jury could find that Mann's insistence that the Collaboration was "fully approved" and that Plaintiff move forward with sales is sufficient to infer that Plaintiff reasonably relied on the promise and suffered losses as a result of its reliance.

### iii.   There is a genuine dispute of material fact as to whether it was reasonable for Plaintiff to rely on Defendants' third promise

There is a genuine dispute of material fact with respect to whether the Plaintiff reasonably relied on the third promise that "adidas would pay for all pattern and sample making costs incurred in developing the Collaboration and Classics Capsules."   (SAC ¶ 115.)   The promise is clear and unambiguous because Mann unequivocally stated that that Defendants would pay for sampling and pattern making with a "budget code," provided Plaintiff with a code, and when the code was unworkable, assured Plaintiff that he would "get the invoice for samples and get [reimbursement] taken care of."   (June 12–26 Mann-Fainlight Emails 9.)   However, the record is unclear as to whether that reliance was reasonable or foreseeable.   There is a question of fact as to whether Plaintiff began pattern making and sampling for the Collaboration before Fainlight received assurance from Mann that those costs would be covered.   (Pl.'s Counter 56.1; Feb. 25–Mar. 14 Mann-Fainlight Emails 2 (where Fainlight states his intention to "finaliz[e] the pieces and concept with [his] pattern and sample maker").)   While Fainlight appears to have

initiated discussion with his pattern and sample maker before Mann promised to cover the costs, it is not clear whether Plaintiff actually incurred those costs before the promise was made.   A reasonable jury could find that Plaintiff's reliance was reasonable and foreseeable given Mann's repeated assurances to cover the sampling costs.   However, if Plaintiff began discussions with the pattern and sample maker before Mann's assurances, a reasonable jury could also find it unreasonable for Plaintiff to assume that it was entitled to reimbursement for expenses it incurred for making the pattern and samples before Mann's assurances were made.

### iv.   Plaintiff's promissory estoppel damages are limited to reliance damages

In deciding what type of damages are available to a plaintiff when no contract or meeting of the minds was formed, the New York Supreme Court, Appellate Division, has held that "where the underlying agreement fails," the doctrine of promissory estoppel is not being used "defensively in support of contract rights" but, instead, to create "a new right in the interests of justice" with relief designed to achieve equity.   *Clifford R. Gray, Inc. v. LeChase Const. Servs.*, 857 N.Y.S.2d 347, 350 (App. Div. 2008); *Rinaldi v. SCA La Goutte, D'Or*, No. 16-CV-1901, 2020 WL 5441290, at *8 (S.D.N.Y. Sept. 9, 2020) ("Promissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." (quoting *Gas Nat., Inc., v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 385 (S.D.N.Y. 2014))).   "Under these circumstances [the] plaintiff 'is not entitled to the benefit of the bargain because there was no bargain'" — the plaintiff is entitled only "to those expenses that [the] plaintiff incurred in relying on [the] defendant's alleged promise."   *Id.* (quoting Restatement (Second) of Contracts § 90, cmt.d, illus. 8, 12 (Am. Law Inst. 1981)); *Cyberchron Corp.*, 47 F.3d at 46 ("[T]he damages recoverable in a promissory estoppel case are

32

sometimes referred to as 'reliance damages,' namely, the actual expenditure made in preparation for performance or in performing the work which has been induced by the defendant-promisor."); *see Cosan v. St. Eats, Ltd*., No. 15-CV-858, 2016 WL 8416456, at *1 (W.D.N.Y. Mar. 14, 2016) (recognizing that expectation damages cannot be recovered where there was no meeting of the minds), *report and recommendation adopted*, 2016 WL 8376840 (W.D.N.Y. Apr. 8, 2016).

The promises Plaintiff relies on lack essential terms, and Plaintiff is therefore limited to reliance damages.[9] *See Cosan*, 2016 WL 8416456, at *2 ("To establish a 'meeting of the minds,' there must be an 'agreement on all essential terms'" (quoting *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div. 2009))); *see e.g., Arcadian Phosphates, Inc. v. Arcadian Corp*., 884 F.2d 69, 74 n.2 (2d Cir. 1989) ("Out-of-pocket damages are particularly appropriate where, as may be the case here, the plaintiff cannot rationally calculate the benefit of the bargain."); *Re-Source America, Inc. v. Corning Inc., 2009 WL 2179254*, *9 (W.D.N.Y. July 22, 2009) (concluding at the summary judgment stage that "it is clear that there was never a meeting of the minds regarding a new agreement. . . . Consequently, Plaintiff cannot recover 'lost profits' on its promissory estoppel claims").

Accordingly, the Court grants Defendants' motion for summary judgment as to the first promise and limits any recovery by Plaintiff regarding Defendants' second and third promises to Plaintiff's reliance damages.

---

[9]   Plaintiff does not dispute that, to the extent any portion of its promissory estoppel claim survives, Plaintiff's recovery must be limited to damages incurred in reliance upon the surviving promises.   (*See* Defs,' Reply; Pl.'s Opp'n 27–29.)

### d.   Quasi-contract claims

Defendants argue that Plaintiff's quasi-contract cause of action fails because Plaintiff (1) cannot recover under quantum meruit since it cannot prove that Defendants accepted the work that Plaintiff performed or that Plaintiff performed the work with an expectation of compensation, (Defs.' Mem at 31–32); and (2) cannot recover under unjust enrichment because Plaintiff cannot prove that the Collaboration enriched Defendants or that equity and good conscience require compensation.   (*Id*. at 32–34.)   In support, Defendants claim that Plaintiff cannot prove a specific or direct benefit to Defendants because Plaintiff kept all proceeds from the Collaboration and abjectly refused to pay Defendants any royalties, (*id.* at 33), and further argue that Plaintiff's damages, if any, must be limited to the reasonable values of the services provided.   (*Id.* at 36.)

Plaintiff contends that its quasi-contract claim does not fail as a matter of law.   (Pl.'s Opp'n at 30.)   In support, Plaintiff argues that Defendants intentionally frustrated Plaintiff's ability to sell the merchandise, which limited Plaintiff's expected profits, and Plaintiff conferred benefits to Defendants by "lend[ing] its streetwear status of its brand to the Defendants' brand[] and . . . fly[ing] across the globe promoting the [Collaboration]."   (*Id.* at 31.)

"Under New York law, unjust enrichment and quantum meruit claims are analyzed together as a single quasi contract claim."   *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd*., 991 F.3d 361, 365 n.1 (2d Cir. 2021); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp*., 418 F.3d 168, 175 (2d Cir. 2005) ("[Q]uantum meruit and unjust enrichment are not separate causes of action. . . . [U]njust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit . . . is one measure of liability for the breach of such a

34

contract." (quoting *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996))).   While "New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim . . . a valid contract bars a quantum meruit action only where 'the scope of the contract clearly covers the dispute between the parties.'"   *Mid-Hudson Catskill Rural Migrant Ministry, Inc.*, 418 F.3d at 175 (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)).

### i. Plaintiff's quantum meruit and unjust enrichment claims fail

"In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."   *Learning Annex Holdings, LLC v. Cashflow Techs., Inc.*, 652 F. App'x 67, 70 (2d Cir. 2016) (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc.*, 418 F.3d at 175); accord *Consigli & Assocs., LLC v. Maplewood Senior Living, LLC*, No. 20-CV-7712, 2021 WL 4238162, at *2 (S.D.N.Y. July 29, 2021).   "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33, 36 (2d Cir. 2021) (quoting B*eth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006); *Green Tree Servicing, LLC v. Christodoulakis*, 689 F. App'x 66, 70 (2d Cir. 2017) (quoting *Kaye*, 202 F.3d at 616).   An unjust enrichment claim "may be premised on deceptive conduct." *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 208 (W.D.N.Y. 2020); *see also Cox v. Microsoft Corp.*,

778 N.Y.S.2d 147, 149 (App. Div. 2004) ("[The] plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment.").   "However, 'unjust enrichment is not a catchall cause of action to be used when others fail.'"   *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 248 (S.D.N.Y. 2021) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)); *see also Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 473 (S.D.N.Y. 2020) (same).   "[A]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."   *Barton*, 535 F. Supp. 3d at 248-49 (quoting *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 6 (S.D.N.Y. 2020)).

Plaintiff's quasi-contract claims fail because it cannot establish that equity and good conscience require restitution or genuine expectation of compensation.   Plaintiff understood that profits from the Collaboration Capsule would likely be primarily profits to Plaintiff.   (Feb. 25–Mar. 14 Mann-Fainlight Emails 2.)   Even though Plaintiff and Defendants failed to finalize the details of the revenue structure, "[Plaintiff] collected all net profits from sales of [the] Collaboration products, to the extent there were any."   (Pl.'s Counter 56.1 ¶ 341.)   Plaintiff may have anticipated that it would receive greater profits as its relationship with Defendants progressed and more customers learned about the Collaboration, however, this is nothing more than expectation of future profits which it is not entitled to.   *See United Mobile Techs., LLC v. Pegaso PCS, S.A. de C.V.*, No. 05-CV-10528, 2011 WL 13382923, at *16 (S.D.N.Y. June 22, 2011) (denying the plaintiff a percentage of the profits the defendants received after a company was sold where the plaintiff anticipated a greater number of users than eventually materialized because there were expectations of future profit); *Abeles, Inc. v. Creekstone Farms Premium*

*Beef, LLC*, No. 06-CV-3893, 2010 WL 446042, at *10 n.27 (E.D.N.Y. Feb. 1, 2010) ("Plaintiff cannot recover under a quasi-contract theory for alleged lost profits but rather only for the value of the services performed." (citing *Collins Tuttle and Co. v. Leucadia, Inc*., 544 N.Y.S.2d 604, 605 (App. Div. 1989))); *see also Carlino v. Kaplan*, 139 F. Supp. 2d 563, 566 (S.D.N.Y. 2001) (determining that the plaintiff could not recover profits under quantum meruit because parties failed to agree to compensation, "a base period, the nature and quantification of benefits received from consultations, the controls that might be appropriate to eliminate the influence of other market conditions, the time frame for services and compensation, or the many other factors that might be pertinent to consulting contracts").   Plaintiff cannot reasonably expect compensation for efforts to bring to fruition a new business venture that does not materialize as it had hoped.

In addition, Plaintiff's development and promotion of the Collaboration merchandise were provided in order to prepare for sales of the merchandise, which would — and did in fact — boost Plaintiff's brand and revenue.   (*See* SAC Compl. ¶¶ 90–91, 94 (stating that Plaintiff travelled to Tokyo to promote the Collaboration and continues to market and sell pieces from the Collaboration); Pl.'s Counter 56.1 ¶ 197 (admitting that Plaintiff retained all revenue from sales of the Collaboration products)); *see Abrams v. Unity Mut. Life Ins. Co.,* 237 F.3d 862, 866 (7th Cir. 2001) (explaining that under New York's "[u]njust enrichment [doctrine] damages are not available for activities that are simply preparatory to performance or activities that otherwise further the plaintiff's own economic interests" (first citing *Absher Constr. Corp. v. Colin*, 649 N.Y.S.2d 174, 175 (App. Div. 1996), and then citing *Songbird Jet, Ltd. v. Amax, Inc*., 581 F. Supp. 912, 926–27 (S.D.N.Y. 1984))).   Plaintiff was financially compensated by selling the Collaboration merchandise and Defendants were not.   In light of this, Plaintiff cannot prove that

any alleged benefit to Defendants is against equity and good conscience, requiring restitution. Unjust enrichment is not a catch-all cause of action to be used because revenues from the Collaboration were not as successful as Plaintiff anticipated.

Accordingly, the Court grants Defendants' motion as to Plaintiff's quasi-contract claims.

### e. Defamation claim

Defendants claim that Plaintiff's defamation claim fails as a matter of law because Anderson's allegedly defamatory statement was 'at least 'substantially true.'   (Defs.' Mem 36 (quoting *Chau v. Lewis*, 771 F.3d 118, 130 (2d Cir. 2014)).)   In support, Defendants argue that the statement from Anderson to V Magazine that the "[C]ollaboration" was "illegitimate" was substantially true because Defendants were not aware of and did not authorize the Collaboration or the V Magazine feature.[10]   (*Id.* at 36–37.)   Defendants also argue that if Plaintiff's defamation claim survives, its recovery must be limited to nominal damages because the record contains no evidence of injury caused by the statements.   (*Id.* at 37.)

---

[10]   Defendants also argue that (1) statements from Jackiewicz, (*id.* at 36–37); and (2) statements asserted in the cease and desist letters were not defamatory.   (*Id.* at 36.)   However, the Court declines to consider Plaintiff's defamation claims as to these statements.   In its March 2020 Decision, the Court struck Plaintiff's counterclaims to Defendants' counterclaims, including Plaintiff's defamation counterclaims to Defendants' counterclaims related to Jackiewicz's and the cease and desist letter's statements.   *See LPD New York, LLC. v. Adidas Am., Inc.*, No. 15-CV-6360, 2020 WL 9886308, at *7 (E.D.N.Y. Mar. 31, 2020), *on reconsideration in part sub nom.*, 2020 WL 9816008 (E.D.N.Y. July 24, 2020).   On reconsideration, the Court construed Plaintiff's defamation counterclaims to Defendants' counterclaims as a motion to amend and granted Plaintiff leave to amend its pleading to assert its defamation claims.   2020 WL 9816008, at *6–7.   Plaintiff failed to amend its pleading; thus the defamation claims with respect to Jackiewicz's statements and the statements in the cease and desist letter are not before the Court.

Plaintiff argues that its defamation claim must proceed and be resolved at trial.   (Pl.'s

Opp'n at 31–33.)   In support, Plaintiff asserts that Judge Mann determined in the August 2016

R&R that its defamation claim was sufficiently pled.   (*Id.* at 33 (quoting *Yesner v. Spinner*, 765

F. Supp. 48, 52 (E.D.N.Y. 1991)).)

"Defamation . . . is the invasion of the interest in a reputation and good name" and

"consist[s] of the twin torts of libel and slander."   *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir.

2001) (citations omitted); *Goldman v. Reddington*, 417 F. Supp. 3d 163, 171 (E.D.N.Y. 2019)

(same).   "Generally, spoken defamatory words are slander; written defamatory words are libel."

*Albert*, 239 F.3d at 265 (citations omitted); *see also Grogan v. Blooming Grove Volunteer*

*Ambulance Corp.*, 917 F. Supp. 2d 283, 289 (S.D.N.Y. 2013) (same); *Biro v. Conde Nast*, 883 F.

Supp. 2d 441, 456 (S.D.N.Y. 2012) ("Defamation is the injury to one's reputation either by

written expression, which is libel, or by oral expression, which is slander." (citation omitted)).

"Under New York law a defamation plaintiff must establish five elements: (1) a . . . defamatory

statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of

the defamatory statement, and (5) special damages or per se actionability."   *Palin v. N.Y. Times*

*Co.*, 940 F.3d 804, 809 (2d Cir. 2019*); Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 169 (2d

Cir. 2000); *Crowley v. Billboard Mag.*, No. 19-CV-7571, 2021 WL 6033608, at *10 (S.D.N.Y.

Dec. 21, 2021); *Lang Sang v. Ming Hai*, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013) ("The

elements of a cause of action to recover damages for defamation are a false statement, published

without privilege or authorization to a third party, fault and either causing special harm or

constituting defamation per se." (brackets and ellipsis omitted)); *Thompson v. Bosswick*, 855 F.

Supp. 2d 67, 76 (S.D.N.Y. 2012) ("New York law allows a plaintiff to recover for defamation by

proving that the defendant published to a third party a defamatory statement of fact that was false, was made with the applicable level of fault, and either was defamatory per se or caused the plaintiff special harm." (citing *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011))). "A defamatory statement is one that exposes the plaintiff 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" *Biro*, 883 F. Supp. 2d at 456 (alterations in original) (quoting *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)). "A statement that tends to injure another in his or her trade, business or profession is defamatory per se." *Id*. (citation omitted). "Ordinarily, opinion statements have absolute protection, and are non-actionable since they are 'not capable of being objectively characterized as true or false.'" *Mestecky v. N.Y.C. Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (quoting *Celle*, 209 F.3d at 178).

"Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Crowley*, 2021 WL 6033608, at *10 (quoting *Mann v. Abel*, 856 N.Y.S.2d 31, 32-33 (App. Div. 2008). In addition, "statements that are substantially true cannot be defamatory." *Id*. (citing *Tucker v. Wyckoff Heights Med*. Ctr., 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)); *Reus v. ETC Hous. Corp*., No. 532765, 164 N.Y.S.3d 692, 697 (App. Div. 2022) ("A defamation action is subject to an absolute defense that the alleged defamatory statements are substantially true"). "In New York, a statement need not be completely true, but can be substantially true, as when the overall 'gist or substance of the challenged statement' is true." *Chau*, 771 F.3d at 130 (quoting *Printers II, Inc.*

40

*v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 146–47 (2d Cir.1986)); *see Conti v. Doe*, 535 F. Supp. 3d 257, 272 (S.D.N.Y. 2021) ("[A] statement is 'substantially true' only if the statement 'would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" (quoting *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998)); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369 (1977); *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (1934)); *Fairley v. Peekskill Star Corp.*, 445 N.Y.S.2d 156 (App. Div. 1981).

###### i. There is a genuine dispute of material fact as to whether Anderson's comment that the Collaboration was "illegitimate" was defamatory

Anderson's statement that the Collaboration was "illegitimate" implies that no one at Defendants' business was aware of or authorized the Collaboration.   However, the record indicates that Mann spoke with Plaintiff's founder extensively about the Collaboration and indicated that upper management approved of the designs and gave Plaintiff permission to move forward.   (June 12–26 Mann-Fainlight Emails 5; July 17–July 22 Mann-Fainlight Emails 3–4.) Although Defendants argue that Mann's instructions were false, they do not dispute that he provided these instructions.   Accordingly, drawing all reasonable inferences in Plaintiff's favor, the instructions provide a factual basis for a reasonable jury to conclude that Plaintiff had a legitimate Collaboration with Defendants.   *See Conti,* 535 F. Supp. at 272 (denying summary judgment as to defamation claim because conflicting record evidence that "could have an entirely 'different effect on the mind of [a] reader'" creates a factual dispute (quoting *Jewell*, 23 F. Supp. 2d at 366)).   In addition, because Mann represented that the Collaboration was approved, a reasonable jury could also conclude that Anderson's statement was not substantially true.   *Jewell*, 23 F. Supp. 2d at 366 (explaining that a statement is "substantially true" only if the

statement "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.").

Accordingly, the Court denies Defendants' motion as to Plaintiff's defamation claim arising from Anderson's statement.

### ii. Plaintiff's recovery for any defamation damages are not limited to nominal damages

"New York law has long recognized that '[w]hen statements fall within' established categories of per se defamation, 'the law presumes that damages will result, and they need not be alleged or proven.'" *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011) (footnote omitted) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)); *Paravas v. Tran*, No. 21-CV-807, 2022 WL 718842, at *7 (S.D.N.Y. Feb. 22, 2022) ("Defamation per se . . . includes statements impugning the plaintiff's business reputation and special damages need not be pled."), *report and recommendation adopted*, 2022 WL 718587 (S.D.N.Y. Mar. 10, 2022); *Yesner v. Spinner*, 765 F. Supp. 48, 52 (E.D.N.Y. 1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se', and therefore actionable without any proof of special damages."); *see also Celle v. Filipino Rep. Enters.*, 209 F.3d 163, 179 (2d Cir. 2000) ("If a statement is defamatory per se, injury is assumed.").

Fainlight testified that after the allegedly defamatory statement, the valuation of Plaintiff decreased and "there was less [press] coverage and less excitement [about the Collaboration]." (Fainlight Declaration 277:14–278:21.)   Indeed, V Magazine removed the marketing video after Anderson's statement.   (Pl.'s Counter 56.1 ¶ 346.)   In addition, Anderson's statement, to the

extent the jury finds it to be defamatory at all, is per se defamatory because it "directly impugn[s] [P]laintiff's integrity, and allege[s] misconduct, unfitness, dishonesty and/or fraud in connection with [its] business." *Yesner*, 765 F. Supp. at 52. Anderson's words, construed in their natural meaning, could reasonably permit a jury to conclude that they are defamatory by disparaging Plaintiff in its trade, business or profession. Therefore, proof of special damages is not required as damage to the reputation of Plaintiff under such circumstances is presumed. *See Torain v. Clear Channel Broad., Inc*., 651 F. Supp. 2d 125, 152 (S.D.N.Y. 2009) (finding statements that give rise to per se liability for defamation obviate the need to prove special damages); *Yesner*, 765 F. Supp. at 52 (finding that the plaintiff need not establish damages as an element of his libel cause of action and his failure to do so does not require the granting of the defendant's motion for summary judgment because defendant's statements were per se libelous); *Gallo v. Montauk Video, Inc*., 684 N.Y.S.2d 817 (App. Div. 1998) (finding that libel per se may be alleged and proved by reference to extrinsic facts, and no special damages need be shown, since presumption of actual damage to reputation arises from the statement itself which entitles plaintiff to recover general damages); *Sachs v. Matano*, 22 N.Y.S.3d 310, 312–13 (Sup. Ct. 2015) (recognizing that words which have a tendency to disparage an individual, *inter alia*, with respect to his office, trade, or business are slanderous per se; as such, the law presumes that damages will result, so they need not be alleged or proven); *see also DeMartini v. DeMartini*, 833 F. App'x 128, 131 (9th Cir. 2020) (finding that defendants were not required to prove actual damages under California law on counterclaim for defamation, where defendants asserted both defamation per quod, for which actual damages were required to be proved, and defamation per se, for which

damages could be assumed).   Plaintiff has provided sufficient evidence of actual damages.

Accordingly, Plaintiff's recovery for defamation is not limited to nominal damages.

### iii.   Plaintiff cannot recover punitive damages

Defendants argue that Plaintiff cannot recover punitive damages for its defamation claims

because Plaintiff cannot establish that the alleged defamatory statements were made "out of

hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law

malice."[11]   (Defs.' Mem at 38.)

Plaintiff contends that it is entitled to punitive damages because Defendants made false

statements and did not correct them after Plaintiff revealed their communications with Mann.

(Pl.'s Opp'n at 34.)

"Under New York law, punitive damages in a defamation case are justified 'to punish a

person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for

another's rights.'"   *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005) (quoting *Prozeralik v.*

*Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479–80 (1993)).   "This is not automatically

satisfied by the requisite finding of 'actual malice' . . . [but] rather, it requires 'hatred, ill will,

spite, criminal mental state or that traditionally required variety of common-law malice.'"   *Id.*

(quoting *Prozeralik*, 82 N.Y.2d at 480); *Paravas*, 2022 WL 718842, at *9 ("To award plaintiff

punitive damages, the [c]ourt must find that plaintiff has established common law malice,

---

[11]   Punitive damages are not available under New York law for Plaintiff's promissory
estoppel or quasi-contract claims.   *Guobadia v. Irowa*, 103 F. Supp. 3d 325, 342 (E.D.N.Y.
2015) ("[U]nder New York law, punitive damages are unavailable for unjust enrichment claims
and other quasi-contract claims." (citing *Legurnic v. Ciccone,* 63 F. Supp. 3d 241, 249–51
(E.D.N.Y. 2014))).

showing by a preponderance of the evidence that the libelous statements were made out of hatred, ill will, or spite." (quoting *Daniels v. Kostreva*, 2017 WL 823583, at *13 (E.D.N.Y. Jan. 12, 2017))), *report and recommendation adopted*, 2017 WL 519227 (E.D.N.Y. Feb. 8, 2017); *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009) ("To be entitled to punitive damages, a defamation plaintiff must prove that the defendant acted, toward the plaintiff, with 'hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice.'" (quoting *Prozeralik*, 82 N.Y.2d at 479–80)).[12]

Plaintiff does not provide evidence that Anderson acted with hatred, ill will, and spite, and deliberately attempted to injure Plaintiff.   Plaintiff argues that Defendants made "a false charge, . . . not caring whether it was true or false."   *See* Pl.'s Opp'n (citing *Pecue v. West*, 233 N.Y. 316, 323 (1922) (recognizing that common law malice can be inferred when a defendant makes "a false charge, not caring whether it was true or false."))·)   However, Plaintiff does not point to evidence in the record from which a reasonable jury could find that Defendants acted with hatred, ill will, or spite toward Plaintiff.   Indeed, as described above, there is a genuine dispute as to whether Anderson was aware that her statements were false.   Plaintiff has not presented any evidence as to Anderson's state of mind when she made the alleged defamatory statement.   Given Plaintiff's failure to provide any evidence of Defendants' motivations for making the allegedly false statement, Plaintiff has failed to demonstrate common law malice. *See Unker v. Joseph Markovits, Inc.*, 643 F. Supp. 1043, 1048 (S.D.N.Y. 1986) ("Under New York law, punitive damages are recoverable in an action for libel or slander only upon proof that

---

[12]   No MKB opinion directly on point in re defamation and punitive damages.

45

the defendant was motivated by ill will or spite, or by a reckless disregard for the plaintiff's rights."); *Zaidi v. United Bank Ltd.,* 747 N.Y.S.2d 268, 276 (Sup. Ct. 2002) ("Common law malice is not concerned with a defendant's general feelings or past actions toward the plaintiff, or even exclusive falsity of the statement, but rather the defendant's motivation for making the alleged defamatory statement."); *cf Paravas*, 2022 WL 718842, at *9 (finding that the plaintiff sufficiently established that the defendant acted out of spite where defendant intentionally created a fake email account purporting to be plaintiff and sent a defamatory email meant to undermine her business credibility.).

Accordingly, the Court denies Plaintiff's claim for punitive damages as to its defamation claims.

### f.   Plaintiff's affirmative defenses

Defendants argue that sixteen of Plaintiff's affirmative defenses for (a) trademark abandonment and cancellation, (b) failure to state a claim, (c) statute of limitations, (d) waiver, (e) laches, (f) unclean hands, (g) acquiescence, (h) estoppel, (i) failure to mitigate, (j) trademark misuse, (k) descriptive fair use, (l) nominative fair use; (m) unjust enrichment, (n) no damages, (o) partnership or joint venture, and (p) comportment with cease-and-desist instruction fail as a matter of law.   Defendants argue that Plaintiff's theory of naked licensing, which it utilizes to support its trademark abandonment and cancellation affirmative defense fails as a matter of law "because the record contains no evidence — much less clear and convincing evidence — that (1) [Defendants] failed to control the quality of goods sold under its marks and (2) those marks therefore 'los[t] [their] significance' as an indicator of source."   (Defs.' Mem at 41.)   In

addition, Defendants point to an absence of evidence in support of Plaintiff's affirmative defenses for the other fifteen affirmative defenses.   (*Id.*)

Plaintiff argues that the July 2020 Decision made its Amended Answer the "operative pleading" and Defendants' failure to admit or deny the Amended Answer's allegations amounts to the admissions of those allegations, including its affirmative defenses, as a matter of law. (Pl.'s Opp'n 2–3.)   Plaintiff does not respond to the merits of Defendants' motion challenging its affirmative defenses.

### i.   Defendants responded to the operative pleading

Federal Rule of Civil Procedure 8(b)(1) requires a party to state "its defenses to each *claim* asserted against it; and admit or deny the *allegations* asserted against it."   Fed. R. Civ. P. 8(b); *Gabilly v. City of New York*, No. 19-CV-11884, 2021 WL 3667981, at *3 n.3 (S.D.N.Y. Aug. 17, 2021) ("Answers must only 'apprise the opponent of those allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable the plaintiff to prevail.'" (quoting Wright and Miller, 5 Fed. Prac. & Proc. Civ. § 1261 (3d ed. 2021))).   Rule 8(c)(1) provides that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."   Fed. R. Civ. P. 8(c); *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 199 (2d Cir. 2021) (same).   Rule 8(c) does not provide a similar responsive requirement as Rule 8(b).   *See* Fed. R. Civ. P. 8(b)–(c); *Tardif v. City of New York*, 302 F.R.D. 31, 36 (S.D.N.Y. 2014) (recognizing that "[r]ule 8(c) requires only that a defendant 'state' affirmative defenses . . . to give [the p]laintiff fair notice of the nature of the defenses (quoting Fed. R. Civ .P. 8(c))); *see also Bromfield v. Bronx Lebanon Special Care Ctr., Inc.*, No. 16-CV-10047, 2020 WL 7696003, at *5 (S.D.N.Y. Dec. 28, 2020).

"One of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice."   *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003); *Doubleday & Co., Inc. v. Curtis*, 763 F.2d 495, 503 (2d Cir. 1985) (recognizing that the purpose of requiring affirmative defenses to be pleaded in the answer is "to notify a party of the existence of certain issues.").   "Providing notice of an affirmative defense provides a plaintiff with 'the opportunity to rebut it.'"   *Walker v. Schult*, 463 F. Supp. 3d 323, 341 (N.D.N.Y. 2020) (quoting *Carnley v. Aid to Hosps., Inc.,* 975 F. Supp. 252, 254 (W.D.N.Y. 1997)).

On May 4, 2018, Plaintiff filed the SAC making it the operative pleading.   On April 22, 2019, Defendants filed an Answer to the operative pleading and Plaintiff filed an Amended Answer asserting counterclaims in response to Defendants counterclaims.   (Defs.' Answer; Pl.'s Am. Answer.)   On June 13, 2019, Defendants responded to Plaintiff's Amended Answer in a letter renewing its June 3, 2019 pre-motion conference request concerning Defendants' anticipated motion to strike Plaintiff's affirmative defenses and for judgment on the pleadings. (*See* Defs.' Letter dated June 13, 2019; Defs.' Second PMC Req. dated July 12, 2019; *see also* PMC Req dated June 3, 2019.)   The July 2020 Decision recognized that Plaintiff's counterclaims to Defendants' counterclaims were improperly asserted because "the Federal Rules of Civil Procedure do not contemplate a counterclaim to a counterclaim," (2020 WL 9816008, at *6 (quoting *Brooks v. Bates*, 781 F. Supp. 202, 207 (S.D.N.Y. 1991))), but that "a reply counterclaim is to be treated as a motion to amend the complaint under Rule 15(a)," (*id.* (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007), *aff'd,* 354 F. App'x 496 (2d Cir. 2009)))   The Court granted Plaintiff leave to amend the SAC

48

to assert its counterclaims for defamation.[13]   2020 WL 9816008, at *7.   However, Plaintiff neither filed an amendment to the SAC or the Amended Answer.   Thus, the SAC remains the operative pleading.

As required by Rule 8(b), Defendants replied to the operative pleading, the SAC.   *See* Fed. R. Civ. P. 8(b)–(c); *Bromfield*, 2020 WL 7696003, at *5.   Moreover, Defendants responded to both the SAC, and Plaintiff's Amended Answer.   (*See* Defs.' Answer; Defs.' Letter dated June 13, 2019; Defs.' Second PMC Req. dated July 12, 2019; *see also* PMC Req dated June 3, 2019.)   The Court addresses Plaintiff's affirmative defenses below.

### ii.   Trademark abandonment and cancellation through naked licensing, in relation to third parties

Plaintiff's Amended Answer alleges that because Defendants "expressly and/or implicitly authorized third parties to use [Defendants' Marks] but did not exercise the requisite control or supervision of those third parties' use thereof, [Defendants] abandoned those trademarks and they must be cancelled."[14]   (Am. Answer at 44.)

---

[13]   In the March 2020 Decision, the Court (1) struck Plaintiff's counterclaims to counterclaims and (2) struck Plaintiff's affirmative defenses for trademark abandonment and cancellation, express contract, implied-in fact contract, binding preliminary agreement, and implied-in-law contract.   2020 WL 9886308, at *8.   Plaintiff sought partial reconsideration of the March 2020 Decision and argued that the Court should construe the counterclaims to Defendants' counterclaims as a motion to amend.   (Pl.'s Response to Defs.' PMC Reqs 14; Pl.'s Mot. for Recons.; Pl.'s Mem. in Supp. of Pl.'s Mot.)   In the July 2020 Decision, the Court reversed portions of its prior decision and (1) granted Plaintiff leave to amend its pleading to assert defamation counterclaims; and (2) reinstated Plaintiff's affirmative defenses of implied in-law contract and trademark abandonment and cancellation in relation to third parties.   2020 WL 9816008, at *7–8, 13–14.

[14]   In the July 2020 Decision, the Court denied Plaintiff's motion to reconsider its prior decision granting Defendants' motion to strike Plaintiff's affirmative defense of trademark abandonment and cancellation in relation to Plaintiff.   *See LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2020 WL 9816008, at *9 (E.D.N.Y. July 24, 2020).

49

"[A]bandonment is not only an affirmative defense to an infringement action; it is a ground for cancelling a federally registered mark." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007) (citing 15 U.S.C. § 1064(3)).   "To establish the defense of abandonment, it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 110 (2d Cir. 2000) (citing *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985)); *Car-Freshner Corp. v. Just Funky LLC*, No. 19-CV-0289, 2019 WL 6270991, at *8 (N.D.N.Y. Nov. 25, 2019) ("An owner has abandoned a mark when (1) the owner's conduct causes the mark to become generic or lose significance, or (2) the owner intends to abandon the mark." (citing 15 U.S.C. § 1127)).   "Although a naked or uncontrolled license may provide the basis for an inference of abandonment of a trademark, a controlled licensing program will not." *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986) (first citing *Carl Zeiss Siftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 917–18 (S.D.N.Y. 1968), *modified on other grounds*, 433 F.2d 686 (2d Cir. 1970); and then citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)); *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 392 (S.D.N.Y. 2018) ("[I]t [is] unlawful for . . . a trademark owner to grant . . . a license to a licensee for the use of a mark without the retention of supervisory control," which is "called a naked license." (internal quotation marks omitted)); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596 (S.D.N.Y. 2010) ("A naked license is a license to use a trademark without sufficient quality control provided by the licensor[,]" which may result in the licensor being "deemed to have involuntarily abandoned the rights to the

mark." (citation and internal quotation marks omitted)); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007) ("Where a licensor retains no control over the nature or quality of goods or services provided in connection with the mark, . . . such naked licensing will result in abandonment." (internal quotation marks omitted) (citing *Dawn Donut Co., Inc.*, 267 F.2d at 367)).   "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark."   *Gen. Motors Corp*., 786 F.2d at 110; *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-CV-8459, 2018 WL 3364388, at *6 (S.D.N.Y. July 9, 2018) ("The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of products sold under the mark." (quoting *Can't Stop Prods., Inc*, 295 F. Supp. 3d at 393)).   A party asserting that it was granted a naked license faces "a high burden of proof."   *Patsy's,* 508 F. Supp. 2d at 212 (quoting *Warner Bros., Inc. v. Gay Toys, Inc*., 724 F.2d 327, 334 (2d Cir. 1983)); *see Fendi*, 689 F. Supp. 2d at 596 (quoting *Patsy's*, 508 F. Supp. 2d at 212).

Plaintiff has failed to produce any evidence proving its trademark abandonment through naked licensing affirmative defense.   The record does not indicate that Defendants' Marks have lost any significance.   *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 698 (S.D.N.Y. 2014) ("[N]aked licensing will lead to an abandonment of a mark only where the mark loses its significance." (quoting *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 265 (2d Cir. 2011))); *see also Dawn Donut Co. v. Hart's Food Stores, Inc*., 267 F.2d 358, 369 (2d Cir. 1959) (stating that any changes to a product in the retail market would not necessarily affect its

51

trademark rights in the wholesale market).   In addition, Plaintiff has not produced actual evidence of alleged backdated contracts that allow the alleged infringer to pay royalties to Defendants in order to continue to sell infringing goods.   Nor has Plaintiff demonstrated that if such alleged contracts do exist, that they are not a product of settlement measures similar to the relief offered to Plaintiff by Defendants.   (Pl.'s Resp. to Defs.' R. 56.1 Statement ¶ 446; *see* the Agreement.)   Moreover, Defendants have demonstrated that they maintain several contractual provisions through which they retain the right to control the nature and quality of goods or marketing bearing their Marks.   (*See* Pl.'s Resp. to Defs.' R. 56.1 Statement ¶ 464.)   Given the evidence of Defendants' comprehensive control mechanisms, Plaintiff's unsupported allegations that settlement agreements are equivalent to Defendants involuntarily abandoning rights to their Marks are insufficient to support a naked licensing theory.   *See Fendi Adele S.R.L.*, 689 F. Supp. 2d at 596 (denying naked licensing counterclaim where defendant failed to present actual evidence of back door dealings and the evidence demonstrated plaintiff's comprehensive quality control mechanisms); *Patsy's*, 508 F. Supp. 2d at 212–13 (denying naked licensing claim where defendant failed to meet "high burden of proof" required for the claim and plaintiff restaurant testified that it routinely and regularly performed quality inspections of their franchise locations, operated franchises like a "regular Patsy's Pizzeria, and taste-tested the pizza).   Thus, this affirmative defense fails as a matter of law.

### iii.   Failure to state a claim for trademark counterfeiting, infringement, unfair competition, dilution, and unfair and deceptive trade practice

Plaintiff's Amended Answer alleged that "[Defendants'] Counterclaim Section fails to state claims against [Plaintiff] upon which the Court can grant relief such that [Defendants']

Counterclaims must be dismissed." (Pl.'s Am. Answer at 42.) Defendants asserted

counterclaims for " counterfeiting, trademark infringement, unfair competition, dilution, and

unfair and deceptive trade practice[] in violation of the . . . Lanham Act . . . and New York

statutory and common law." (Defs.' Am. Ans. 42.) Plaintiff did not specify which

counterclaims fail. However, Defendants have made sufficient allegations to state federal

counterclaims for trademark counterfeiting, infringement and unfair competition and New York

statutory and common law counterclaims for trademark infringement, unfair competition, and

dilution. Defendants have not done so as to their counterclaim for unfair and deceptive trade

practice under GBL § 349.

### 1. Trademark counterfeiting, infringement and unfair competition

To state a claim for trademark counterfeiting (section 1114), infringement (section 1114)

and unfair competition (section 1125(a)) under the Lanham Act, a movant must allege sufficient

facts to establish that "(1) 'it has a valid mark that is entitled to protection' and that (2) the

defendant's 'actions are likely to cause confusion with [that] mark.'" *Tiffany & Co. v. Costco

Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (alteration in original) (quoting *Sports Auth.,

Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)); *Nike, Inc. v. B&H Customs Servs.,

Inc.*, 565 F. Supp. 3d 498, 506 (S.D.N.Y. 2021) (recognizing that trademark counterfeiting,

trademark infringement, and unfair competition, are analyzed under the same standard); *see

Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216-17 (2d

Cir. 2012) (recognizing that trademark infringement claims are analyzed in two stages: "'[f]irst

[courts] look to see whether plaintiff's mark merits protection' . . . [s]econd. . . [courts] must

then determine 'whether [the infringer's] use of a similar mark is likely to cause consumer confusion.'" (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006))); *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (noting that trademark infringement claims under Lanham Act sections 1114(1) and 1125(a) are analyzed under the same test); *Chanel, Inc. v. RealReal, Inc*., 449 F. Supp. 3d 422, 435 (S.D.N.Y. 2020) ("Courts analyze trademark infringement claims under a two-step test that asks, 'first whether the mark "merits protection" and, second, whether the allegedly infringing use of the mark (or a similar mark) is "likely to cause consumer confusion."'" (quoting *Victorinox AG v. B&F Sys., Inc*., 709 F. App'x 44, 47 (2d Cir. 2017)); *see also 1-800 Contacts, Inc. v. WhenU.Com, Inc*., 414 F.3d 400, 406–07 (2d Cir. 2005) (applying the same legal standard to analyze trademark infringement claims under sections 1114 and 1125).   As to the second prong, "[w]hen an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law."   *L & L Wings, Inc. v. Marco-Destin, Inc*., 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) (citing *Ryan v. Volpone Stamp Co*., 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000)); *see also Bowmar Instrument Corp. v. Cont'l Microsystems, Inc*., 497 F. Supp. 947, 959 (S.D.N.Y. 1980) (holding that continued use of a mark after termination of a license constitutes trademark infringement).   This is because,"[i]n such situations, confusion is almost inevitable [as] consumers have already associated the formerly licensed infringer with the trademark owner."   *Id.* (citing *Volpone Stamp*, 107 F. Supp. 2d at 399).

Defendants allege that its Marks are entitled to protection.   (Defs.' Am. Ans. 57–58.) Defendants' Amended Answer states that it owns numerous trademark registrations for its Marks covering apparel and accessories.   (*Id.* at 50, 54); *see Adidas Am., Inc. v. Thom Browne Inc.,* No.

54

21-CV-5615, 2022 WL 1185605, at *4 (S.D.N.Y. Apr. 21, 2022) ("'A certificate of registration with the [United States Patent and Trademark Office],' like those asserted in the [Amended Answer] 'is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce.'" (quoting *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999))); *adidas America Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 752 (9th Cir. 2018) ("adidas is also known for its Three-Stripe mark, which has been featured on its products for many years as part of its branding strategy and for which it owns federal trademark registrations."). Defendants also allege that Plaintiff's use of its Marks will likely cause consumer confusion. The Court previously found that "Plaintiff's implied license to use Defendants' trademark [ended] as of May 1, 2015." (Mar. 29, 2019 M&O 12–14.) In addition, it is undisputed that Plaintiff continued to use Defendants' Marks after its license expired. (Pl.'s Resp. to Defs.' R. 56.1 Statement ¶ 452.) In its Amended Answer, Defendants provide several examples of clothing from Plaintiff's athletic wear line that are alleged to be infringing. (Defs.' Am. Ans. 45–46, 55.) Plaintiff's continued use of Defendants' Marks after termination of its license is likely to cause confusion because consumers have already associated the formerly licensed infringer with the trademark owner.[15] *Bowmar Instrument Corp.*, 497 F. Supp. at 959;

---

[15] Under New York common law, the standards for trademark infringement and unfair competition are "virtually identical" to the standard under the Lanham Act, "except that [New York law] requires an additional showing of bad faith." *Lopez v. Adidas Am., Inc.*, No. 19-CV-7631, 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020) (quoting *TechnoMarine SA v. Jacob Time, Inc.*, 2012 WL 2497276, at *5 (S.D.N.Y. June 22, 2012)). In addition, "under New York law, the use of a counterfeit mark establishes a presumption of bad faith." *Gym Door Repairs,*

*see Gym Door Repairs, Inc. v. Young Equip. Sales, Inc*., 206 F. Supp. 3d 869, 903 (S.D.N.Y. 2016) (stating that the complaint was sufficient to withstand the motion to dismiss because it "provide[d] examples of particular, allegedly infringing conduct"); *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 51 (S.D.N.Y. 2015) (finding that the plaintiff sufficiently alleged its unfair competition claim by attaching to its complaint "non-exhaustive" examples of infringing items of clothing).

## 2.   Trademark dilution

To state a claim for trademark dilution under the Lanham Act, a party must allege that "(1) its mark is famous; (2) the defendant's use of the mark is made in commerce; (3) the defendant used the mark after the mark was famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment."   *See* 15 U.S.C. § 1125(c)(2)(B); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc*., 588 F.3d 97, 105 (2d Cir. 2009); *Adidas Am.*, 2022 WL 1185605, at *6; *accord Savin Corp. v. Savin Grp.*, 391 F.3d 439, 448 (2d Cir. 2004).

Defendants allege that its Marks are famous, that Plaintiff, "without authorization from [Defendants], sourced, distributed, marketed, promoted, offered for sale, and sold apparel and accessories bearing [Defendants'] Marks after the Marks were famous; and thus diluted the Marks.   (Defs.' Am. Ans. 42–46, 50.)   These allegations are sufficient to state a counterclaim for trademark dilution.   *See Adidas Am., Inc*., 2022 WL 1185605, at *6 (recognizing a list of

---

*Inc. v. Young Equip. Sales, Inc*., 206 F. Supp. 3d 869, 901 (S.D.N.Y. 2016) (citing *Malletier v. Dooney & Bourke, Inc*., 340 F. Supp. 2d 415, 436-37 (S.D.N.Y. 2004)).

56

non-exhaustive factors to determine likelihood of dilution and finding that the plaintiff stated a claim for dilution where the complaint pled "that the adidas Three-Stripe Mark is famous . . ., [the defendant] s[old] clothing with the infringing mark in commerce[,] that such commerce began long after the Three-Stripe Mark became famous[,] . . . and likelihood of dilution . . [because] there [were] similarities between adidas' Three-Stripe Mark and [the defendant's] use of stripes").[16]

### 3.   Unfair and deceptive trade practice

General Business Law section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."   N.Y. Gen. Bus. Law § 349.   To assert a claim, "a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result."   *Electra v. 59 Murray Enters., Inc*., 987 F.3d 233, 258 (2d Cir. 2021) (quoting *Spagnola v. Chubb Corp*., 574 F.3d 64, 74 (2d Cir. 2009)).[17]   "[T]he prevailing view in the Second Circuit is that 'trademark . . . infringement claim[s] are not cognizable under [section] 349 unless there is specific and substantial injury to the public interest over and above

---

[16]   "To establish a trademark dilution claim under New York law, [a plaintiff] must show ownership of a distinctive mark and a likelihood of dilution [by either blurring or tarnishment]."   *Empresa Cubana del Tabaco v. Culbro Corp*., 399 F.3d 462, 485–86 (2d Cir. 2005) (citing *Sports Auth., Inc. v. Prime Hosp. Corp*., 89 F.3d 955, 966 (2d Cir. 1996)); *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014).   New York law does not require the mark to be "famous."   *Kaplan, Inc.*, 16 F. Supp. 3d at 352.   Defendants' Amended Answer satisfies the New York dilution elements as it does the federal dilution elements.

[17]   Source: *Chung v. Igloo Prod. Corp*., No. 20-CV-4926, 2022 WL 2657350, at *7 (E.D.N.Y. July 8, 2022).

57

the ordinary trademark infringement.'"   *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887

F. Supp. 2d 519, 543 (S.D.N.Y. 2012) (second and third alterations in original) (quoting

*MyPlayCity, Inc. v. Conduit Ltd.*, No. 10-CV-1615, 2012 WL 1107648, at *15 (S.D.N.Y. Mar.

30, 2012)); *see also Kaplan, Inc.*, 16 F. Supp. 3d at 352–53 (collecting cases holding that

trademark infringement is outside the scope of section 349).

Defendants state that "[t]he public is likely to be damaged as a result of [Plaintiff]'s

deceptive trade practices or acts [and] [Plaintiff]'s conduct is causing irreparable injury to

[Defendants] and to its goodwill and reputation," (Defs.' Am. Ans. 61.)   These allegations are

insufficient to state a counterclaim because Defendants have not alleged specific and substantial

injury to the public interest over and above the ordinary trademark infringement.   *See Perfect*

*Pearl Co.*, 887 F. Supp. 2d at 542 (recognizing that "the public harm that results from trademark

infringement is too insubstantial to satisfy the pleading requirements of [section] 349") (internal

quotation marks omitted); *see, e.g.*, *Shandong Shinho Food Indus. Co. v. May Flower Int'l, Inc.*,

521 F. Supp. 3d 222, 263 (E.D.N.Y. 2021) (dismissing the plaintiff's unfair and deceptive trade

practice claim where the plaintiff did not allege that the defendants' conduct resulted in injury to

consumers because consumer confusion is insufficient to state a claim under NYGBL section

349); *Solid 21, Inc. v. Richemont N. Am., Inc.*, No. 19-CV-1262, 2020 WL 3050970, at *8

(S.D.N.Y. June 8, 2020) (granting motion to dismiss section 349 claim because, "[w]hile the

[plaintiff] alleges facts showing that [the d]efendants' references to 'Red Gold' could mislead a

consumer, the [plaintiff] does not allege facts that give rise to the inference that consumer

confusion would affect the public health or interest").

Thus, the Court grants Defendants' motion as to Plaintiff's affirmative defense for failure to state a claim regarding Defendants' counterclaims for trademark infringement, unfair competition, and dilution.   The Court denies Defendants' motion as to Plaintiff's affirmative defense for failure to state a claim regarding Defendants' counterclaim for unfair and deceptive trade practice.

### iv.   Statute of limitations

Plaintiff's Amended Answer alleged that "[Defendants'] claims are barred in whole or in part by the applicable statute of limitations."   (Pl.'s Am. Answer at 42.)   Plaintiff does not specify which of Defendants' counterclaims are subject to a statute of limitations.

Nevertheless, Defendants' counterclaims for violations of N.Y. Gen. Bus. Law § 349 is subject to a three-year statute of limitations period and therefore is not time barred.   *See Greenlight Cap., Inc. v. GreenLight (Switzerland) S.A.,* No. 04-CV-3136, 2005 WL 13682, at *7 (S.D.N.Y. Jan. 3, 2005) ("New York common law unfair competition and N.Y. Gen. Bus. Law §[] 349 . . . claims are subject to a three-year statute of limitations set forth in N.Y. C.P.L.R. § 214(2)."). "[T]rademark infringement and trademark dilution are continuing torts and so give rise to a fresh cause of action so long as the wrong persists."   *Hester Indus., Inc. v. Tyson Foods, Inc.*, No. 94-CV-391, 1995 WL 113939, at *5 (N.D.N.Y. Jan. 30, 1995) (first citing *R. G. Barry Corp. v. Mushroom Makers,* 436 N.Y.S.2d 927, 930 (Sup. Ct. 1981), *aff'd*, 444 N.Y.S.2d 922 (App. Div. 1981), then citing *De Medici v. Lorenzo De Medici, Inc.,* 475 N.Y.S.2d 391, 393 (App. Div. 1984)); *Thurber v. Finn Acad.: An Elmira Charter Sch.*, No. 20-CV-6152, 2022 WL 303795, at *7 (W.D.N.Y. Feb. 2, 2022) (collecting cases); *Greenlight Cap.*, 2005 WL 13682, at *7 ("[I]t is settled that trademark infringement is a continuing tort.").   Plaintiff marketed and

sold merchandise from the Collaboration until at least August of 2018.   Therefore, Defendants'

compulsory counterclaims filed on April 29, 2019 were timely and this affirmative defense fails

as a matter of law.   *See Classic Liquor Imps., Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 440

(S.D.N.Y. 2016) ("[T]rademark infringement is generally a compulsory counterclaim in the

context of a declaratory action for non-infringement.").

### v.   Waiver

Plaintiff's Amended Answer alleged that "[Defendants'] claims are barred in whole or in

part due to waiver."   (Pl.'s Am. Answer at 43.)   Waiver is "an intentional relinquishment of a

known right with both knowledge of its existence and an intention to relinquish it."   *In re

Cohen*, 422 B.R. 350, 380 (E.D.N.Y. 2010) (citation omitted).   Plaintiff did not specify which of

Defendants' counterclaims were waived and the Court therefore strikes this affirmative defense.

*See Kochan v. Kowalski*, 478 F. Supp. 3d 440, 454 (W.D.N.Y. 2020) (finding that waiver of

affirmative defense was not plausibly asserted and striking it because the party that asserted it

did not offer any explanation for how it applied nor could the court discern any such basis from

the allegations set forth in the amended complaint); *Walters v. Performant Recovery, Inc*., 124 F.

Supp. 3d 75, 80–81 (D. Conn. 2015) (determining that a waiver affirmative defense that is a

"bald legal conclusion, devoid of any facts" fails because it precludes the party it was asserted

against from "properly tailor[ing] her discovery and motion practice as the case progresses");

*Coach Inc. v. Kmart Corps*., 756 F. Supp. 2d 421, 428 (S.D.N.Y. 2010) (concluding that a bare

allegation of waiver prevented the court from finding a "question of fact or law that might allow

a waiver defense to succeed" and was thus "insufficient as a matter of law"); *see also Shaub &

Williams, L.L.P. v. Augme Techs., Inc.*, No. 13-CV-2202, 2014 WL 625390, at *9 (S.D.N.Y. Feb.

14, 2014) (striking affirmative defense of waiver where Defendant "ha[d] not alleged any fact supporting the assertion").

### vi. Laches

Plaintiff's Amended Answer alleged that "[Defendants'] claims are barred in whole or in part pursuant to the doctrine of laches."   (Pl.'s Am. Answer at 43.)   Plaintiff did not specify which claims were subject to the doctrine of laches.   "Laches will bar a [party's] claim when [the opposing party] has been prejudiced by [the party's] unreasonable delay in bringing suit." *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 29 (2d Cir. 2013)).

Defendants are entitled to summary judgment as to Plaintiff's laches defense because, among other reasons, Defendants pursued their counterclaims within the applicable six-year period of limitations.   *See Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co*., 897 F.3d 413, 419 (2d Cir. 2018) ("While the Lanham Act includes no specific statute of limitations, in evaluating a laches defense to trademark infringement in a New York suit, we analogize to New York's six-year statute of limitations for fraud claims."); *Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 7-CV-2933, 2008 WL 84541, at *2 (S.D.N.Y. Jan. 8, 2008) ("Prior to the running of the [six-year statute of limitations period] there is no presumption of laches. . . ." (citation omitted and alteration in original)).   Plaintiff adduces no evidence that Defendants unreasonably delayed in bringing suit or that Plaintiff was prejudiced, thus, this affirmative defense fails as a matter of law.   *See Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Rd. Dawgs, Inc*., 679 F. Supp. 2d 259, 283 (N.D.N.Y. 2009) (denying laches defense where the record established that the defendant did not show that they suffered any real harm or

prejudice because of the plaintiff's delay in asserting their rights over their trademark); *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 703 (2d Cir. 1970).

### vii.  Unclean hands

Plaintiff's Amended Answer alleged that "[Defendants'] claims are barred in whole or in part due to their unclean hands."   (Pl.'s Am. Answer at 43.)   The doctrine of unclean hands allows a court to deny relief to a party which has entered litigation in bad faith.   *See Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 243 (1933).   The burden of proof on this claim rests with the party invoking the defense.   *Perfect Pearl*, 887 F. Supp. 2d at 546; *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999).   Plaintiff has not provided any evidence to support a claim that Defendants initiated this litigation in bad faith.   Thus, this affirmative defense fails as a matter of law.

### viii.  Acquiescence and estoppel

Plaintiff's Amended Answer alleged that "[Defendants'] claims are barred in whole or in part by the doctrine[s] of estoppel. . . . [and] acquiescence."   (Pl.'s Am. Answer at 43–44.)

The Court addressed Plaintiff's estoppel claim above.   *See Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) (recognizing that equitable estoppel is "properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct"); *Coach*, 756 F. Supp. 2d at 426 ("[I]t is an essential element of estoppel 'that the party who invokes it shall have acted to his detriment in reliance upon what the other party had done.'" (quoting *Helvering v. Schine Chain Theaters*, 121 F.2d 948, 950 (2d Cir. 1941))); *see also Telectronics Proprietary,*

*Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 841 (S.D.N.Y. 1988) (striking estoppel defense on the ground that "the word 'estoppel' without more is not a sufficient statement of a defense").

"Acquiescence is implied by active consent, which is 'conduct on the plaintiff's part that amount[s] to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.'" *Fendi Adele S.R.L. v. Ashley Reed Trading, Inc.*, No. 06-CV-243, 2010 WL 571804, at *8 (S.D.N.Y. Feb. 16, 2010) (quoting *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F. Supp .2d 466, 472 (S.D.N.Y. 2003)). "To prove acquiescence, a [party asserting this affirmative defense] must demonstrate that the [trademark owner] actively consented. Active consent means 'conduct on the [trademark owner's] part that amount[s] to an assurance to the [party asserting this affirmative defense], express or implied, that the [trademark owner] would not assert his trademark rights against the [party asserting this affirmative defense]." *Fendi Adele, S.R.L.*, 507 F. App'x at 29 (quoting *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002)). Plaintiff has failed to show that Defendants represented that they would not assert a trademark claim against Plaintiff or that Plaintiff was prejudiced by this assurance. Thus, this defense fails as a matter of law. *See Fendi Adele S.R.L.*, 2010 WL 571804, at *8 (granting summary judgment where party asserting affirmative defense did not show how opposing party "actively represented" that it would not assert a claim); *Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 365 (S.D.N.Y. 2008) (striking affirmative defense for acquiescence where the party asserting the affirmative defense had not shown how it is prejudiced by the delay beyond simply asserting that it relied on opposing party's assurances that it would assert a right or claim).

63

ix.   **Failure to mitigate**

Plaintiff's Amended Answer alleged that "[Defendants] failed to mitigate their damages, if any."   (Pl.'s Am. Answer at 43.)   A failure to mitigate defense "is most commonly applied in breach of contract and tort actions."   *Coach*, 756 F. Supp .2d at 430 n.5.   Nevertheless, even assuming this defense is relevant, Plaintiff has not shown that Defendants' mitigation efforts were unreasonable.   After Plaintiff marketed the Collaboration, Defendants requested that Plaintiff remove its "provocative" marketing video, (November 21 Mann-Fainlight Emails), and stop selling merchandise, (*id.*).   Plaintiff nevertheless continued to promote and sell items from the Collaboration and manufactured pieces from both Capsules to fill previously obtained sales orders.   (SAC Compl. ¶¶ 90–91.)   Plaintiff continued to market and sell the Collaboration products until it received Defendants' cease-and-desist letter in August of 2018.   (Pl.'s Counter 56.1 ¶ 452.)   Defendants' chosen mitigation strategy was well within the bounds of reason. *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 180 (E.D.N.Y. 2016) (granting summary judgment on failure to mitigate defense where party defending affirmative defense launched a confidential investigation and waited a month before alerting plaintiff that it was aware of its alleged counterfeiting).   Thus, this defense fails as a matter of law.

x.   **Trademark misuse**

Plaintiff's Amended Answer alleged that "[Defendants] ha[ve] used their trademark registrations, if still valid, to improperly and unfairly promote a monopoly, restrict competition, and for other impermissible purposes; therefore, [Defendants] should be denied enforcement of any purported rights therein."   (Pl.'s Am. Answer at 44.)   "To the extent that courts in [the

64

Second Circuit] recognize trademark misuse as an independent defense, they have held that it requires a showing that the plaintiff has used its trademark in violation of anti-trust laws." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 245 (S.D.N.Y. 2012).   "Courts in other circuits have found that this defense is duplicative and unnecessary where defendants plead the defense of unclean hands." *Id.*   Plaintiff has not alleged that Defendants violated anti-trust laws and also pled the unclean hands defense.   Thus, this defense fails as a matter of law.

### xi.   Descriptive fair use

Plaintiff's Amended Answer alleged that "[Plaintiff]'s use of [Defendants' Marks], in whole or in part, constitutes descriptive fair use for which [Defendants] cannot hold [Plaintiff] liable."   (Pl.'s Am. Answer at 44.)   To prevail on such a defense, a plaintiff must show that it used the defendants' Marks "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith."   *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (citations omitted).   "The purpose of the fair use defense is to 'permit[] others to use a protected mark to describe aspects of their own goods.'"   *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 431 (S.D.N.Y. 2018) (*quoting Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006)).   Plaintiff has failed to provide evidence to indicate that it used Defendants' Marks in a "descriptive sense."   *Id.*   Thus, this defense fails as a matter of law.

### xii.   Nominative fair use

Plaintiff's Amended Answer alleged that "[Plaintiff]'s use of [Defendants' Marks], in whole or in part, constitutes descriptive fair use for which [Defendants] cannot hold [Plaintiff]

liable."[18]   (Pl.'s Am. Answer at 44–45.)   The Second Circuit held that "nominative fair use" is not a cognizable affirmative defense.   *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 167 (2d Cir. 2016).   Thus, this defense fails as a matter of law.

### xiii.   Unjust enrichment, no damages, partnership or joint venture, and comportment with cease-and-desist instruction

Plaintiff's Amended Answer alleged that "(1) [Defendants] would be unjustly enriched if allowed to recover on their Counterclaims;" (2) "[Defendants] suffered no damages on account of [Plaintiff]'s conduct;" (3) "[Plaintiff] and Defendants entered a partnership or joint venture pursuant to which [Plaintiff]'s conduct was authorized by [Defendants];" and (4) "[Defendants] first instructed [Plaintiff] to cease and desist in its conduct in July 2018, and [Plaintiff] timely complied with those instructions."   (Pl.'s Am. Answer at 44–46.)   Plaintiff provides no evidence or citations to prove these defenses.   In addition, the record demonstrates that Defendants requested that Plaintiff remove its "provocative" marketing video, and stop selling merchandise in November of 2014.   (November 21 Mann-Fainlight Emails.)   Plaintiff nevertheless continued to promote and sell items from the Collaboration for nearly four years thereafter — until it received Defendants' cease-and-desist letter in August of 2018.   (Pl.'s Counter 56.1 ¶ 452.)   Thus, these defenses fail as a matter of law.

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's affirmative defenses for: (a) trademark abandonment and cancellation, (b) failure to state a claim — as to Defendants' counterclaims for trademark counterfeiting, infringement, unfair

---

[18]   Plaintiff appears to recite the language for descriptive fair use when asserting its affirmative defense for normative fair use.

competition, and trademark dilution, (c) statute of limitations, (d) waiver, (e) laches, (f) unclean hands, (g) acquiescence, (h) estoppel, (i) failure to mitigate, (j) trademark misuse, (k) descriptive fair use, (l) nominative fair use; (m) unjust enrichment, (n) no damages, (o) partnership or joint venture, and (p) comportment with cease-and-desist instruction.   The Court denies Defendants' motion for summary judgment as to Plaintiff's affirmative defense of failure to state a claim regarding Defendants' unfair and deceptive practice counterclaim.

> **g.   Plaintiff abandons its defenses to Defendants' trademark infringement and counterfeiting counterclaims**

Defendants argue that the Court should grant them summary judgment as to their counterclaims for trademark infringement and counterfeiting.   In support, they argue that Plaintiff violated the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) by continuing to use Defendants' "famous Three-Stripe Mark" for more than three years after "Adidas's attorneys demanded [Plaintiff] cease all use and proposed a retroactive license for the prior use."   (Defs.' Mem. 39.)   In addition, Defendants assert that Fainlight should be personally liable for Plaintiff's trademark infringement of Defendants' Three-Stripe Mark because "Fainlight is and has always been [Plaintiff]'s owner, sole member, sole employee, and, by his own admission, the sole person responsible for [Plaintiff]'s decision to continue displaying, offering for sale, and selling products bearing [Defendants' Marks] after May 1, 2015."   (*Id.* at 40.)   Defendants also argue that Plaintiff's defense of naked licensing fails as a matter of law "because the record contains no evidence — much less clear and convincing evidence — that (1) Adidas failed to control the quality of goods sold under its marks and (2) those marks therefore 'los[t] [their] significance' as an indicator of source."   (Defs.' Mem at 41.)

Plaintiff does not dispute Defendants' trademark and counterfeiting counterclaims in its

67

memorandum in opposition to Defendants' motion.   (*See generally* Pl.'s Opp'n; Defs.' Reply at

17–18.)   Plaintiff did not respond to Defendants' trademark infringement, counterfeiting, or

naked licensing arguments and therefore has abandoned its defense of these claims.

   "Where a partial response to a motion [for summary judgment] is made — *i.e.*,

referencing some claims or defenses but not others . . . in the case of a counseled party, a court

may, when appropriate, infer from a party's partial opposition that relevant claims or defenses

that are not defended have been abandoned."   *Dynamic Concepts, Inc. v. Tri-State Surgical*

*Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) (alteration in original) (quoting *Jackson*

*v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014)); *Colbert v. Rio Tinto PLC*, 824 F. App'x.

5, 11 (2d Cir. 2020) ("[D]istrict courts frequently deem claims abandoned when counseled

plaintiffs fail to provide arguments in opposition[,]" a practice that has been "expressly approved

. . . in the context of summary judgment motions[.]"); *accord Kovaco v. Rockbestos-Surprenant*

*Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (finding that claims were deemed abandoned

where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary

judgment" while arguing against the motion as to his other claims); *see also Ziming Shen v. City*

*of New York*, 725 F. App'x 7, 17 (2d Cir. 2018) (affirming the district court's finding that the

plaintiff abandoned claims that she did not address in her opposition to summary judgment);

*Zsuffa v. Britt Realty, LLC*, No. 18-CV-05719, 2022 WL 837025, at *2 (E.D.N.Y. Mar. 21,

2022) ("A party abandons a claim in the context of a summary judgment motion when she does

not respond to arguments concerning that claim." (quoting *Bryant v. Steele*, 462 F. Supp. 3d 249,

270 (E.D.N.Y. 2020))); *Curry v. Keefe*, No. 18-CV-208, 2021 WL 1087444, at *6 (D. Vt. Mar.

22, 2021) ("Federal courts may deem a claim abandoned when a party moves for summary

judgment on one claim and the party opposing summary judgment fails to address the argument in any way." (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003))).

While Plaintiff did not formally withdraw its defenses as to Defendants' trademark and counterfeiting counterclaims, it does not mention these counterclaims nor respond to Defendants' arguments in support of summary judgment.   (*See generally* Pl.'s Opp'n.)   Accordingly, the Court grants Defendants' summary judgment as to its trademark infringement and counterfeiting counterclaims.   *See Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) ("Even '[w]here abandonment by a counseled party is not explicit,' a court may infer abandonment 'from the papers and circumstances viewed as a whole.'" (quoting *Jackson*, 766 F.3d at 196)); *see also Colbert*, 824 F. App'x at 11; *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267–68 (E.D.N.Y. 2009) (collecting cases and stating that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way" (quoting *Taylor*, 269 F. Supp. 2d at 75)).

### III.   Conclusion

For the forgoing reasons, the Court (1) denies Defendants' motion as to Plaintiff's promissory estoppel claim for two promises and Plaintiff's defamation claim; (2) grants Defendants' motion as to Plaintiff's quasi-contract claims; (3) grants Defendants' motion as to fifteen of Plaintiff's affirmative defenses, but denies Defendants' motion as to Plaintiff's failure

to state a claim defense regarding Defendants' unfair and deceptive practice counterclaim; and

(4) grants Defendants' motion as to its counterclaims for trademark infringement and

counterfeiting.

Dated:   September 24, 2022
          Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge